UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

IN RE:

Crapp Farms Partnership                           Case No. 17-11601
                                                  Chapter 11
            Debtor.

**BMO HARRIS BANK, N.A.'S OMNIBUS OBJECTION TO (I) DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION; (II) DEBTOR'S MOTION FOR AN ORDER: (i) AUTHORIZING PAYMENT OF EMPLOYEE WAGE OBLIGATIONS, PAYROLL TAXES, AND EXPENSE REIMBURSEMENTS; (ii) AUTHORIZING MAINTAINING AND HONORING EMPLOYEE BENEFIT PROGRAMS; AND (iii) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS; (III) DEBTOR'S MOTION FOR AN ORDER AUTHORIZING USE OF PREPETITION BANK ACCOUNTS AND BUSINESS FORMS; AND (IV) DEBTOR'S MOTION FOR AN ORDER AUTHORIZING PAYMENT OF PREPETITION SALES, USE AND OTHER TAXES, FEES AND GOVERNMENT CHARGES**

BMO Harris Bank, N.A. ("**BMO**") and BMO Harris Equipment Finance Company ("**BMO Leasing**"), by their attorneys Axley Brynelson LLP by David M. Pelletier hereby object to the Debtor's Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection ("**Cash Collateral Motion**"); Debtor's Motion for an Order: (i) Authorizing Payment of Employee Wage Obligations, Payroll Taxes, and Expense Reimbursements; (ii) Authorizing Maintaining and Honoring Employee Benefit Programs; and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers ("**Prepetition Wage Motion**"); Debtor's Motion for an Order Authorizing Use of Prepetition Bank Accounts and Business Forms ("**Prepetition Account Motion**"), and; Debtor's Motion for an Order Authorizing Payment of Prepetition Sales, Use and Other Taxes, Fees and Government

Charges ("**Prepetition Tax Motion**") (altogether the "**First Day Motions**") upon the grounds set forth herein below, and represent as follows:

### Preliminary Statement

1.  What is most telling from Debtor's First Day Motions is the motion that was not filed. The Debtor, Crapp Farms Partnership ("**Debtor**"), has not requested approval of a debtor-in-possession loan to plant 2017 crops (nor has Debtor proposed a DIP loan to finance its cattle and pig operations). This is not for want of trying on the part of the Debtor to obtain a crop input loan for 2017. The Debtor, its related entities, and the Crapps themselves have feverishly sought financing to plant 2017 crops in the 2,200 acres owned by Debtor (previously owned by Crapp Land, LLC) and the approximately 10,000 acres rented by Debtor. All conventional sources of any such financing have dried up. The Debtor previously struggled in 2016 to obtain input financing for crops based on its historic poor financial performance, and was forced to settle for a high interest rate loan. When it failed to timely pay back its 2016 crop lender, the Debtor found no ready sources for 2017 crop inputs.

2.  Assuming that there was any time left to obtain financing to plant a crop, at this point it appears that the Debtor's only potential financing sources are so-called lenders of last resort who charge exorbitant interest rates and expect a pound of flesh in return. Recently, the Debtor presented BMO with a DIP financing proposal from a third-party lender to finance 2017 crop inputs which proposed a loan of $9 million with a minimum interest rate of 11% and granted the DIP lender a first lien position on all of Debtor's assets ahead of BMO and other creditors. The terms suggested that, while the Debtor was predicted to lose money on its crops in 2017, the proposed DIP lender would make millions from the transaction, and leave other creditors, including BMO, with a shortfall that would never be satisfied. The Debtor has

apparently abandoned that dangerous proposal. Even if Debtor was somehow able to come to this Court with a new proposal (which seems unlikely at this late date), what is obvious from the Debtor's past performance (and the Debtor's own 2017 projections) is that the Debtor will lose money by continuing to operate and that the only parties that would gain from any such continued operation would be the DIP lender earning excessive interest on its loan and Debtor's landlords. The Debtor has nothing to gain by planting a crop in 2017, and the Debtor and BMO will suffer additional losses if Debtor is allowed to continue operating.

