# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In re:

CRAPP FARMS PARTNERSHIP

                    Debtor.

Chapter 11
Case No. 3-17-11601-cjf

---

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. § 364(c) and 364(d): (I) AUTHORIZING DEBTOR-IN-POSSESSION TO INCUR POST-PETITION SECURED INDEBTEDNESS AND (II) GRANTING SECURITY INTERESTS AND PRIORITY LIENS PURSUANT TO 11 U.S.C. § 364; AND APPROVING THE ASSUMPTION AND SUBLEASE OF CERTAIN UNEXPIRED FARM LEASES RELATED THERETO

---

Crapp Farms Partnership, the debtor and debtor-in-possession herein ("Crapp Farms" or the "Debtor") hereby moves the Court for entry of interim and final orders approving and authorizing the Debtor to enter into post-petition financing agreements (the "DIP Financing") with Ag Resource Management ("ARM"), and Federal Hybrids, Inc. ("Federal Hybrids") (collectively, the "Lenders") as set forth in ARM's 2017 Crop Operating Loan Term Sheet and Federal Hybrids' Approval Letter, attached hereto and incorporated herein by reference as **Exhibit 1** and **Exhibit 2** (the "DIP Financing Documents"); and for the entry of an order authorizing the Debtor to assume certain unexpired farm and farm-related leases identified in **Exhibit 3** attached hereto and incorporated herein by reference (the "Unexpired Farm Leases").

The Debtor seeks entry of orders that provide for, among other things:

(a) Authorization, under sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code, and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain from the Lenders $5,834,398 for 2017 crop inputs and other crop expenses as set forth in the DIP Financing for the purpose of planting approximately 8,717 acres of corn.

(b) Assurance to the Lenders for the full and timely payment of the obligations of the Debtor to the Lenders in connection with the DIP Financing, including, but not limited to, payment of principal, interests, costs and fees in accordance with the proposed DIP Financing and granting the Lenders (i) pursuant to section 364(d) a security interest and first lien on all crops to be planted in 2017, and assignment of Debtor's 2017 crop insurance, and assignment of the Debtor's interest in the 2016 government payment to be paid later in 2017 ($349,000.00), and an assignment of the Debtor's interest in the 2017 government payment due in 2018 ($474,000.00) ("DIP Financing Collateral"). The Lenders have agreed among themselves the order of priority in the collateral sought. The order of priority is set forth in the DIP Financing Documents. The lien and security interests in the DIP Financing shall be senior to the lien and security interests of BMO Harris, N.A. ("BMO") on all of the Debtor's crops, no matter where located.

(c) In connection with the authorization of the Debtor to enter into the DIP Financing, approving the assumption and sublease of the Unexpired Farm Leases.

The facts and circumstances supporting this Motion are set forth in the Declaration of Darrell C. Crapp, a partner of Crapp Farms Partnership, in support of first-day motions filed on May 8, 2017, and a Second Declaration by Mr. Crapp filed contemporaneously with this Motion. In further support of this Motion, the Debtor respectfully represents as follows:

## Introduction

1.      On May 3, 2017 (the "Petition Date"), Crapp Farms filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Chapter 11 Case").

2.      This Court has jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. § 1334. This matter is a court proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

3.      Crapp Farms is a general partnership located in Potosi, Grant County, Wisconsin. It was formed in 2003 and the current partners are Darrell C. Crapp ("Darrell"), his spouse, Diana Crapp ("Di"), and their two sons, Carl D. Crapp ("Carl") and Tony D. Crapp ("Tony") (collectively, the "Crapp Family"). The Crapp Family has farmed in the Grant County area for

over a century, going back three (3) generations and have grown steadily over the years through both land acquisitions and expanding their livestock operations, as well as adding trucking and excavating operations.

4.      Crapp Farms has a diverse farming operation consisting of over 10,000 acres of grain crops, corn and soybeans being the primary crops, and wheat and alfalfa being secondary. It also has large pork and cattle facilities.

5.      In addition to farming the lands it owns, the Debtor historically leased, and is a party to several pre-petition leases for, farm land from several land owners in Grant County which the Debtor uses in its planting and harvesting operations, grain storage facilities to store harvested crops, and livestock feeding facilities.

6.      Over the years, to fund its farming operations, Crapp Farms entered into numerous loan transactions with its primary secured lender, BMO Harris, N.A. ("BMO"). The loan documents include mortgages granting BMO a first lien on Crapp Farms' real property containing approximately 2,210 acres along with improvements. BMO also has a properly perfected lien on farm equipment, crops and other personal property and interests more particularly described in the original Declaration of Darrell D. Crapp filed on May 8, 2017.

7.      Crapp Farms enjoyed many profitable years due to robust corn, soybean and livestock prices. Crapp Farms' financial difficulties began in 2013 when corn prices declined steeply. Crapp Farms continued to experience financial difficulties in 2014 due to the continued decline in corn prices and beef and pork prices. Crapp Farms' financial situation grew worse, and it was required to seek crop input financing for the 2016 season from a different lender, which line of credit carried a much higher interest rate and less favorable terms than Crapp Farms' previous financing arrangements with BMO.

8.    Crapp Farms' financial status became more tenuous when several of its loans with BMO matured on January 31, 2017.  In addition, the proceeds from crop sales that were paid to Crapp Farms by their 2016 crop financing lender were not provided on a timely basis, resulting in larger accounts payable than Crapp Farms normally experiences at the end of a crop season.