3. By its instant bankruptcy filing, the Debtor is hoping to delay for the purpose of locating a DIP lender to finance the 2017 crops. The Debtor either has already or will shortly run out of time. Realistically the Debtor has until the end of May to plant a crop to obtain full crop insurance.[1] In the meantime, Debtor seeks use of BMO's cash collateral to operate its cattle and pig farming operations. The Debtor has failed to meet its burden to establish that it should be entitled to dissipate BMO's cash collateral for any period of time, and Debtor's adequate protection proposal is wholly inadequate.

4. The Debtor and several related entities are obligated to BMO on notes with a total payoff on all obligations as of May 3, 2017 ("**Petition Date**"), of more than $29,067,310.42.[2] Most of this payoff relates to loans that matured on January 31, 2017, more than 90 days ago. The obligations of the Debtor to BMO are secured by first position mortgages on all real property now owned by Debtor and by a first position security interest (subject to certain purchase money interests and a subordination to Commodity Credit Corporation on 2016 crops)

---

[1] According to the United States Department of Agriculture/Risk Management Office, the Debtor has until the end of May to plant a corn crop to be able to obtain full crop insurance coverage. *See* https://www.rma.usda.gov/fields/mn_rso/2017/final/corn.pdf.

[2] Debtor is also obligated to BMO Leasing separately, which obligations are not included in this payoff.

in all of the Debtor's personal property assets including crops, livestock, and equipment. Darrell Crapp, in his Declaration in Support of First Day Motions, values the Debtor's assets subject to BMO's liens at $29,037,959, which BMO believes is overstated. However, even using the Debtor's inflated values there is no equity cushion.

5. BMO has worked with the Crapps for several years to afford them multiple opportunities to stabilize their finances. Unfortunately for the Debtor, corn prices have not rebounded and projections indicate that they won't. According to Debtor's past financial disclosures, Debtor and its related entities had negative income of $4,070,867 in 2015, and as of November 2016 had negative income of $7,097,779. BMO was unwilling to finance these continuing losses and informed Debtor that it would not renew the loans that matured on January 31, 2017. Since that time, BMO has continued to listen to and work with Debtor and Debtor's turnaround consultant to find a workable solution. However, Debtor's proposal to continue growing unprofitable crops is not acceptable to BMO. On May 2, 2017, BMO requested the appointment of Michael Polsky as Wisconsin Statutes Chapter 128 receiver for the assets of Debtor (and related entity Crapp Land, LLC) to operate Debtor's pig and cattle operations as a going concern. A hearing was scheduled on the Petition Date to appoint Mr. Polsky as receiver.

6. BMO strongly believes that a state court receivership is in the best interest of the Debtor and its creditors. Along with this Objection, BMO is moving for relief from stay or dismissal requesting permission to proceed with the receivership action. BMO opposes any use by the Debtor of its cash collateral in the meantime. Debtor's budget does not adequately inform the Court of its cash needs. Debtor has no operating line of credit, no DIP financing, and currently has barely enough cash on deposit at BMO to cover its day-to-day operations. In the face of this reality, Debtor proposes to use cash collateral not only for immediate, necessary

expenses, but also proposes to purchase additional livestock in the first month at a budgeted price of $166,716, and by the year end in the amount $1,012,278.  How can the Debtor rationally propose to expend BMO's cash collateral to purchase additional livestock when Debtor has not even established that it can afford to feed and care for the cattle and pigs that it presently has?  If the Debtor operates at a loss (which it projects to do in its second month of operations), how does Debtor propose to cover such losses?  The Debtor's budget is incomplete, and does not adequately inform BMO or the Court as to Debtor's actual cash needs.