9.    In December, 2016, Crapp Farms continued aggressive efforts to obtain inputs for the 2017 crop season and looked to several sources to provide the financing.  All such sources required a security interest in crops and personal property of the Debtor.  No potential source would consider providing crop input financing on an unsecured basis.

10.    As the 2017 crop season proceeded, Crapp Farms was not able to make the rental payments as required by farm land leases and some third-party landlords terminated leases and obtained other tenants.  As of today's date, the landlords of the Unexpired Farm Leases  continue to be willing to rent to the Debtor the lands that are subject to the Unexpired Farm Leases, most significantly, the landlord for 8,717 acres of farm land, for Crapp Farms to plant in the 2017 planting season.

### Relief Requested

The Debtor requests entry of a final order: (i) authorizing the Debtor to obtain and use the DIP Financing set forth in the DIP Financing Documents and the Budget identified above; (ii) providing assurances to the Lenders by granting them a priming lien pursuant to section 364(d)(1) on the 2017 crop insurance, 2017 crops, the Debtor's interest in the 2016 government payment to be paid later in 2017 ($349,000.00), and the Debtor's interest in the 2017 government payment due in 2018 ($474,000.00); (iii) authorizing the Debtor to assume the Unexpired Farm Leases and sublease them accordingly; and (iv) for such other and further relief as is just and equitable.

## Debtor's Need for Post-Petition Financing

11.    Without immediate access to DIP Financing, the Debtor will be unable to fulfill its obligations to rent over 9,000 acres of real property from third-party landlords and plant 2017 crops, some of which the Debtor is dependent upon to feed its livestock, currently consisting of approximately 4,600 hogs and 2,700 heads of cattle.  Crapp Farms farming operation also relies upon annual crops to be planted, grown and harvested to contribute to its income to service its liabilities.

12.    Pursuant to sections 364(a) and (b), the Debtor has attempted to, but has been unable to, obtain either unsecured credit or unsecured credit allowed under section 503(b)(1) of the Bankruptcy Code.

13.    The Debtor has also been unable to obtain secured credit for the purchase of the 2017 crop inputs, despite its efforts, other than under the terms and provisions set forth in the DIP Financing Documents with the Lenders.

14.    The Debtor believes that, under the circumstances, the terms and provisions contained in the DIP Financing Documents are a fair and reasonable response to the Debtor's request for financial assistance to obtain the necessary 2017 crop inputs, cure rental payments to various landlords, and pay other necessary expenses related to planting, maintaining and harvesting the crops during the 2017 crop season.  The proposed terms to obtain such 2017 crop financing are superior to any other terms and conditions of financing otherwise offered to the Debtor.  Therefore, the Debtor submits that approval of this Motion and the DIP Financing are necessary, essential and appropriate to maximize the value of the Debtor's estate and are in the best interests of the Debtor's estate and its creditors.

## Summary of Terms of the Post-Petition Financing

15.     Pursuant to Rule 4001(d)(1)(B), the following is a summary of the material provisions of the proposed Agreement:

- Parties:  Debtor, ARM and Federal Hybrids.

- Duration of Agreement:  The financing provided by ARM shall mature on March 16, 2018 and the financing provided by Federal Hybrids shall mature on March 1, 2018, unless either maturity date is extended by the parties in writing.

- DIP Collateral:   first and priming lien on Debtor's 2017 crops, an assignment of 2017 crop insurance, an assignment of the Debtor's interest in the 2016 government payment to be paid later in 2017 ($349,000.00), and an assignment of the Debtor's interest in the 2017 government payment due in 2018 ($474,000.00).

- No cross-collateralization of pre-petition debt with post-petition assets is proposed.  BMO's liens attach to the same collateral as BMO had pre-petition.

- Debtor waives the automatic stay to permit the Lenders to file financing statements and give notices as may be required by the Agreement.

- Funding in the amount of $4,964,994.00 from ARM.

- Funding in the amount of $869,404 consisting of the value of seed corn to be delivered by Federal Hybrids.

- Personal guarantees from each of the general partners of the Debtor, i.e. Darrell, Di, Tony, and Carl.

- Cross Collateralized by the following assets of Tony: all crops to be planted in 2017, and assignment of Tony's 2017 crop insurance, an assignment of Tony's interest in the 2016 government payment to be paid later in 2017, and an assignment of Tony's interest in the 2017 government payment due in 2018.

16.     The financing arrangements to which the Debtor and the Lenders have agreed have been negotiated as an arm's-length transaction and in good faith.

<u>**Related Loan to Tony**</u>

17.     Based upon the lending model followed by ARM, it cannot loan the Debtor the entire amount of the financing required by the Debtor to purchase inputs and pay for other expenses related to the 2017 crop season for all of the farm land that it rents annually.

18.     Therefore, in a separate loan transaction, ARM shall be lending to Tony the amount of $1,619,935.00 and Federal Hybrids shall loan Tony the sum of $430,623.00 (in the form of seed corn to be delivered to Tony).  The loans to Tony shall be under the same terms as set forth in the DIP Financing Documents between the Lenders and the Debtor, as set forth in ARM's 2017 Crop Operating Loan Term Sheet and Federal Hybrids' Approval Letter, attached hereto and incorporated herein as **Exhibits 4 and 2**, respectively (the "Related Tony Loan").