7. As adequate protection for the use of its cash collateral the Debtor proposes to pay BMO $20,000 a month for the use of collateral it values at almost $30 million.  This amount is insufficient especially given Debtor's proposal to operate in the ordinary course despite its perilous financial condition.  "Because cash collateral is consumed, or used up, the standard for determining adequate protection is strict."  *In re Walker*, No. 10-72459, 2011 BANKR. LEXIS 690, *7-8, 2011 WL 839508 (Bankr. C.D. Ill. Mar. 7, 2011).  Debtor has failed to meet this strict standard and its request should be denied.

**Background**

8. Debtor is a Wisconsin general partnership with farm operations located in Potosi, Wisconsin.  Debtor's farm operation is twofold:  Debtor, in the past, has grown crops (mostly corn) on land rented from a related entity, Crapp Land LLC ("**Land LLC**") and third-party land owners, and Debtor raises and sells cattle and pigs on land previously owned by Land LLC.  Prior to filing bankruptcy the general partners of Debtor were Darrell Crapp ("**Darrell**"), Tony Crapp ("**Tony**"), and Carl Crapp ("**Carl**").  Di Crapp ("**Di**") was admitted as a partner on the eve of filing bankruptcy.

9. Crapp Excavating LLC ("**Excavating LLC**") was owned pre-petition by Darrell, Tony and Carl. Excavating LLC provided construction services to third-parties unrelated to the Crapps' farming operations. Crapp Farms Trucking LLC ("**Trucking LLC**") was owned pre-petition by Darrell, Tony and Carl, and provides trucking services, primarily to local farms, to transport crops. Trucking LLC provides trucking services to the Crapps' farming operations. Land LLC owned approximately 2,200 acres that it rented to Debtor to grow crops and for farming operations. The improvements on the land are used for the Debtor's livestock operations.

10. Just prior to filing bankruptcy, Excavating LLC, Trucking LLC, and Land LLC transferred all of their assets to Debtor for no consideration. BMO did not consent to the transfer of assets out of Excavating LLC, Trucking LLC, or Land LLC, and believes that such transfers constitute fraudulent transfers. BMO reserves all rights to challenge such transfers and specifically alleges that its security interest and liens attached to all assets transferred.

**I.  Obligations.**

*A.  Obligations of Debtor to BMO.*

11. On October 15, 2015, Debtor executed and delivered to BMO a Note in the original principal amount of $11,850,000.00 ("**Note 1**"). On January 15, 2016, Debtor executed its First Amendment to Promissory Note which amended Note 1. The First Amendment to Note 1 provided, in part, that Note 1 matured on January 31, 2017. As of May 3, 2017, there is due and owing on Note 1 principal in the amount of $10,000,000, interest of $120,171.75, and late charges of $501,441.40, for a total due on that date of $10,621,613.15 with interest accruing at the rate of $1,036.88 per day.

12.    On October 15, 2015, Debtor executed and delivered to BMO its Note in the original principal amount of $2,250,000.00 ("**Note 2**").  On January 15, 2016, Debtor executed its First Amendment to Promissory Note which amended Note 2.  The First Amendment to Note 2 provided, in part, that Note 2 matured on January 31, 2017.  As of May 3, 2017, there is due and owing on Note 2 principal in the amount of $2,248,888, interest of $27,025.28, and late charges of $112,768.55, for a total due on that date of $2,388,681.83 with interest accruing at the rate of $233.18 per day.

13.    On October 15, 2016, Debtor executed and delivered to BMO its Note in the original principal amount of $500,000.00 ("**Note 3**").  On January 15, 2016, Debtor executed its First Amendment to Promissory Note which amended Note 3.  The First Amendment to Note 3 provided, in part, that Note 3 matured on January 31, 2017.  As of May 3, 2017, there is due and owing on Note 3 principal in the amount of $490,779.89, interest of $5,897.78, and late charges of $24,609.74, for a total due on that date of $521,287.41 with interest accruing at the rate of $50.89 per day.