19.     Upon funding of the Related Tony Loan, and subject to authorization by this Court for the Debtor to assume the Unexpired Farm Leases and sublease them to Tony, except for the lease with Eagle Creek Midwest/UBS ("UBS") and Jim/Kevin Wilson for a hog building (the "Wilson Hog Barn Lease").  The Debtor and Tony shall enter into subleases for the farm land subject to the remaining Unexpired Farm Leases, and the cure amount for each Unexpired Farm Lease that is subleased to Tony shall be paid from the proceeds of the Related Tony Loan.  Tony

shall then plant crops on the farm lands subleased from the Debtor, which harvested crops shall be considered to be owned Tony's 2017 subject to the liens granted to ARM and Federal Hybrids as set forth in Tony's Loan Documents. Tony shall use the proceeds from his 2017 crops to pay the ARM and Federal Hybrids in accordance with Tony's Loan Documents, and pay all of the ordinary and necessary expenses related to planting, maintaining and harvesting his 2017 crops. The net profits that Tony receives for his 2017 crops will be paid to the Debtor as further consideration for subleasing the farm leases from the Debtor. The Debtor shall guaranty the Related Tony Loan, and shall also pledge the collateral it will be pledging as security for the DIP Financing, as collateral for the Related Tony Loan.

## BASIS FOR RELIEF

### The Post-Petition Financing (DIP Financing)

20.    Section 364 of the Bankruptcy Code allows the Debtor to: (a) obtain unsecured credit in the ordinary course of business; (b) obtain secured credit out of the ordinary course of business; and (c) obtain credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super priority administrative expense status or is secured by a lien on unencumbered property, or a combination of the foregoing.

21.    The Debtor proposes to obtain financing under the DIP Financing Documents and provide security interests in and liens on the DIP Financing Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the Debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (the debtor must show "by a

good faith effort that credit was not available without" the protections of section 364(c)). Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *In re Crouse Group, Inc.,* 71 B.R. 544, 549, modified on other grounds, 75 B.R. 553 (Ban kr. E.D. Pa. 1987) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

22.    Courts have articulated a three-part test to determine whether a debtor is entitled to section 364(c) and (d) financing:

(a) The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing the DIP Lender only an administrative claim;

(b) The credit transaction is necessary to preserve the assets of the estate; and

(c) The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor and the proposed lender.

23.    As noted above, the need for the Debtor to obtain financing is critical. As stated in the Second Declaration of Darrell D. Crapp, the evidence at the hearing on this Motion will show that a loan of the type and magnitude needed in this Chapter 11 case could not have been obtained on an unsecured basis. The evidence will demonstrate that the Debtor sought alternative sources of financing. As will be shown, the potential sources of post-petition credit for the Debtor obtainable on an expedited basis and on reasonable terms, and in light of the positions of existing secured creditors, were nonexistent. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Federal Sav. And Loan Ass'n.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

24.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(d). *Id.; see also In re Plabell,* 137 B.R. at 900. Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley,* 99 B.R. 117, 120 N.4 (N.D. Ga. 1989). Thus, the evidence introduced at the hearing on this Motion will satisfy the requirement of section 364(c) that unsecured credit was unavailable to the Debtor.

25.     Only the Lenders were willing to offer the DIP Financing to meet the Debtor's financing needs on the terms sought by the Debtor.

### The Business Judgment Standard

26.     As described above, the Debtor's partners have concluded that the financing described in the DIP Financing Documents was the only alternative available in the circumstances of this case. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943); *Ames,* 115 B.R. at 38 (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1938) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

27.     In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

28.     The Debtor has exercised sound business judgment in determining that the financing set forth in the DIP Financing Documents is appropriate and has satisfied the legal prerequisites to borrow thereunder. The financing set forth in the DIP Financing Documents is fair and reasonable, was negotiated in good faith and at arm's length, and is in the best interests of the Debtor's bankruptcy estate. Accordingly, the Debtor should be granted authority to enter into the DIP Financing and borrow funds from the Lenders on the secured basis described above, pursuant to section 364(d) of the Bankruptcy Code, and take the other actions as requested herein.

### Proposed Modification of the Automatic Stay

29.     The proposed financing contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Lenders to take any action authorized or contemplated by the Agreement, and to carry out the terms thereof, subject to any notice, procedural or other conditions contained therein. Stay modification provisions of this sort are ordinary and usual features of post-petition debtor-in-possession financing and, in the Debtor's business judgment, are reasonable under the present circumstances. The Court

accordingly should modify the automatic stay to the extent contemplated by the DIP Financing Documents.

## Good Faith

30.    Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *In re EDC Holding Co*, 676 F.2d 945, 957 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some other creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."). The financing contemplated in the DIP Financing Documents is the result of good faith and arm's-length negotiations, with all parties represented by counsel. The Debtor believes that the terms of such financing are fair and reasonable under the circumstances, and that the Lenders are entitled to the benefits of section 364(e) of the Bankruptcy Code.

## The 364(d) Priming Lien

31.    Under Bankruptcy Code 364(d)(1)(B) and 361(3), a secured creditor's lien may be primed. In this case, the only security interest of a secured creditor that will be primed is BMO's security interests in the Debtor's 2017 crop insurance, 2017 crops, its interest in the 2016 government payment to be paid later in 2017 ($349,000.00), and its interest in the 2017 government payment due in 2018 ($474,000.00).