14.    On November 20, 2014, Debtor executed and delivered to BMO its Note in the original principal amount of $37,600.00 ("**Note 4**").  As of May 3, 2017, there is due and owing on Note 4 principal in the amount of $20,316.73 and interest of $29.23, for a total due on that date of $20,345.96 with interest accruing at the rate of $2.25 per day.

15.    On November 15, 2013, Debtor executed and delivered to BMO its Note in the original principal amount of $43,000.00 ("**Note 5**").  As of May 3, 2017, there is due and owing on Note 5 principal in the amount of $14,629.09, and interest of $32.40, for a total due on that date of $14,661.49 with interest accruing at the rate of $1.80 per day.

16. On April 8, 2016, Debtor executed and delivered to BMO its Note in the original principal amount of $7,950,000.00 ("**Note 6**"). Note 6 matured on January 31, 2017. As of May 3, 2017, there is due and owing on Note 6 principal in the amount of $7,867,577.53, interest of $134,622.99, and late charges of $396,088.82, for a total due on that date of $8,398,289.34 with interest accruing at the rate of $874.18 per day.

17. Debtor is obligated to BMO Leasing pursuant to a Master Lease of Personal Property dated June 18, 2013 ("**Master Lease**").

### B. *Obligations of Land LLC to BMO.*

18. On June 30, 2014, Land LLC executed and delivered to BMO its Note in the original principal amount of $88,000.00 ("**Note 7**"). As of May 3, 2017, there is due and owing on Note 7 principal in the amount of $79,398.49, and interest of $297.95, for a total due on that date of $79,696.44 with interest accruing at the rate of $8.81 per day.

19. On June 7, 2013, Land LLC executed and delivered to BMO its Note in the original principal amount of $7,350,000.00 ("**Note 8**"). As of May 3, 2017, there is due and owing on Note 8 principal in the amount of $6,578,450.78, and interest of $110,970.13, for a total due on that date of $6,689,420.91 with interest accruing at the rate of $754.69 per day.

### C. *Obligations of Excavating LLC to BMO.*

20. On October 15, 2015, Excavating LLC executed and delivered to BMO its Note in the original principal amount of $100,000 ("**Note 9**"). Note 9 was amended by that certain First Amendment to Promissory Note executed on January 15, 2016. The First Amendment to Note 9 provided, in part, that Note 9 matured on January 31, 2017. As of May 3, 2017, there is due and owing on Note 9 principal in the amount of $99,999.98, and interest of $1,223.87, for a total due on that date of $101,223.85 with interest accruing at the rate of $10.37 per day.

**D.    *Obligations of Trucking LLC to BMO.***

21.    On October 15, 2015, Trucking LLC executed and delivered to BMO its Note in the original principal amount of $100,000.00, which amount was increased to $200,000 by amendment by a Promissory Note, from Trucking LLC to BMO dated January 15, 2016 ("**Note 10**"). Pursuant to the Note dated January 15, 2016, the maturity date on Note 10 was January 31, 2017. As of May 3, 2017, there is due and owing on Note 10 principal in the amount of $159,985, interest of $1,958.02, and late charges of $8,024.69, for a total due on that date of $169,967.71 with interest accruing at the rate of $16.59 per day.

22.    On May 1, 2014, Trucking LLC executed and delivered to BMO its Note in the original principal amount of $79,300.00 ("**Note 11**"). As of May 3, 2017, there is due and owing on Note 11 principal in the amount of $34,828,30, and interest of $123.32, for a total due on that date of $34,951.62 with interest accruing at the rate of $3.86 per day.

23.    On June 9, 2014 Trucking LLC executed and delivered to BMO a note in the original principal amount of $29,000.00 ("**Note 12**"). As of May 3, 2017, there is due and owing on Note 12 principal in the amount of $13,229.76, and interest of $35.14, for a total due on that date of $13,264.90 with interest accruing at the rate of $1.46 per day.