32.    The Court may authorize this limited priming lien if the Debtor is unable to obtain such credit otherwise, and if there is adequate protection of the interests of the creditor whose lien is subject to priming. *See* 11 U.S.C. § 364(d)(1). Adequate protection is designed to preserve the

secured creditor's position as it existed at the time of the bankruptcy filing, and should provide the

secured creditor with the same level of protection it would have had without the DIP Financing

sought. *See In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003).

33.     Here, the Debtor has been unable to procure financing without this limited priming

lien because no lender has been willing to provide 2017 crop inputs to the Debtor on an unsecured

basis. All potential sources of financing have insisted that they be provided a security interest in

assets of the Debtor.

34.     Priming BMO's lien claim secured by the crops is necessary and appropriate

because BMO is, and will remain, adequately protected in its position with respect to its pre-

petition and Post-Petition Collateral.

## ASSUMPTION AND SUBLEASE OF UNEXPIRED FARM LEASES BY THE DEBTOR SHOULD BE APPROVED

35.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession

"subject to the court's approval, may assume or reject any…unexpired lease of the debtor." 11

U.S.C. § 362(a).

36.     Section 365(b)(1) of the Bankruptcy Code provides that a debtor-in-possession may

assume an unexpired contract under which there has been a default by the debtor. In order for a

debtor to assume an unexpired contract under which there has been a default, a debtor must (a)

cure or provide adequate assurance that the debtor will cure the default; (b) compensate or provide

adequate assurance that the debtor will compensate the other party for any pecuniary loss to such

party resulting from such a default; and (c) provide adequate assurance of future performance

under the contract. 11 U.S.C. §§ 365(b)(1)(A), (B), and (C); *In re Bon Ton Restaurant & Pastry*

*Shop, Inc.*, 53 B.R. 789, 793 (Bankr. N.D. Ill. 1985); *In the Matter of Luce Industries, Inc.*, 8 B.R.

100, 104 (Bankr. S.D.N.Y. 1980).

37.    As discussed above, as of the Petition Date, the Debtor is a lessee under the Unexpired Farm Leases, which are several cash farm leases, with varying terms, for the lease of farm land in Lancaster, Wisconsin used by the Debtor in its grain crop operations. The Debtor intends to assume the Unexpired Farm Leases, which Unexpired Farm Leases are collectively identified in **Exhibit 3,** and immediately enter into subleases for each with Tony, except for the lease with UBS and the Jim/Kevin Wilson hog building lease.

38.    The arrearages under the Unexpired Farm Leases are identified according to the schedule attached hereto and incorporated herein as **Exhibit 5** (the "Cure Schedule"), and the arrearages shall be cured within five (5) days following the funding of the DIP Financing and the Related Tony Loan. As discussed in Paragraph 19 above, the arrearages owed on the land subleased to Tony shall be cured from the proceeds of the Related Tony Loan as a majority of the Related Tony Loan is specifically earmarked to pay the arrearages. In addition, the DIP Financing to be obtained by the Debtor includes funds to cure the arrearages owed to UBS and the Jim/Kevin Wilson for a hog building lease.

39.    The Unexpired Farm Leases are necessary for the continued operations of the Debtor's crop growing operations because the income derived from the crops planted and harvested from the land is the main source of income the Debtor and its partners receive from the Debtor's crop growing operations.

40.    The Debtor shall make its future rental payments to each lessor of the Unexpired Farm Leases according to the terms of each from additional payments from Tony to the Debtor as described in Paragraph 19 above, and from the cash flow that will be generated form the Debtor's crop growing operations. The Debtor's 2017 Crop Budget, attached hereto and incorporated herein as **Exhibit 6** (the "Crop Budget"), indicates the Debtor's overall relative profitability from its crop

growing operations. The Crop Budget indicates that adequate assurance of the Debtor's future performance under each Unexpired Farm Lease.

41.   The assumption of the Unexpired Farm Leases by the Debtor and immediate sublease to Tony, as set forth above, is in the best interest of the Debtor's estate and its creditors because it will permit the Debtor to continue its crop growing operations, and will allow the Debtor to effectively reorganize.

## REQUEST FOR IMMEDIATE RELIEF

42.   The Debtor requires immediate financing to permit it to pay the landlords for the land the Debtor is renting and to pay for seed corn, beans, fertilizer, and chemicals, and other crop expenses itemized in the Budget.

43.   Absent immediate financing for its 2017 crop season, the Debtor's attempt to maximize the value of its assets will be immediately and irreparably jeopardized, to the detriment of the bankruptcy estate, the creditors thereof, and other parties in interest, namely, third-party landlords who are relying upon the rental payments from the Debtor for their 2017 income. If the Debtor does not obtain access to the proposed crop financing, the Debtor will be forced to consider the immediate dismissal of the Chapter 11 case in order for the involuntary receivership filed by BMO prior to this bankruptcy case filing to proceed.

44.   Bankruptcy Rule 4001(c)(2) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 38.

A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See, e.g., Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

45.    The Debtor's expedited request for lending, in accordance with the DIP Financing Documents, and assumption and sublease of the Unexpired Farm Leases, is necessary to avoid immediate and irreparable harm to the Debtor, the bankruptcy estate, and the Debtor's creditors. Without immediate access to the DIP Financing, the Debtor will be unable to begin planting at a crucial stage of the 2017 crop season because its cropland leases with its landlords require either partial or full payment of the rent before the landlords will allow fertilizing or planting to begin.