24.    On June 12, 2014, Trucking LLC executed and delivered to BMO a note in the original principal amount of $30,400.00 ("**Note 13**"). As of May 3, 2017, there is due and owing on Note 13 principal in the amount of $13,873.57, and interest of $32.24, for a total due on that date of $13,905.81 with interest accruing at the rate of $1.53 per day.

25.    Note 1, Note 2, Note 3, Note 4, Note 5, Note 6, Note 7, Note 8, Note 9, Note 10, Note 11, Note 12, and Note 13 are referred to as the "**Notes**."

E.  *Guaranties and Cross-Collateralization.*

26.  Each of the Debtor, Land LLC, Excavating LLC, and Trucking LLC have executed multiple guaranties of all obligations due and owing to BMO. The individual owners of Debtor – Darrel, Di, Tony, and Carl – have also executed guaranties of the debt owed by Debtor, Land LLC, Excavating LLC, and Trucking LLC.

27.  On November 7, 2013, Debtor, Land LLC, Excavating LLC, and Trucking LLC executed a Cross Collateral and Cross Default Agreement which provided, in part, that all of the obligations of Debtor, Land LLC, Trucking LLC, and Excavating LLC were cross-defaulted and cross-collateralized ("**Cross Collateral Agreement**"). The Cross Collateral Agreement was twice amended; first on September 22, 2015, and Second on April 8, 2016. The Cross Collateral Agreement and amendments have all been recorded with the Register of Deeds for Grant County, Wisconsin against the Farm Property.

## II.  Security For The Obligations To BMO.

28.  The Notes are secured by the following mortgages and security agreements relating to real property previously owned by Land LLC, and now owned by Debtor:

    a.  A Real Estate Mortgage, Security Agreement and Financing Statement from Land LLC to BMO dated January 7, 2013, which is recorded with the Register of Deeds for Grant County, Wisconsin on January 8, 2013 in Volume 1349 Records, Page 68 as Document No. 752015 ("**Mortgage 1**"), granting BMO a mortgage on approximately 2,200 acres located in Grant County ("**Farm Property**").

    b.  A Real Estate Mortgage, Security Agreement and Financing Statement from Land LLC to BMO dated June 30, 2014, which is recorded with the Register of Deeds for Grant County, Wisconsin on July 29, 2014 in Volume 1399, Page 425 as Document No. 764493 granting BMO a mortgage on the Farm Property ("**Mortgage 2**").

    c.  An Assignment of Leases and Rents from Land LLC to BMO dated November 7, 2013 from Land LLC to BMO, which is recorded with the Register of Deeds for Grant County, Wisconsin on November 18, 2013 in Volume 1380 Records,

Page 293 as Document No. 759617 assigning rents and profits associated with the Farm Property to BMO ("**Assignment of Rents**").

29. As security for the Notes, Debtor executed its Agricultural Security Agreement on September 19, 2012 granting BMO a security interest in all of Debtor's assets including accounts, equipment, crops, and livestock ("**Security Agreement 1**"). Security Agreement 1 was amended by Amendment to Agricultural Security Agreement dated April 8, 2016, which added Darrell, Carl, and Tony as Grantors.

30. BMO perfected its security interest in the assets of Debtor by filing its UCC Financing Statement with the Wisconsin Department of Financial Institutions ("**WDFI**") on October 9, 2012, as filing number 120013123010. The Amendment to Security Agreement 1 was perfected by filing a financing statement with WDFI on April 19, 2016, as filing number 160005125114.

31. Debtor has executed numerous additional security agreements granting BMO a security interest in its assets, including the following:

    a. A Commercial Pledge and Security Agreement dated September 19, 2012 ("**Security Agreement 2**").

    b. A Farm Security Agreement dated January 7, 2013 ("**Security Agreement 3**").

    c. A Commercial Security Agreement dated November 15, 2013 ("**Security Agreement 4**").

    d. A Commercial Security Agreement dated November 20, 2014 ("**Security Agreement 5**").