**WHEREFORE**, Crapp Farms Partnership requests that this Court enter an order: (**i**) authorizing Debtor to obtain the DIP Financing requested; (**ii**) granting the security interests sought by the Lenders as set forth in the motion; (**iii**) authorizing the Debtor to assume and sublease the Unexpired Farm Leases; (**iv**) setting a hearing on this Motion to consider the entering of an interim order authorizing and approving the DIP Financing pending a final hearing on the Motion; and (**v**) setting a final hearing on the Debtor's request for DIP Financing during this case.

Respectfully submitted,

**KREKELER STOTHER, S.C.**

By: _Kristin Sederholm_  5/24/17
Kristin J. Sederholm, State Bar No. 1001895
Eliza M. Reyes, State Bar No. 1030764
Jennifer M. Schank, State Bar No. 1077110
*Proposed Attorneys for the Debtor in Possession,*
*Crapp Farms Partnership*

2901 W. Beltline Highway, #301
Madison, WI 53713
Phone: (608) 258-8555
Fax: (608) 258-8299

## Kris Sederholm

| | |
|---|---|
| **From:** | Mark Bellis <mbellis@armlend.com> |
| **Sent:** | Wednesday, May 24, 2017 8:12 AM |
| **To:** | Kris Sederholm |
| **Cc:** | darrellcrapp@gmail.com; Di Crapp |
| **Subject:** | Crapp Farms Financing Approval |
| **Attachments:** | Crop Loan Analysis Crapp Farms Partnership-Approval.pdf; Crop Loan Analysis Tony Crapp-approval.pdf |

| | |
|---|---|
| **TimeMattersID:** | MF531A798DF81556 |
| **TM Contact:** | Crapp Farms Partnership |
| **TM Contact No:** | 20523 |
| **TM Matter No:** | 20523.002 |
| **TM Matter Reference:** | CRAPP FARMS PARTNERSHIP          Post Pet Chp 11 |

Kris,

Attached is the approval for Crapp Farms Partnership and Tony Crapp.  This loan has been approved by Ag Resource Management contingent upon the terms in the collateral conditions being met.  Please let me know if you have any questions.  Thanks!



**Mark Bellis**
*Senior Loan Officer*
2815 Old Jacksonville Road Suite 102
Springfield, IL 62704
**Phone:** (217) 391-6335
**Fax:** (217) 666-9715
**Cell Phone:** (217) 720-0137
mbellis@armlend.com
www.armlend.com

*__Confidentiality Notice:__ This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  If you have received this e-mail in error, please notify the system manager.  Please note that any views or opinions presented in the e-mail are solely those of the author and do not necessarily represent those of the company.  The recipient should check this e-mail and any attachments for the presence of viruses.  Ag Resource Management accepts no liability for any damage caused by any virus transmitted by this e-mail.*

**EXHIBIT**

tabbies

1

| 2017 Crop Operating Loan Term Sheet | |
|---|---|
| Borrower: | Crapp Farms Partnership |
| Lender: | Ag Resource Management / Agrifund, LLC |
| Participating Distributor: | Federal Hybrids |
| | |
| Total Commitment Amount: | $5,834,398 |
| ARM Portion of Commitment: | $4,964,994 |
| Distributor Portion of Commitment: | $869,404 |
| | |
| ARM Interest Rate: | 9.00% |
| Loan Origination Fee: | 0.50% |
| Loan Service Fee: | 2.00% |
| | |
| Collateral: | Crop, Crop Insurance, and Government Payments |
| | |
| Conditions: | AGRICULTURAL SECURITY AGREEMENT ON 2017 CROPS |
| | ASSIGNMENT OF 2016 AND 2017 FSA DIRECT, CCP, AND LDP PAYMENT |
| | ASSIGNMENT OF 2017 CROP INSURANCE |
| | FEDERAL BANCRUPTCY COURT ORDER TO INCUR DEBT |
| | PERSONAL GUARANTEE:  DARRELL CRAPP, DIANA CRAPP, TONY CRAPP, CARL CRAPP |
| | APPROVAL BY FEDERAL HYBRIDS |
| | CROSS COLLATERALIZED WITH TONY CRAPP LOAN |
| | LOAN MATURITY DATE 3/15/18 |

Client Acknowledgement:

x_____     _____
Signature                                              Date

Note: This is a term sheet and not a commitment to lend. These terms and conditions are subject to change. The anticipated commitments are based upon the intended acres, crop mix, and crop insurance type and levels that were communicated to ARM. If intended planted acres, crop mix, and/or crop insurance type and levels change, I agree to promptly notify ARM. Please note that this outline does not contain all of the terms, conditions, and other provisions involved in this transaction that would be more fully described in the definitive legal document(s) for the proposed transaction.

# FEDERAL HYBRIDS, INC.

402 Clermont Street
P.O. Box 237
Elgin, IA 52141-0237
Phone: 563.426.5888
Fax:    563.426.5586

**FEDERAL HYBRIDS**
★ ★ ★ Quality Hybrids Since 1932 ®

May 23, 2017

**Crapp Farms Partnership**
**5761 Substation Road**
**Lancaster, WI 53813**
Darrell C. Crapp
Diana Crapp
Carl D. Crapp
Tony Crapp

Dear Partners,
I am pleased to inform you that the owners of Federal Hybrids, Inc, have approved your request to provide
Federal Hybrids seed corn and soybean seed, with financing, under the following terms and conditions.