32. As security for all of the Notes, Darrell, Tony, Carl, and Debtor executed their Security Agreement dated April 8, 2016, granting BMO a security interest in all of their assets including certain identified vehicles ("**Security Agreement 6**"). The security interest granted

pursuant to Security Agreement 6 was perfected by the filing of an amendment to financing statement which was filed WDFI on April 19, 2016, as filing number 160005125114.

33. As security for the Notes, Land LLC has granted BMO a security in interest in several life insurance policies by executing several assignment of life insurance policies.

34. Security Agreement 1, Security Agreement 2, Security Agreement 3, Security Agreement 4, Security Agreement 5 and Security Agreement 6 are referred to as the "**Security Agreements**."

35. The assets granted as collateral pursuant to the Security Agreements are defined herein as the "**Collateral**."

### III. State Court Receivership Action And Bankruptcy Filing.

36. After multiple attempts to work with the Debtor to reach a mutually beneficial resolution regarding Debtor's defaulted loans, BMO was left with no option other than to commence an action seeking the appointment of Michael Polsky as Chapter 128 receiver for the assets of Debtor and Land LLC. On May 2, 2017, BMO and BMO Leasing commenced a Chapter 128 action in Grant County, Wisconsin (Case No. 17CV148) ("**Receivership Action**"). The Grant County Circuit Court scheduled a hearing on May 3, 2017, to consider BMO's emergency motion to appoint a receiver. BMO sought the appointment of a receiver over Debtor and Land LLC, but not Excavating LLC and Trucking LLC. Just prior to the hearing, Debtor filed the instant bankruptcy.

**Argument**

### I. BMO' Objects To Use Of Its Cash Collateral.

37. Section 363(c)(2) provides that a debtor "may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court,

after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section. BMO does not consent to use of its cash collateral as requested by the Debtor. In order to obtain a court order authorizing the use of BMO's cash collateral, the Debtor must provide adequate protection of BMO's interest. *See* 11 U.S.C. § 361. The Debtor bears the burden of proof on the issue of adequate protection. 11 U.S.C. § 363(p).

38. In order to establish adequate protection, the Debtor must demonstrate that BMO's interests are protected as "nearly as possible against the possible risks to that interest." *In re Ernst Home Ctr., Inc.*, 209 B.R. 955, 966-967 (Bankr. W.D. Wash. 1997). "Because cash collateral is consumed, or used up, the standard for determining adequate protection is strict." *In re Walker*, No. 10-72459, 2011 BANKR. LEXIS 690, *7-8, 2011 WL 839508 (Bankr. C.D. Ill. Mar. 7, 2011)

39. Payments to a creditor out of that creditor's cash collateral "will seldom protect a creditor from the dissipation caused by spending other portions of that cash collateral." *In re Chardon, LLC*, No. 13-B-81372, 2015 BANKR. LEXIS 140, *9 (Bankr. N.D. Ill. Jan. 12, 2015). "While the creditor's claim may decrease by the amount of the payment received, the value of the cash collateral will decrease by an equal amount if the payment is made using the creditor's own collateral." *See id.* ("cash payment out of [creditor's] cash collateral or replacement liens on [creditor's] collateral would not offer adequate protection.")

40. There is no equity cushion. Debtor quotes case-law in its Cash Collateral Motion that an equity cushion, without more, may constitute adequate protection. Using Debtor's own valuation numbers, BMO is undersecured. BMO currently believes that Debtor has overvalued its assets. In any event, there is no substantiation for any claim that there is an equity cushion present in this case.