Federal Hybrids, Inc will provide up to 5,000 - 80K units of hybrid seed corn and 300 - 140K units of soybean
seed to Crapp Farms Partnership for the 2017 growing season.  The value of the above-mentioned seed is
approximately $1,300,000.   This seed is due and payable on August 1, 2017; however, Federal Hybrids, Inc,
will finance the amount due from August 1, 2017, until March 1, 2018, at which time the total balance along
with interest is due in full.  The interest rate will be 9.0% APR after August 1, 2017, until paid.

This offer is contingent upon the following conditions:

1.  Crapp Farms Partnership (Darrell C. Crapp, Diana Crapp, Carl D. Crapp, Tony Crapp) being granted an
    Order to Incur Debt by the U.S. Bankruptcy Court; and Federal Hybrids, Inc, being named in the
    financing in 2nd lien position directly behind Ag Resource Management's loan (not to exceed
    $6,923,827 including interest & fees) for all the 2017 crops being raised by Crapp Farms Partnership,
    rights to Federal Crop Insurance, and government paid subsidies; and ahead of all other creditors.

2.  Ag Resource Management approves a loan to Crapp Farms Partnership for additional crop input costs
    such as Cash Rents, Fertilizer, Chemical, Fuel, Machinery Costs, including repairs, Drying Costs, Labor
    Costs, and miscellaneous expenses related to the farming operation.

Please note that this is a letter of commitment only, and is not legally binding until an actual seed order
commitment and contract documents are signed by all parties.
Thank you very much.  We trust that this will assist you in your financing arrangements.

Sincerely,

*Tim Butikofer*

Tim Butikofer
President



EXHIBIT

2

## UNEXPIRED FARM LEASES (LAND AND BUILDINGS)

Al Wepking
10526 Liberty Ridge Road
Lancaster, WI 53813-9523
Cash Farm Lease.

Robert & Joan Book
11 South Hershey Avenue
Leola, PA 17540
Cash Farm Lease

Grenith K. Cherry
P.O. Box 85
Benton, WI 53803
Cash Farm Lease

Crary Builders Inc.
7255 Cross Country Road
Verona, WI 53593
Cash Farm Lease

Todd Wolf
9051 Hwy 35,61,81
Lancaster, WI 53813
Cash Farm Lease

Economy Feed Mill
Box 427
Bloomington, WI 53804
Amended Cash Farm Lease

Tom Oyen
7515 Shady Road
Platteville, WI 53818
Cash Farm Lease

Ronald Wienkes
P.O. Box 185
Montfort, WI 53569-0185
Cash Farm Lease



**EXHIBIT**
3

Betty Schurman
Schurman Farm
909 Ridge Avenue
Lancaster, WI 53813
Cash Farm Lease

Eagle Creek Midwest LLC
c/o UBS AgriVest LLC
4415 West Harrison, #238
Hillside, IL 60162
Amended and Restated Farmland Lease

Eagle Creek Midwest LLC
c/o UBS AgriVest LLC
4415 West Harrison, #238
Hillside, IL 60162
Grain Bin Storage Lease

Daniel Weaver
9411 Lucey Lane
Lancaster, WI 53813
Cash Farm Lease

Jim Wilson & Kevin Wilson
Sunset View Farm
13804 Highway 61
Fennimore, WI 53809
Hog Building Lease

Jim Wilson & Kevin Wilson
Sunset View Farm
13804 Highway 61
Fennimore, WI 53809
Cash Farm Lease

## Kris Sederholm

| | |
|---|---|
| **From:** | Mark Bellis <mbellis@armlend.com> |
| **Sent:** | Wednesday, May 24, 2017 8:12 AM |
| **To:** | Kris Sederholm |
| **Cc:** | darrellcrapp@gmail.com; Di Crapp |
| **Subject:** | Crapp Farms Financing Approval |
| **Attachments:** | Crop Loan Analysis Crapp Farms Partnership-Approval.pdf; Crop Loan Analysis Tony Crapp-approval.pdf |

| | |
|---|---|
| **TimeMattersID:** | MF531A798DF81556 |
| **TM Contact:** | Crapp Farms Partnership |
| **TM Contact No:** | 20523 |
| **TM Matter No:** | 20523.002 |
| **TM Matter Reference:** | CRAPP FARMS PARTNERSHIP        Post Pet Chp 11 |

Kris,

Attached is the approval for Crapp Farms Partnership and Tony Crapp.  This loan has been approved by Ag Resource Management contingent upon the terms in the collateral conditions being met.  Please let me know if you have any questions.  Thanks!