41. The budgets presented by Debtor in support of its Cash Collateral Motion are incomplete and do not provide adequate information to support Debtor's drastic request to use and dissipate BMO's cash collateral. Debtor supports its Cash Collateral Motion by attaching a series of simple six month budgets for three of the four operating entities: Debtor (Crapp Farms Partnership), Excavating LLC, and Trucking LLC. There is no budget for Land LLC, nor is there any provision at all in the Debtor's budget for the payment of rent or use of land or facilities. Debtor proposes to use the buildings and facilities subject to BMO's mortgages and assignment of rents and leases free of charge. Debtor does not even propose to make any adequate protection payments to BMO for use of the buildings and facilities. That is an unsupportable position to take. Upon information and belief Debtor currently rents space where it stores excess grain off-site. The budget does not appear to provide for payment of these charges (nor is there a motion to allow such payments to be made).

42. The Debtor's proposed budget also includes a substantial expenditure in the first month for the purchase of cattle and pigs, and additional substantial expenditures for each month thereafter. Debtor proposes to use $166,716 of BMO's cash collateral to purchase additional livestock in the first month, and to expend $700,652 to purchase livestock over the first six months. If Debtor is granted the interim relief it requests, it will have carte blanche to expend substantial amounts of cash collateral on additional livestock and to continue business as usual. Unfortunately, Debtor's financials show that business as usual results in substantial operating losses year after year.

43. Debtor's proposal to continue expending large amounts of cash collateral operating in the ordinary course highlights another substantial issue with Debtor's budget. Debtor's budget lacks a detailed cash flow statement or any sort of cash flow analysis. Debtor

14

has no financing or credit available to it. All of Debtor's lines of credit with BMO matured in January. Debtor's own budget projects negative income from operations in month two of $154,898. Debtor's budget does not sufficiently detail cash inflow and cash outflow and leaves too many questions regarding where Debtor proposes to obtain financing if there are shortfalls (after it has expended all of BMO's cash collateral). In fact, prepetition the Debtor demanded that BMO permit funds from its operating account to be used to pay past-due invoices for feed in the amount of $251,025.08. At that time, Debtor had only approximately $44,000 in its operating account with an additional approximately $118,000 in checks that BMO was holding.

44. Debtor's proposal to pay BMO $20,000 a month as adequate protection is inadequate. Debtor claims that the proposed $20,000 payment "is equal to the combined approximate value of the Debtor's personal property collateral consisting of livestock and equipment at Four Percent (4%) interest, amortized over three (3) years for the livestock and five (5) years for the equipment." That is simply not accurate. Debtor's proposed payment appears to approximate interest-only payments on the collateral values for livestock and equipment and is not amortized over the periods set forth. Furthermore, Debtor makes no allowance for the continued use and depreciation of the buildings and facilities subject to BMO's mortgages or the value of the 2,200 acres pledged to BMO. Nor does the Debtor propose to make any payments or escrow for accruing real estate property taxes. Finally, Debtor proposes to use 34,000 bushels of harvested corn without compensation to BMO or to Commodity Credit Corporation (who has the first lien on crops).

45. For these reasons, BMO objects to the Cash Collateral Motion.

## II. BMO Objects To Debtor's Prepetition Wage Motion.

46. Debtor seeks Court approval to pay prepetition wages to its employees. BMO objects to Debtor's request on several grounds. Debtor has not provided sufficient information regarding the proposed payments to enable BMO or the Court to adequately evaluate the immediate necessity warranting the extraordinary relief requested. Additionally, while employee wage claims may be entitled to priority down the road, at this early stage and given the Debtor's perilous financial condition it is questionable whether the Debtor's case will be administratively solvent, let alone that Debtor will ever propose a confirmable plan.

47. Even though prepetition claims of employees may be accorded priority status under 11 U.S.C. § 507(a)(4), prepetition claims of employees are still prepetition claims of creditors. *In re EcoSmart, Inc.*, No. 15-bk-27139-RK, 2015 BANKR. LEXIS 4244, *12-15 (Bankr. C.D. Cal. Dec. 18, 2015).