**Mark Bellis**
*Senior Loan Officer*
2815 Old Jacksonville Road Suite 102
Springfield, IL 62704
**Phone:** (217) 391-6335
**Fax:** (217) 666-9715
**Cell Phone:** (217) 720-0137
mbellis@armlend.com
www.armlend.com

*Confidentiality Notice: This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  If you have received this e-mail in error, please notify the system manager.  Please note that any views or opinions presented in the e-mail are solely those of the author and do not necessarily represent those of the company.  The recipient should check this e-mail and any attachments for the presence of viruses.  Ag Resource Management accepts no liability for any damage caused by any virus transmitted by this e-mail.*

**EXHIBIT**

4

| 2017 Crop Operating Loan Term Sheet | |
|---|---|
| Borrower: | Tony Crapp |
| Lender: | Ag Resource Management / Agrifund, LLC |
| Participating Distributor: | Federal Hybrids |
| | |
| Total Commitment Amount: | $2,050,559 |
| ARM Portion of Commitment: | $1,619,935 |
| Distributor Portion of Commitment: | $430,623 |
| | |
| ARM Interest Rate: | 9.00% |
| Loan Origination Fee: | 0.50% |
| Loan Service Fee: | 2.00% |
| | |
| Collateral: | Crop, Crop Insurance, and Government Payments |
| | |
| Conditions: | AGRICULTURAL SECURITY AGREEMENT ON 2017 CROPS |
| | ASSIGNMENT OF 2016 AND 2017 FSA DIRECT, CCP, AND LDP PAYMENT |
| | ASSIGNMENT OF 2017 CROP INSURANCE |
| | FEDERAL BANCRUPTCY COURT ORDER TO INCUR DEBT |
| | GUARANTOR: CRAPP FARMS PARTNERSHIP |
| | APPROVAL BY FEDERAL HYBRIDS |
| | CROSS COLLATERALIZED WITH CRAPP FARMS PARTNERSHIP LOAN |
| | LOAN MATURITY DATE 3/15/18 |

Client Acknowledgement:

x_____     _____
Signature                                                Date

Note: This is a term sheet and not a commitment to lend. These terms and conditions are subject to change. The anticipated commitments are based upon the intended acres, crop mix, and crop insurance type and levels that were communicated to ARM. If intended planted acres, crop mix, and/or crop insurance type and levels change, I agree to promptly notify ARM. Please note that this outline does not contain all of the terms, conditions, and other provisions involved in this transaction that would be more fully described in the definitive legal document(s) for the proposed transaction.

# Crapp Farms Ptr - 2017 Cash Rent Due          $2,767,711

| Desc | 578's | Acres | Curr Amount | Ave. price/acre | Date | Amount Due | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wieking | 48.52 | 52 | $10,400 | $200 | | | | | | 10400 | | | | | | | | |
| Kok | 447.14 | 453 | $45,300 | $200 | | | | 45300 | | | | | | | | | | |
| Querry | 98.76 | 98.5 | $11,081 | $225 | November-17 | $ 11,081 | | | | | 11081 | | | | | | 11081 | |
| Query - PAID | 14.51 | 14 | $0 | $0 | | | 3150 | | | | | | | | | | | |
| Todd Wolf | 11.72 | 11 | $1,063 | $97 | | | | | | 1063 | | | | | | | | |
| Economy | 2.54 | 2.98 | $671 | $225 | | | | | 671 | | | | | | | | | |
| Economy - PAID | 1 | 1 | $0 | $0 | | | | 50 | | | | | | | | | | |
| Hurricane - PAID | 1 | 1 | $0 | $0 | | | | | | | | | | | | | | |
| Chen | 535 | 534.5 | $120,263 | $225 | | | | | | 120263 | | | | | | | | |
| Ed. Wienkes | 100.31 | 100 | $22,500 | $225 | | | | | | 22500 | | | | | | | | |
| Schurman Farm | 313.4 | 312.38 | $34,690 | $222 | November-17 | $ 34,690 | | | 34690 | | | | | | | | 34690 | |
| HTS | 8716.67 | 8629 | $2,157,250 | $250 | November-17 | 2157250 | 2157250 | | | | | | | | | | | |
| HTS (Grain Bin) | N/A | N/A | $340,737 | N/A | | 340737 | 340737 | | | | | | | | | | | |
| Wilson (Hog Bldg) | 7.8 | 9.5 | $0 | $200 | November-17 | $ 1,900 | | | | | | | | | | | 1900 | |
| Weaver | N/A | N/A | $0 | $200 | Monthly | $ 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,500 | 3,900 |
| Wilson | 165.11 | 176.5 | $19,856 | $225 | October-17 | $ 19,856 | | | | | | | | | | 19856 | | |
| CRP land Acres | 2.155 | 2.155 | | | | | | | | | | | | | | | | |
| | 10,462 | 10,394 | $2,767,711 | $221 | | | 2505037 | 49750 | 39261 | 177982 | 14981 | 3900 | 3900 | 3900 | 3900 | 23756 | 96871 | 3900 |
| Acres | 12,617 | 12,549 | | | | | | | | | | | | | | | | |



EXHIBIT
5

tabbies

# CRAPP FARMS PARTNERSHIP AND TONY CRAPP

## 2017 Growing Crop WIP

| | ACRES | BU/ACRE (APH) | TOTAL BU | REVENUE | |
|---|---|---|---|---|---|
| Corn | 12,305 | 206 | 2,534,830 | $ 9,043,871 | See attached corn pricing sheet |
| Beans | 214 | 70 | 14,980 | $ 164,780 | $11/BU |
| Wheat | 30 | 90 | 2,700 | $ 16,200 | $6/BU |
| Alfalfa | 386 | 4 Ton/Ac | 1,544 Ton | $ 92,640 | $60/Ton |
| Total Acres | 12,935 | | | $ 9,317,491 | |
| GOVT ARC-CO | | | | $ 350,000.00 | |
| GOVT CSP Pollinator | | | | $ 41,000.00 | |
| | | | | $ 9,708,491 | Total Revenue |

| | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|
| Labor | 60,852 | 61,192 | 70,178 | 76,989 | 80,002 | 120,667 | 77,000 | 77,000 | 623,880 |
| Equipment Insurance | 16,905 | 2,425 | 2,425 | 16,905 | 2,425 | 16,905 | 2,425 | 2,425 | 62,840 |
| Life Insurance | 3,092 | 2,507 | 4,452 | 2,507 | 2,507 | 2,507 | 3,092 | 2,702 | 23,366 |
| Fuel | 41,500 | 41,500 | 20,344 | 20,344 | 20,344 | 41,500 | 41,500 | 41,500 | 268,532 |
| Crop Insurance | | | | | | | | 682,761 | 682,761 |
| Partner Draws | 14,797 | 14,797 | 14,797 | 14,797 | 14,797 | 14,797 | 14,797 | 14,797 | 118,376 |
| Attorney Fees | 20,000 | | | | | | | | 20,000 |
| Rent Land | | 11,100 | | | | | | 11,100 | 22,200 |
| Rent Lease - UBS Bins | 2,633,148 | | | | | | | | 2,633,148 |
| Property Taxes | 320,000 | | | | | | | | 320,000 |
| Repair Equipment | 9,150 | 10,159 | 11,050 | 10,324 | 21,560 | 15,150 | 40,650 | 20,750 | 138,793 |
| Supplies | 12,740 | 13,945 | 19,365 | 15,198 | 18,542 | 25,450 | 21,670 | 11,545 | 138,455 |
| Worker's Comp Ins | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 24,000 |
| LP grain site | | | | | 131,884 | | | | 131,884 |
| Chemicals | 357,595 | | | | | | | | 357,595 |
| Custom Machine | | | 42,600 | | | | | | 42,600 |
| Nitrogen & PK-UBS Acres | 941,872 | | | | | | | | 941,872 |
| Nitrogen Only | 250,659 | | | | | | | | 250,659 |
| Seed | 1,300,090 | | | | | | | | 1,300,090 |
| Semi Leases | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 50,000 |
| CNH Capital Tractor Leases | 76,408 | | | | | | | | 76,408 |
| AGCO Sprayer Leases | 154,734 | | | | | | | | 154,734 |
| TOTAL EXPENSES | 6,222,792 | 166,875 | 194,461 | 166,314 | 301,311 | 246,226 | 210,384 | 873,830 | 8,382,193 |


tabbies®
EXHIBIT

# Crapp Farms
## 2017 Corn Crop

| Corn Acres | Yield | Total Bushels |
|---|---|---|
| 12,305 | 206 | 2,534,830 |

| Bushels Sold | Unpriced | % Sold |
|---|---|---|
| 2,534,830 | 0 | 100.00% |

| Balance | |
|---|---|
| Long | 0% |
| Short | 100% |

| | Month | Mkt Value | Bushels | % | Strike | Cost |
|---|---|---|---|---|---|---|
| Open Puts | | 0.0000 | 0 | 0.00% | 0.00 | |
| | Dec | | 1,700,000 | 67.07% | 4.00 | -0.2100 |
| | Dec | 0.0000 | -1,700,000 | -67.07% | 4.70 | 0.0700 |
| Open Calls | | | | 0.00% | | |
| | | | 0 | 0.00% | | |

| 2017 Contracts | | Futures: | 3.8900 | | | | |
|---|---|---|---|---|---|---|---|
| Bushels | Location | Delivery | Futures | Basis | Cash | Comments | Revenue |
| 300,000 | Gavilon DBQ | Nov | 4.3000 | -0.3000 | 4.0000 | 4.30 less .10 for Marketing Fee | 1200000 |
| 450,000 | Big River | Dec | 3.8200 | -0.2300 | 3.5900 | 3.89 less 7c Big River | 1615500 |
| 50,000 | ADM Clinton | Dec | 3.8200 | -0.1400 | 3.6800 | Clinton | 184000 |
| 350,000 | Big River | Jan | 3.9000 | -0.3100 | 3.5900 | 3.98 less 8c | 1256500 |
| 50,000 | ADM Clinton | Jan | 3.9000 | -0.2200 | 3.6800 | Clinton | 184000 |
| 350,000 | Big River | Feb | 3.9000 | -0.2900 | 3.6100 | 3.98 less 8c | 1263500 |
| 50,000 | ADM Clinton | Feb | 3.9000 | -0.2000 | 3.7000 | Clinton | 185000 |
| 650,000 | Big River | March | 3.9000 | -0.2700 | 3.6300 | 3.98 less 8c | 2359500 |
| 84,830 | ADM Clinton | March | 3.9000 | -0.2000 | 3.7000 | Clinton | 313871 |
| 200,000 | LIVESTOCK FEED | | 3.9000 | -0.3000 | 3.6000 | Clinton | 720000 |
| 2,534,830 | Total Bu Sold | Avg Price | $3.93 | 3.6617 | | Corn Total | 9281871 |
| | Closed Trades P/L | NET/AVG | $3.93 | 3.6617 | | Option Cost | 238000 |
| | | | | | | Corn Net | |
| | | | | | | Revenue | $ 9,043,871 |

NOTE: These prices are cash prices as of today if we were to contract them today. In this price is built the cost of purchasing a $4.00 December call and selling a $4.70 December call which leaves the upside open to $4.70/bushel.