48. Section 507(a)(4) only accords priority in payment to employee claims when a distribution on claims is authorized, which in a Chapter 11 bankruptcy case is pursuant to a confirmed reorganization plan under 11 U.S.C. § 1129. *Id.* (citing *In re Air Beds, Inc.*, 92 B.R. 419, 422-424 (B.A.P. 9th Cir. 1988) ("The general rule is that a distribution on pre-petition debt in a Chapter 11 case should not take place except pursuant to a confirmed plan of reorganization, absent extraordinary circumstances."). Section 507(a)(4) itself does not authorize payment of prepetition wage and commission claims in advance of other prepetition claims.

49. The Debtor has not filed its schedules yet, this farm bankruptcy does not involve a pre-packaged Chapter 11 plan, and given Debtor's significant financial struggles and inability to find a DIP lender it is premature to request that any prepetition unsecured creditor should receive

payment. There are too many question marks at this point to warrant the extraordinary relief requested.

50. Furthermore, Debtor's request does not provide adequate information. Courts reviewing similar requests have demanded that the debtor, at a minimum, identify: (A) whether the employees proposed to be paid are still employed; (B) the necessity for payment; (C) the benefit of the procedures; (D) the prospect of reorganization; (E) whether the employees are insiders; (F) whether the employees' claims are within the limits established by 11 U.S.C. § 507; and that (G) the payment will not render the estate administratively insolvent. *In re EcoSmart, Inc.*, No. 15-bk-27139-RK, 2015 BANKR. LEXIS 4244, *4-5 (Bankr. C.D. Cal. Dec. 18, 2015). *See also In re Escalera Res. Co.*, No. 15-22395-TBM, 2015 BANKR. LEXIS 4003, *11, 61 Bankr. Ct. Dec. 226 (Bankr. D. Colo. Nov. 9, 2015) (permitting payment of prepetition wage claims in a pre-packaged Chapter 11 with evidence of likelihood of ability to confirm plan).

51. The Debtor's Prepetition Wage Motion does not identify with adequate specificity the employees sought to be paid for prepetition wages and does not state whether those employees are currently employed. The Debtor has informed BMO recently that it has lost a number of employees. If the requested payments are for employees no longer employed with Debtor, then there is no justification that such payments are necessary to retain qualified employees. The Debtor states that the payments are entitled to administrative priority, but there is no showing supporting this claim. Debtor should have provided specific wage information (redacted for confidentiality) showing the exact amounts necessary, the services provided, and the pay periods covered. Presently the Debtor has no financing to plant crops and has presented no realistic prospect of any such financing. If any of the proposed prepetition wage payments

relate to the growing or preparing for growing of crops then there can presently be no realistic showing that such payments are necessary for the preservation of the estate.

### III. BMO Objects To Debtor's Prepetition Account Motion.

52. Debtor seeks to maintain all of its present accounts at BMO. BMO agrees with this proposal generally, but as set forth above BMO opposes any use by the Debtor of BMO's cash collateral.

### IV. BMO Objects To Debtor's Prepetition Tax Motion.

53. BMO incorporates herein its objection to the Prepetition Wage Motion and, for the same reasons set forth above, objects to the Prepetition Tax Motion. Debtor's request for payment of prepetition expenses is premature given the lack of any indication that Debtor will be able to reorganize.

### Conclusion

54. For the reasons set forth above, BMO objects to Debtor's First Day Motions. BMO requests that the Court schedule a hearing on BMO's separate Motion for Relief from Stay or, in the Alternative, for Dismissal.

Dated this 11th day of May, 2017.        AXLEY BRYNELSON, LLP

/s/ David M. Pelletier
David M. Pelletier
State Bar No. 1072343
Attorneys for BMO Harris Bank, N.A.
2 East Mifflin Street, Suite 200 (53703)
Post Office Box 1767
Madison, WI 53701-1767
(608) 260-2495