**THIS ORDER IS SIGNED AND ENTERED.**

**Dated: June 1, 2017**

_____
Hon. Catherine J. Furay
United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WISCONSIN

*In re:*

Crapp Farms Partnership,

      Debtor.

Case No. 17-11601
Chapter 11

---

### AGREED ORDER:
### (I) AUTHORIZING DEBTOR-IN-POSSESSION TO INCUR POST-PETITION SECURED INDEBTEDNESS; (II) GRANTING SECURITY INTERESTS AND PRIORITY LIENS PURSUANT TO 11 U.S.C. § 364; (III) APPROVING THE ASSUMPTION AND SUBLEASE OF CERTAIN UNEXPIRED FARM LEASES RELATED THERETO; AND (IV) AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL

---

Based upon an agreement by and between Crapp Farms Partnership, the debtor herein (the

"Debtor" or "Partnership"); BMO Harris Bank, N.A., a secured creditor and interested party herein

("BMO"); Agrifund, LLC ("ARM") and Federal Hybrids, Inc. ("Federal Hybrids") (together,

ARM and Federal Hybrids are referred to as the "Lenders"); Eagle Creek Midwest LLC c/o UBS

AgriVest LLC ("UBS"), an interested party herein by virtue of its unexpired pre-petition leases

with the Debtor; and the Office of the United States Trustee (the "UST"), regarding the Debtor's

motion to enter into post-petition financing agreements (the "DIP Financing") with the Lenders,

which are collectively ARM, Federal Hybrids and UBS; for the entry of an order authorizing the
Debtor to assume certain unexpired farm and farm-related leases; and for the entry of an order
authorizing Debtor's limited use of cash collateral, the parties stipulate and agree as follows.

A.      The Debtor commenced this bankruptcy proceeding on May 3, 2017 (the "Petition
Date").

B.      The Debtor is obligated to BMO pursuant to the loans and guaranties described and
set forth in the Proof of Claim and attachments thereto filed by BMO on May 11, 2017 [Claim
Number 2-1]. The obligations described in BMO's Proof of Claim (referred to therein as Note 1,
Note 2, Note 3, Note 4, Note 5, Note 6, Note 7, Note 8, Note 9, Note 10, Note 11, Note 12, and
Note 13) are referred to hereafter as the "Notes".

C.      As of the Petition Date, Debtor owed BMO on the Notes $29,067,310.42, plus
additional costs and fees including, but not limited to, attorneys' fees and costs (the
"Indebtedness"), which amounts are owing without offset, defense, deduction, or counterclaim of
any kind.

D.      The Indebtedness is secured by a properly perfected, valid, and enforceable security
interest in all personal property of the Debtor, including, but not limited to, all accounts, deposit
accounts and contract rights of Debtor, and proceeds thereof owned by Debtor and related to
Debtor's current operations as described in the security agreements executed by the Debtor and
certain related entities prepetition, and by mortgages on real property now owned by the Debtor
located in Grant County, Wisconsin, which property was owned by Crapp Land, LLC prepetition
(altogether, the "BMO Collateral"), except to the extent that any such collateral may be subject to
valid, properly perfected, priority liens of pre-petition secured creditors other than BMO.

E.      Prior to the filing of the Debtor's bankruptcy Petition, BMO commenced a
Wisconsin Statutes Chapter 128 Receivership Action against Debtor (and a related entity) in the

Circuit Court for Grant County, Wisconsin (Case No. 17CV148) ("Receivership Action") seeking the appointment of Michael Polsky, Esq. as the Wisconsin Statutes Chapter 128 Receiver ("Proposed Receiver"). The instant bankruptcy filing stayed that action and the appointment of the Receiver.

F.    In addition to BMO's other properly perfected, valid, and enforceable first position security interest in personal property, BMO maintains a first priority security interest in any and all accounts, deposit accounts and contract rights of Debtor, and proceeds thereof owned by Debtor and related to Debtor's current operations (the "Cash Collateral").

G.    On May 26, 2017, this Court entered the *Agreed Interim Order:  (1) Authorizing Debtor's Limited Use of Cash Collateral; and (2) Granting BMO Harris Bank, N.A. Relief from the Automatic Stay* (the "Interim Cash Collateral Order").  *See* Docket Entry No. 72.  Pursuant to the Interim Cash Collateral Order, Debtor was granted limited use of BMO's Cash Collateral until June 16, 2017, and BMO was granted relief from stay to proceed with the Receivership Action in the event that the Debtor was unable to obtain an order of the Court permitting Debtor to obtain post-petition financing to plant a crop on or before June 16, 2017.

H.    In order to protect BMO's security interest in Cash Collateral that existed on or after the date of the filing of Debtor's bankruptcy Petition, BMO holds a first and paramount post-petition replacement lien (the "Post-petition Lien") on the Debtor's real and personal property, including but not limited to, equipment, livestock, fixtures, inventory, documents, general intangibles, accounts, and contract rights, and specifically including any and all accounts, deposit accounts and contract rights of Debtor, and proceeds thereof owned by Debtor and related to Debtor's livestock, trucking and excavating operations, except to the extent that any such collateral may be subject to valid, properly perfected, priority liens of pre-petition secured creditors other than BMO.

I.      The Post-petition Lien was deemed perfected as of the Petition Date upon the entry of the Interim Cash Collateral Order.  BMO may, but is not required to, file a financing statement with the Wisconsin Department of Financial Institutions to perfect the Post-petition Lien.  The Post-petition Lien shall be deemed to attach to any such assets that the Debtor has an interest in not otherwise described herein.

J.      The Post-petition Lien to BMO shall not be deemed to attach to any accounts, deposit accounts, contract rights, or other such interests in, and solely related to, any 2017 crops that may be planted by the Debtor to the extent that Debtor obtains Court approval for financing to plant during the pendency of this Chapter 11 Case.

K.      On May 24, 2017, the Debtor filed its *Motion for Interim and Final Orders Pursuant to 11 U.S.C. § 364(c) and 364(d):  (I) Authorizing Debtor-In-Possession to Incur Post-Petition Secured Indebtedness and (II) Granting Security Interests and Priority Liens Pursuant to 11 U.S.C. § 364; and Approving the Assumption and Sublease of Certain Unexpired Farm Leases Related Thereto* (the "DIP Financing Motion") (*See* Docket Entry No. 63).

L.      As of the date of the parties' entry into this Agreed Order, the UST is continuing its efforts to form a creditor's committee, but no official committee has been appointed in this Chapter 11 Case.

M.      The Debtor and BMO, having reached an agreement regarding the DIP Financing Motion that will allow the Debtor to enter into the post-petition financing agreements with the Lenders, subject to certain conditions; and further extending the Interim Cash Collateral Order subject to certain conditions; there being no objections to the DIP Financing Motion having been filed by any party in interest as of the date of the hearing set for the DIP Financing Motion, and this Court being advised in the premises, the parties this Agreed Order agree to the entry of this Agreed Order:  (1) Authorizing the Debtor to incur post-petition secured indebtedness, granting

security interests and priority liens, and authorizing the Debtor to assume and sublease certain

expired farm leases; and (2) further extending the Interim Cash Collateral Order.

**THEREFORE, based upon the record and file here and the stipulated facts;**

**IT IS HEREBY ORDERED** that:

I.    **Authority for the Debtor to incur post-petition secured indebtedness and grant security interests and priority liens to Lenders.**

1.    Subject to and in accordance with the provisions of this Agreed Order, the Debtor is

authorized to enter into a post-petition financing agreement with ARM pursuant to the terms and

conditions of its financing and security agreements (the "ARM DIP Financing Documents");

which ARM DIP Financing Documents are attached hereto and incorporated herein as **Exhibit A**.

2.    Pursuant to the ARM DIP Financing Documents, ARM shall be granted a post-

petition, first-position security interest in the collateral as described herein, and subject to the

terms of, the ARM DIP Financing Documents (the "ARM Collateral"); and BMO shall assign its

properly perfected first-position security interest in the Debtor's 2016 government payment to

ARM.

3.    The automatic stay pursuant to Section 362 of the Bankruptcy Code shall be

modified to permit ARM to take any action authorized or contemplated by the ARM DIP

Financing Documents to carry out the terms thereof, including, but not limited to, perfection of its

security interest in the ARM Collateral, subject to any notice, procedural or other conditions

contained in the ARM DIP Financing Documents.

4.    The Debtor is authorized to enter into a post-petition financing agreement with

Federal Hybrids pursuant to the terms and conditions of its financing and security agreements (the

"Federal Hybrids DIP Financing Documents"; which Federal Hybrids DIP Financing Documents

are attached hereto and incorporated herein as **Exhibit B**.

5.    Pursuant to the Federal Hybrids DIP Financing Documents, Federal Hybrids shall be granted a post-petition, second-position security interest in the collateral as described in, and subject to the terms of, the Federal Hybrids DIP Financing Documents (the "Federal Hybrids Collateral").

6.    The automatic stay pursuant to Section 362 of the Bankruptcy Code shall be modified to permit Federal Hybrids to take any action authorized or contemplated by the Federal Hybrids DIP Financing Documents to carry out the terms thereof, including, but not limited to, perfection of its security interest in the Federal Hybrids Collateral, subject to any notice, procedural or other conditions contained in the Federal Hybrids DIP Financing Documents.

7.    In addition to the post-petition financing with ARM and Federal Hybrids, as described above, Debtor is authorized to obtain: (i) a loan from UBS in the sum of $450,000 pursuant to the terms and conditions of its financing and security agreements (the "UBS DIP Financing Documents"); which UBS DIP Financing Documents are attached hereto and incorporated herein as **Exhibit C**; and (ii) an additional potential future loan from UBS in the sum of $135,000, which loan UBS agrees to make to the Debtor, and which shall ONLY be made and disbursed by UBS to the Debtor in the event the proceeds of the Debtor's 2017 federal crop insurance are insufficient to cover any losses of revenue covered by such federal crop insurance, in which case UBS, on behalf of the Debtor, shall disburse such loan proceeds to the Debtor for the benefit of ARM and/or Federal Hybrids, as applicable, for application to the Debtor's outstanding obligations to ARM and/or Federal Hybrids under and pursuant to the ARM DIP Financing Documents and/or the Federal Hybrids DIP Financing Documents; AND upon further approval and authorization by this Court upon the Debtor's filing and properly noticing of a motion seeking entry of an order granting such approval and authorization.

8.    Pursuant to the UBS DIP Financing Documents, UBS shall be granted a post-

petition, third-position security interest in the collateral as described in, and subject to the terms of, the UBS DIP Financing Documents (the "UBS Collateral").

9.    The automatic stay pursuant to Section 362 of the Bankruptcy Code shall be modified to permit UBS to take any action authorized or contemplated by the UBS DIP Financing Documents to carry out the terms thereof, including, but not limited to, perfection of its security interest in the UBS Collateral, subject to any notice, procedural or other conditions contained in the UBS DIP Financing Documents.

10.    In accordance with the ARM DIP Financing Documents, the Federal Hybrids Financing Documents, and UBS Financing Documents, BMO's security interests in: 1) the proceeds from crops planted by the Debtor in 2017; 2) the Debtor's 2017 crop insurance payment; 3) the 2016 government payment due to Debtor which Debtor anticipates receiving in late 2017; and 4) the 2017 government payment due to Debtor which the Debtor anticipates receiving in 2018, shall be and is hereby primed in favor of the Lenders.

11.    In the event that the net sale proceeds from crops planted by the Debtor in 2017 are insufficient to allow the Debtor to pay Federal Hybrids and/or UBS in full pursuant to the Federal Hybrids DIP Financing Documents and the UBS Financing Documents, then Federal Hybrids and/or UBS shall each be entitled to apply for the allowance of an administrative expense claim pursuant to 11 U.S.C. § 503 to allow for such deficiency in payment from the Debtor to be treated as an administrative expense claim; however Federal Hybrids and UBS each acknowledge that BMO will not allow the Debtor to use any of BMO's Collateral to be used to pay any such allowed administrative expense claim of Federal Hybrids or UBS.

**II.**    **Approval and authority for the Debtor to assume and sublease certain unexpired farm leases.**

12.    The Debtor is authorized to assume the unexpired, pre-petition farm leases for the

lease of farm land (the "Land Leases"), and the unexpired, pre-petition leases for grain storage facilities and livestock feeding facilities (the "Storage Leases") (collectively with the Land Leases, the "Unexpired Farm Leases"), collectively identified in **Exhibit D** attached hereto and incorporated herein.

13.    Except for the leases between the Debtor and Eagle Creek Midwest LLC c/o UBS AgriVest LLC (the "UBS Lease"), and the hog building lease between the Debtor and Jim and Kevin Wilson (the "Wilson Hog Building Lease"), Debtor is authorized to enter into subleases for each of the Unexpired Farm Leases with Tony D. Crapp, one of the partners of the Debtor ("Tony"). As provided in Paragraph 19 of the DIP Financing Motion, any net profits that Tony receives for his 2017 crops shall immediately be paid to the Debtor as further consideration for subleasing the Unexpired Farm Leases from the Debtor.

14.    Except for the UBS Lease and the Wilson Hog Building Lease, Tony shall cure the pre-petition arrearages for the leases he is subleasing from the Debtor from the proceeds of a related loan from the Lenders to Tony; and Tony shall cure such pre-petition arrearages within five (5) days from the funding of the related loan to him.

15.    The Debtor shall cure the pre-petition arrearages for the UBS Lease and the Wilson Hog Building Lease from the proceeds of the loans from each of the Lenders; and the Debtor shall cure such pre-petition arrearages within five (5) days of the funding of the loans from the Lenders.

**III.    Authority for Debtor to use cash collateral and provide adequate protection payment to BMO.**

16.    The Debtor may use Cash Collateral in the ordinary course of business to pay its post-petition expenses for its livestock, trucking and excavating operations in accordance with the Debtor's budget consolidating these operations' income and expenses, attached to this Agreed Order (the "Approved Consolidated Budget") as **Exhibit E**, and as long as the Debtor is in

compliance with the terms of this Stipulation. For the avoidance of doubt, the Debtor shall not be authorized to use the Cash Collateral to pay any costs, fees, or expenses in any way related to crop inputs for the 2017 planting season or related to the 2017 crops. The Debtor shall segregate funds in its DIP account so that proceeds from the livestock, trucking, and excavating operations are separate, identifiable, and distinct from proceeds relating to the 2017 crops. The Debtor reserves the right to submit to BMO for BMO's consideration an amended consolidated budget.

17.     Unless otherwise ordered by the Court and subject to any confirmed Chapter 11 Plan, the Debtor's authority to use Cash Collateral as set forth herein shall terminate effective December 31, 2017 ("Termination Date").

18.     The parties agree that BMO is entitled to adequate protection for the use of the Cash Collateral, and the BMO Collateral, that these adequate protection payments are not Cash Collateral, that BMO shall be entitled to apply such payments to the Indebtedness in its discretion, and the Debtor shall make the following adequate protection payment(s) to BMO (collectively, the "Adequate Protection Payments"):

(i)     A one-time cash payment in the amount of $450,000.00 to be made to BMO upon the closing and funding of the DIP Financing; and

(ii)    Monthly adequate protection payments in the amount of $15,000 delivered to BMO Harris Bank, N.A., Attn: Laureen K. Mueller, 4711 Monona Drive, Monona, Wisconsin, 53716 with the first payment due on or before June 15, 2017, and each subsequent payment to be made on the fifteenth (15th) day of each month thereafter, which payments shall continue until modified by the written agreement of the parties or order of the Court.

19.     The Debtor shall continue to sell its crops harvested from the 2016 planting season in the ordinary course of its business, with all proceeds from such sales to be paid directly to

Commodity Credit Corporation ("CCC") and BMO pursuant to the priorities between CCC and BMO, and CCC and BMO shall be entitled to apply such proceeds to their respective obligations with the Debtor in their discretion.  The proceeds to be sent to BMO may be sent directly to: BMO Harris Bank, N.A., Attn:  Laureen K. Mueller, 4711 Monona Drive, Monona, Wisconsin, 53716.

20.    No later than ten (10) days from the end of business day on June 16, 2017, the Debtor shall open a new debtor-in-possession account at an authorized financial institution, and shall be required to obtain and use new correspondence and business forms related to its operations accordingly.

21.    Notwithstanding Section 552(a) of the Code, and in addition to the security interest granted by Section 552(A) of the Code, the Post-petition Lien provided for in the Interim Cash Collateral Order is hereby extended and continued.  BMO shall be granted with a continuing first and paramount post-petition replacement lien (defined above as the Post-petition Lien) on the Debtor's real and personal property, including but not limited to, equipment, livestock, fixtures, inventory, documents, general intangibles, accounts, and contract rights, and specifically including any and all accounts, deposit accounts and contract rights of Debtor, and proceeds thereof owned by Debtor and related to Debtor's current livestock, trucking and excavating operations, except to the extent that any such collateral may be subject to valid, properly perfected, priority liens of pre-petition secured creditors other than BMO or constitutes the ARM Collateral, the Federal Hybrids Collateral, or the UBS Collateral.  The Post-petition Lien provided for in the Interim Cash Collateral Order shall be continued, but the provisions of this Agreed Order shall govern as to use of Cash Collateral, granting of the Post-petition Lien, and all other terms, conditions, and provisions which are in contrast between this Agreed Order and the Interim Cash Collateral Order.

22.    The Post-petition Lien shall be deemed perfected as of the Petition Date upon the

entry of this Agreed Order, and shall survive the termination of this Agreed Order. BMO may, but is not required to, file a financing statement with the Wisconsin Department of Financial Institutions to perfect the Post-petition Lien. The BMO Post-petition Lien shall be deemed to attach to any such assets that the Debtor has an interest in not otherwise described herein. The Debtor will cooperate with BMO to execute a DIP account control agreement with the lender maintaining the DIP account which shall acknowledge BMO's security interest in the DIP account.

23.     The Post-petition Lien shall not be deemed to attach to the ARM Collateral, the Federal Hybrids Collateral, or the UBS Collateral as described in the Lenders' respective DIP financing documents.

24.     In accordance with the Approved Consolidated Budget, the Debtor shall timely pay all real estate taxes on the real property owned by Debtor.

25.     The Debtor shall continue to insure its real and personal property assets, and pay all premiums when due. The Debtor shall timely furnish proof of adequate insurance on their real and personal property assets within a reasonable time upon request by any party to this Agreed Order.

26.     By consenting to the use of Cash Collateral pursuant to the terms of this Agreed Order and as provided for in the Approved Consolidated Budget, and by consenting to the Debtor to enter into the DIP financing provided for herein, BMO shall not be deemed to be providing consent for its collateral to be surcharged under 11 USC 506(c) or any other provision of law. By stipulating to the entry of this Agreed Order, BMO has not, and shall not be deemed to have, consented to any payments or charges that operate as surcharge pursuant to 11 USC 506(c). The parties hereto, as further adequate protection for BMO, have, and shall be deemed to have, waived all claims which might now or hereafter exist against BMO pursuant to Section 506(c) of the Code, and such claims are prohibited and forever barred.

27.     Subject to the terms and conditions provided herein, BMO is not agreeing to

advance new or additional funds, but is only permitting Debtor to use Cash Collateral to pay the expenses provided for in the Approved Budget.

28.     In addition to restrictions set forth above, Cash Collateral shall not be used for

(i)     payment of any prepetition unsecured indebtedness, unless approved in advance of payment by the Court, with notice to BMO prior to obtaining Court approval; and

(ii)     payment of any expenses relating to crop inputs for the 2017 planting season or related to the 2017 crops.

29.     Debtor shall provide BMO the following information and documents:

(i)     Commencing two weeks after the entry of this Order, Debtor shall provide BMO by Tuesday of the following week, a report on its income and expenses during the prior week, an account statement relating to deposits and credits to Debtor's DIP account, and shall include updated livestock numbers, copies of checks deposited, and copies of checks negotiated. That report shall be emailed to BMO's attorney.

(ii)     Commencing on June 15, 2017, in addition to, and simultaneously with the Operating Reports required by the U.S. Trustee to be filed on the 15th day each month, the Debtor shall provide BMO with a comparison of actual income and expenses to budgeted income and expenses, a detailed payroll report, and an internally prepared monthly balance sheet and income statement. Those additional reports shall be emailed to BMO's attorney.

(iii)     Debtor shall permit BMO and its representatives to inspect the BMO Collateral and inspect, audit, and review Debtor's books and records at all times requested, upon 48 hours notice, and shall permit BMO and its representatives to make copies of said books and records or extracts therefrom.

30.     Debtor currently reports that it maintains 2,410 head of cattle, and 4,110 head of

hogs (the "Livestock Collateral"). Debtor consents and agrees that the Livestock Collateral shall

not decrease in number by more than 7% of the current reported total at any time. The failure of

the Debtor to maintain these levels shall constitute an immediate event of default under this

Agreed Order, and BMO shall thereafter be entitled to relief from the automatic stay which BMO

shall be entitled to upon notice to the Court upon the filing of an affidavit of default.

31.     The occurrence of any event of default under the ARM DIP Financing Documents,

the Federal Hybrids DIP Financing Documents, and the UBS DIP Financing Documents shall

constitute a default under the Cash Collateral provisions of this Order, and shall entitle BMO to

relief from the automatic stay which BMO shall be entitled to upon notice to the Court upon the

filing of an affidavit of default.

32.     In addition to those events of default set forth elsewhere in this Agreed Order, upon

the occurrence of any of the following events (each of which is an "Event of Default"), Debtor

shall be in Default under this Order:

(i)     Any failure to comply with a term or requirement of this Order.

(ii)    The dismissal of the pending bankruptcy case, the appointment of a Chapter

11 Trustee, or the conversion of the case to one under Chapter 7.

(iii)   The appointment in the bankruptcy case of an interim trustee or examiner

appointed by the Court to perform certain duties generally reserved to the Debtor.

(iv)    The formal challenge by the Debtor, U.S. Trustee, or any party in interest,

whether by adversary proceeding or otherwise, of the extent, validity, or priority of BMO's

liens on the BMO Collateral described herein.

(v)     Cancellation or lapse of any of the Debtor's insurance policies that insure

the BMO Collateral.

(vi)    Cessation of normal business operations by Debtor.

33.    Upon the occurrence of an Event of Default by the Debtor, BMO shall provide notice of such default to the Debtor, which written notice shall be accomplished by electronic mail (email) to Debtor's counsel at ksederholm@ks-lawfirm.com and ereyes@ks-lawfirm.com, with a copy to the Debtor to their mailing address of 5761 Substation Road, Lancaster, Wisconsin, 53813. If the Debtor fails to cure the default within three (3) days of BMO's notice, in addition to remedies provided elsewhere in this Agreed Order, upon the occurrence or continuation of any event of Default, the Debtor's right to use Cash Collateral pursuant to this Agreed Order shall terminate, and BMO shall have the right to notify the financial institution maintaining the DIP account of the default under this Agreed Order, and that the DIP account is to be frozen pending further order of the Court. However, such written notice and right to cure shall be limited to one occurrence during the period covered by this Agreed Order.

34.    By agreeing to the entry of this Agreed Order, BMO has not waived and has specifically reserved its right to challenge the authorization of the actions taken in merging Debtor's operations with its related entities pre-petition, and the transferring of real and personal property pre-petition. BMO has not waived all rights and claims available to it and reserves the right to challenge any proposed plan put forth by the Debtor.

35.    Non delay or omission to exercise any right, power or remedy accruing to BMO upon a breach or default of Debtor under this Agreed Order or any other loan document, agreement, or order shall impair any such right, power or remedy of BMO, nor shall it be construed to be a waiver of any such breach or default, nor an acquiescence therein, or of any breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any breach or default under this Agreed Order must be in writing, and signed by BMO, and shall only be effective to the extent of such writing. All remedies under this Order or by law or otherwise afforded to BMO shall be cumulative and not alternative.

36.    If any or all of the provisions of this Agreed Order are hereafter modified, vacated, amended or stayed by subsequent order of this or any other Court, such modification, vacation, amendment, or stay shall not affect the validity or enforceability of the Post-petition lien provided herein or BMO's pre-petition lien on the BMO Collateral.

37.    In the event that this Case is dismissed for any reason, the Debtor shall not file any new bankruptcy proceeding until the earlier of (1) forty-five (45) days after the entry of any order dismissing this Case; (2) the earliest date for re-filing permissible under the Bankruptcy Code.

38.    The stipulations in Paragraphs A through M above (the "Stipulations") shall be binding on the Debtor, BMO, and the UST and, except as expressly set forth in the immediately following sentence, any person or entity claiming through the Debtor.  Until the day that is the later of:  (a) thirty (30) days from the formation of an official committee of unsecured creditors (the "Committee"); or (b) fifteen (15) days following the Section 341 Meeting of Creditors; a Committee, if any, shall be entitled to investigate the accuracy of the Stipulations.

39.    This Agreed Order may be signed in counterparts and facsimile or electronic signatures are regarded by the parties as original for the purposes of this Agreed Order.

**[The remainder of this page has been intentionally left blank.]**

**KREKELER STROTHER, S.C.**
*Attorneys for Debtor, Crapp Farms Partnership*

Dated   5/31/17

By:   Kristin J. Sederholm, SB #1001895
     Eliza M. Reyes, SB #1030764
     Jennifer M. Schank, SB #1077110

**AXLEY BRYNELSON, LLP**
*Attorneys for BMO Harris Bank, N.A.*

Dated _____

By:   David M. Pelletier, SB #1072343

**OFFICE OF THE UNITED STATES TRUSTEE**

Dated _____

By:   Tiffany E. Rodriguez
     Attorney for the United States Trustee

**AGRIFUND, LLC**

Dated   5/31/17

By:   Mark Bellis
Its:   Senior Loan Officer

**O'CONNOR & THOMAS P.C.**
*Attorneys for Federal Hybrids, Inc.*

Dated _____

By:   Peter D. Arling, SB #1054845
     Tonya A. Trumm, SB#1034790

**KREKELER STROTHER, S.C.**
*Attorneys for Debtor, Crapp Farms Partnership*

Dated _____

By:     Kristin J. Sederholm, SB #1001895
           Eliza M. Reyes, SB #1030764
           Jennifer M. Schank, SB #1077110

**AXLEY BRYNELSON, LLP**
*Attorneys for BMO Harris Bank, N.A.*

Dated: June 1, 2017

    */s/ David M. Pelletier*
By:     David M. Pelletier, SB #1072343

**OFFICE OF THE UNITED STATES TRUSTEE**

Dated: June 1, 2017

    */s/ Tiffany E. Rodriguez*
By:     Tiffany E. Rodriguez
           Attorney for the United States Trustee

**AGRIFUND, LLC**

Dated _____

By: _____
Its: _____

**O'CONNOR & THOMAS P.C.**
*Attorneys for Federal Hybrids, Inc.*

Dated: June 1, 2017

    */s/ Tonya A. Trumm*
By:     Peter D. Arling, SB #1054845
           Tonya A. Trumm, SB#1034790

**MESSERLI & KRAMER**
*Attorneys for Eagle Creek Midwest, LLC c/o*
*UBS Agrivest, LLC*

Dated:  June 1, 2017                    _____/s/ Joseph W. Lawver_____

By:    Joseph W. Lawver, Esq.

### ###

# EXHIBIT A

**ARM Crop Loan Documents**

Borrower's exact full legal name, if organization, include organizations legal representative full legal name

| **Borrower** | | **SSN/TID** |
|---|---|---|
| Entity Name | Crapp Farms Partnership | |
| Borrower Name | Darrell Carl Crapp | 82-0581539 |
| Address | 5761 Substaation Road | |
| City ST Zip | Lancaster, WI 53813 | |
| | | |
| Entity Name | | |
| Co-Borrower Name | Tony Darrell Crapp | 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 |
| Address | 322 Alona Ln | |
| City ST Zip | Lancaster, WI 53813 | |
| | | |
| Entity Name | | |
| Co-Borrower Name | Carl Daniel Crapp | 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 |
| Address | 6638 Stage Rd | |
| City ST Zip | Potosi, WI 53820 | |
| | | |
| Entity Name | | |
| Co-Borrower Name | Diana M. Crapp | 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 |
| Address | 5761 Substation Rd | |
| City ST Zip | Lancaster, WI 53813 | |

**Terms**

| | |
|---|---|
| Loan Origination Date | 5/30/2017 |
| Total Loan Commitment | $5,834,398.00 |
| Loan Due Date | 3/15/2018 |
| Loan Rate | 9.00% |

**Collateral**

| | |
|---|---|
| Crop Year | 2017 |
| Crop State | Wisconsin |
| Insured Crops | Corn & Soybeans |

**Guarantor(s)**

| | |
|---|---|
| Guarantor | Darrell Carl Crapp |
| Guarantor | Tony Darrell Crapp |
| Guarantor | Carl Daniel Crapp |
| Guarantor | Diana M. Crapp |

**Buyers(s)**

| | |
|---|---|
| Buyer | Eastland Feed and Grain Gavilon |
| Buyer | |
| Buyer | |
| Buyer | |

**Cross-Collateral**

| | | |
|---|---|---|
| Related Borrower / Amount | Tony Darrell Crapp | $2,050,559.00 |
| Related Borrower / Amount | | |
| Related Borrower / Amount | | |
| Related Borrower / Amount | | |

**Distributor Participation**

| | |
|---|---|
| Distributor | Federal Hybrids, Inc. |
| Address, City, ST Zip | 209 3rd St Ne, W. Bend, IA 50597 |
| Distributor Commitment | $869,404.00 |
| ARM Commitment | $4,964,994.00 |

## NOTICE AND BORROWING RESOLUTION

Each of the undersigned, constituting all partners, members and officers of Crapp Farms Partnership ("Company"), hereby consents to the following action in lieu of any annual or special meeting of the partners, members or the board of directors, and with the express intention that the action have the same effect as though duly adopted by vote at such meeting;

It being proposed that the Company be authorized to execute any and all documents necessary to enable the Company to borrow funds from Agrifund, LLC ("ARM"),  Federal Hybrids, Inc. and Eagle Creek Midwest, LLC ("Eagle Creek") for financing the Company's 2017 crops in accordance with the loan documents prepared by ARM, Federal Hybrids and Eagle Creek.

After due notice, and after consideration the proposal, the Partners hereby adopt the following resolutions:

**RESOLVED,** that all actions taken by the Partners since the date of formation of Company and known to the undersigned and not otherwise objected to, are hereby ratified and approved.

**FURTHER RESOLVED AND APPROVED** that full and exclusive authority is hereby conferred upon and vested in each of the undersigned to:  (i) execute any and all documents necessary to enable the Company to borrow funds from Agrifund, LLC ("ARM"), Federal Hybrids, Inc. ("Federal Hybrids") and Eagle Creek Midwest, LLC ("Eagle Creek" and collectively with ARM and Federal Hybrids, the "Lenders") for financing the Company's 2017 crops in accordance with the loan documents prepared by the Lenders (collectively, the "Loan Documents"); (ii) grant to the Lenders the security interests in and liens on the Company's assets described in the Loan Documents; and (iii) take any other or further action necessary to consummate the transactions contemplated by the Loan Documents.  .

Effective May _____, 2017.

**CRAPP FARMS PARTNERSHIP**

By: _____
Darrell C. Crapp, Partner

By: _____
Carl D. Crapp, Partner

By: _____
Tony D. Crapp, Partner

By: _____
Diana Crapp, Partner

2, 3

**Promissory Note**                                                      **Negotiable Paper**

$4,964,994.00 **ON DEMAND** on 3/15/2018, we the makers, endorsers, guarantors, sureties and all of us, **IN SOLIDO**, promise to pay and guarantee payment to **Agrifund, LLC ("ARM")** the above sum for value received with interest at the rate of 9.00% per year. In the event of Borrower's default under the terms and conditions of the attached ARM security agreement, ARM shall have the right, at ARM's sole option, to increase the interest rate under this Note to a default rate increase (the "Default Rate Increase") equal to six (6.00%) percent per annum over the original rate listed on the Note and to further declare this Note to be in default and to accelerate the maturity and insist upon immediate payment in full of the unpaid principal balance then outstanding under this Note, plus accrued interest at the Default Rate.  ARM shall further be entitled upon Borrower's failure to pay this Note when due to prospectively increase the interest rate to the Default Rate provided hereinabove.

Should this Note be placed in the hands of an attorney for collection, then Borrower agrees to pay reasonable attorney's fees together with all court costs incurred in the collection of this Note.

This note contemplates multiple advances up to the face amount herein.

The makers, endorsers, guarantors, sureties and all of us hereby severally waive presentment for payment, demand, notice of non-payment, protest, notice of protest, all pleas of division, and discussion, and all pleas of compensation and offset of the indebtedness represented by this instrument; consent to one or more extensions of payment for such periods and amounts as may be granted; and agree that any security for the payment of same may be from time to time changed, surrendered, or otherwise dealt with as the holder of said note may determine.

Upon the death, suspension, failure in business, or insolvency of any party hereto, or any notice of any tax lien or writ of seizure, or upon the appointment of a receiver, for or against any party hereto, the makers hereof, and each of them, to said **ARM**, shall at the option of the holder, immediately mature and become due and eligible.

All parties hereto agree that **ARM** may in its sole discretion, release, substitute, or otherwise deal with or dispose of, and collateral pledged to secure the payment of this note.  No delay on the part of any holder hereof in exercising any power or right hereunder shall operate as a waiver of any power or right, nor shall any single or partial exercise of any power or right hereunder preclude another or further exercise thereof, or the exercise of any other power or right.

If this promissory note is being executed in conjunction with an Agricultural Security Agreement, all terms and conditions of said Agricultural Security Agreement are incorporated herein as fully as if completely being reproduced herein..

"THIS NOTE OR INSTRUMENT IS SUBJECT TO (A) A SECURITY INTEREST GRANTED BY AGRIFUND, LLC (THE "BORROWER"), IN FAVOR OF CAPITAL ONE, NATIONAL ASSOCIATION, IN ITS CAPACITY AS ADMINISTRATIVE AGENT (TOGETHER WITH ITS SUCCESSORS AND ASSIGNS, THE "ADMINISTRATIVE AGENT"), PURSUANT TO THAT CERTAIN AMENDED AND RESTATED SECURITY AGREEMENT DATED AS OF NOVEMBER 22, 2016, EXECUTED AND DELIVERED BY THE BORROWER IN FAVOR OF THE ADMINISTRATIVE AGENT (AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME), WHICH SECURITY AGREEMENT IS REQUIRED UNDER THE TERMS AND CONDITIONS OF THAT CERTAIN AMENDED AND RESTATED CREDIT AGREEMENT DATED AS OF NOVEMBER 22, 2016, BY AND AMONG THE BORROWER, CERTAIN SUBSIDIARIES AND AFFILIATES OF THE BORROWER, AS GUARANTORS, THE ADMINISTRATIVE AGENT, AND THE LENDERS FROM TIME TO TIME PARTY THERETO (AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME), EACH HOLDER HEREOF ACQUIRING THIS NOTE OR INSTRUMENT BY TRANSFER FROM A PREVIOUS HOLDER TAKES THIS NOTE OR INSTRUMENT SUBJECT TO SUCH SECURITY INTEREST."

**Interest is payable.**
"NE VARIETUR" for identification with an act of Agriculture Security Agreement passed before me this 5/30/2017

Crapp Farms Partnership by:

_Darrell Carl Crapp_ (signature)
Darrell Carl Crapp- Partner

_Tony Darrell Crapp_ (signature)
Tony Darrell Crapp- Partner

_Carl Daniel Crapp_ (signature)
Carl Daniel Crapp- Partner

_Diana M Crapp_ (signature)
Diana M. Crapp- Partner

4

## Agricultural Security Agreement

| GRANTOR(S): | LENDER: |
|---|---|
| Crapp Farms Partnership | Agrifund, LLC ("ARM") |
| Darrell Carl Crapp<br>5761 Substaation Road | 1401 Hudson Lane, STE 300, Monroe, LA 71201 |
| Lancaster, WI 53813<br>82-0581539 | 47-4742827 |
| Tony Darrell Crapp<br>322 Alona Ln<br>Lancaster, WI 53813<br>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 | |
| Carl Daniel Crapp<br>6638 Stage Rd<br>Potosi, WI 53820<br>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 | |
| Diana M. Crapp<br>5761 Substation Rd<br>Lancaster, WI 53813 | |
| 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 | |
| BORROWER(S) NAME:<br>Crapp Farms Partnership | Darrell Carl Crapp<br>Tony Darrell Crapp<br>Carl Daniel Crapp<br>Diana M. Crapp |

TERMS AND CONDITIONS

DEFINITIONS: The following terms shall have the following meanings when used in this agreement:

Agreement: The term "Agreement" refers to this Security Agreement as this Agreement may be modified or amended in writing from time to time, and to any exhibits or attachments to this Agreement which are incorporated herein by reference.

Borrower: The term "Borrower" refers individually, collectively and interchangeably to the above named Borrower(s) to the extent that this is a third party security agreement.

Collateral: The term "Collateral" refers individually, collectively and interchangeably to the Collateral as more fully described in the Collateral Description section of this Agreement.

Grantor: The term "Grantor" refers individually, collectively and interchangeably to the above named Grantor(s), and all other parties signing this Agreement as a grantor.

Indebtedness: The term "Indebtedness" refers to Grantor's (and/or Borrower's) Indebtedness and obligations under a certain promissory note dated 5/30/2017, in the amount of U.S. $4,964,994.00, as well as any substitute, replacement or refinancing note or notes for the above described promissory note.

The term "Indebtedness" also refers individually, collectively and interchangeably to any and all present and future loans, loan advances, extensions of credit and/or other financial accommodations obtained and/or to be obtained by

5

Grantor (and/or Borrower) from Lender, as well as from Lender's successors and assigns, from time to time, one or more times, now or in the future, and any and all promissory notes and other instruments or agreements evidencing such present and future loans, loan advances, extensions of credit, and/or other financial accommodations, as well as any and all other obligations and liabilities that Grantor (and/or borrower) may now and/or in the future owe to or incur in favor of Lender. as well as Lender's successors and assigns, whether directly or indirectly, or by way of assignment or purchase of participation interest, and whether absolute or contingent, liquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether otherwise secured or unsecured, and whether Grantor (and/or Borrower) is obligated alone or with others on a joint, several or solidary basis, as a principal obligator or as a surety, of every nature and kind whatsoever, in principal, interest, costs, expenses, attorney's fees and other fees and charges, whether such additional indebtedness or obligations are in any way related to the loan evidenced by the promissory note described in the immediately preceding paragraph, and whether any such indebtedness or obligations may be barred under any statute of limitations or prescriptive period, or may be or become otherwise unenforceable or voidable for any reason whatsoever. Unless otherwise agreed by Lender in writing, the maximum amount of indebtedness secured by this Agreement shall be limited to $50,000,000.00.

Lender: The term "Lender" refers to the Lender named above, its successors and assigns, and any subsequent holder or holders of the indebtedness or any interest therein.

GRANT OF SECURITY INTEREST:  In order to secure the prompt and punctual payment and satisfaction of the indebtedness as defined above, Grantor does by these presents hereby grant a continuing security interest in favor of Lender as affecting the Collateral described in the Collateral Description section of this Agreement.

COLLATERAL DESCRIPTION: (Check as Applicable)
1.  ☒  CROPS:  Any and all of Grantor's present and future rights, title and interest in and to the following described crops:
     a.  ☐  ALL CROPS: Any and all of Grantor's crops of every type and description
     b.  ☒  Specific Crops: See Exhibit A attached.

growing or to be planted, cultivated, grown, raised and/or harvested on the property more fully described herein or on any exhibit attached hereto, together with any and all agricultural and farm products produced or derived therefrom, of every nature and kind whatsoever, and all present and future inventory of Grantor and the products thereof, of every type and description derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, and all proceeds derived or to be derived therefrom,-whether in the form of cash, farm product, or otherwise, and whether from or through any federal or state government agency or program or otherwise, including without limitation all easements, profits, rights of storage, trailing and grazing, irrigation, water rights, all rights of payment by or through the Commodity Credit Corporation or the ASCS, all rights to payments for participation in the Agricultural Conservation Program, the Cropland Conversion Program, the National Wool Act of 1954, the Wheat, Feed Grain, and Cotton Programs of the Agricultural Adjustment Act of 1938, and any other programs of the United States Department of Agriculture, and all payments in kind, including without limitation PIK certificates and commodities redeemed or acquired by PIK certificates, warehouse receipts, chemicals and fertilizers, documents, letters of entitlement, and deficiency, conservation reserve, and diversion and storage payments, and seed payments or rebates, gin rebates, elevator rebates, and warehouse rebates, and all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be  due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts and contract rights of Grantor to collect and enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way relating or pertaining to any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Unless otherwise agreed or specified by Lender in writing, this Security Agreement will affect Grantor's crops for the crop year in which this Agreement is executed as well as for all subsequent crop years thereafter until such time as this Agreement is canceled or terminated by Lender in writing.

2.  ☐  FARM PRODUCTS:  Any and all of Grantor's present and future rights, title and interest in and to
     a.  ☐  ALL FARM PRODUCTS: Any and all of Grantor's now owned and after acquired farm products of every type and description
     b.  ☐  SPECIFIC FARM PRODUCTS:  See Exhibit A attached.

together with all replacements and substitutions therefore and additions thereto, and all offspring and products previously, contemporaneously and/or in the future acquired by Grantor whether by purchase, exchange, accretion otherwise, and any and all of Grantor's present and future inventory in any way derived or to be derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing in any way related thereto, and any and all additions thereto and substitutions and replacements therefore, and all accessories, attachments, and accessions thereto, whether added now or later, and any and all other products and proceeds derived or to be derived therefrom, whether in cash, farm products, or otherwise, and whether from or through any federal or state government agency or program or otherwise, including without limitation all easements, profits, rights of storage, trailing and grazing and irrigation, water rights, and all rights to payments by or through the Commodity Credit Corporation or the ASCS, all right to payment for participation in the Agricultural Conservation Program, the Cropland Conversion Program, the National Wool Act of 1954, the Wheat, Feed Grain and Cotton programs of the Agricultural Adjustment Act of 1938, and any other programs of the United States Department of Agriculture, and all payments in kind, including without limitation PIK certificates and commodities redeemed or acquired by PIK certificates, warehouse receipts, chemicals and fertilizers, documents, letters of entitlement, and deficiency, conversation reserve, and storage payments, and all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale or other disposition of any of the foregoing, and any rights of Grantor to collect or to enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and any and all rights that Grantor may have with regard thereto.

3. ☐ EQUIPMENT: Any and all of Grantor's present and future rights, title and interest in and to
   a. ☐ ALL EQUIPMENT: Any and all of Grantor's now owned and after acquired machinery, equipment, furniture, furnishings and fixtures, of every type and description
   b. ☐ SPECIFIC EQUIPMENT: See Exhibit    attached.

together with all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation, any equipment purchased with proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, note and monies that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation , or use of the foregoing, and all rights of Grantor with regard thereto.

4. ☒ INVENTORY: Any and all of Grantor's present and future rights, title and interest in and to
   a. ☐ ALL INVENTORY: Any and all of Grantor's present and future inventory (including consigned inventory) of every type and description
   b. ☒ SPECIFIC INVENTORY: See Exhibit A attached.

and any and all additions thereto and substitutions and replacements therefor, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering all or any part of the foregoing, any and all accessories, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation, all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to ownership, operation, use or collection of any of the foregoing, including without limitation, Grantor's books, records, files, computer discs and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on account.

5. ☐ LIVESTOCK:
   a. ☐ MARKET LIVESTOCK: See Exhibit    attached.

7

b.   ☐  BREEDING LIVESTOCK:  See Exhibit   attached.

LOCATION OF COLLATERAL: Lender's security interest will affect the Collateral wherever located. Grantor agrees not to remove or relocate, or to permit the removal or relocation of any of the Collateral from the State of Wisconsin for a period in excess of sixty (60) consecutive days without first obtaining Lender's prior written consent.

Some or all of the Collateral consisting of Grantor's crops and farm products may be located on the following described property: See Exhibit A attached.

CONTINUING SECURITY INTEREST TO SECURE PRESENT AND FUTURE INDEBTEDNESS:  Grantor affirms that Grantor is granted a continuing security interest in the Collateral in favor of Lender to secure any and all present and future indebtedness as may be outstanding from time to time, one or more times, in principal, interest, costs, expenses, attorney's fees and charges, with the continuing preferences and priorities provided under applicable law.

DURATION OF AGREEMENT: This Agreement shall remain in full force and effect until such time that this Agreement and the security interest created hereby are terminated and canceled by Lender under a written cancellation instrument in favor of Grantor.

PERFECTION OF SECURITY INTEREST: Grantor agrees to take whatever actions are required by Lender to perfect and continue Lender's security interest in the Collateral. Contemporaneous with the execution of this Agreement, Grantor will execute appropriate forms of financing statements and any similar statements as required by law to perfect Lender's security interest in the Collateral. Grantor hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to effect or to continue the security interest granted by this Agreement. Upon request of Lender, Grantor will deliver to Lender any and all documents evidencing or constituting the Collateral, and Grantor will note Lender's interest on any documents and chattel paper if not delivered to Lender for possession by Lender.

GRANTOR'S REPRESENTATION AND WARRANTIES:  Except as previously disclosed to Lender in writing, Grantor hereby represents and warrants to Lender that: (A) Grantor is and will continue to be the lawful owner of the Collateral; (B) Grantor has the right to grant a security interest in the Collateral in favor of Lender: (C) as of the time this Agreement is executed or at the time each financing statement is filled with regard to the Collateral, there are and will be no liens, encumbrances, or other security interests affecting the Collateral, other than the second lien of Federal Hybrids, Inc. and the third lien of Eagle Creek Midwest, LLC, in accordance with bankruptcy court order entered in the Western District of Wisconsin; (D) the security rights and interest granted under this Agreement will at no time become subordinate or junior to any security rights, interest, liens or claims of any person, firm, or corporation; and (E) this Agreement is binding upon Grantor as well as Grantor's successors, representatives and assigns, and is legally enforceable in accordance with its terms. The above representations and warranties and all other representations and warranties contained in this Agreement are and will be continuing in nature and will remain in full force and effect until such time as this Agreement is canceled in the manner provided above.

PROHIBITIONS REGARDING THE COLLATERAL: So long as this Agreement remains in effect, and to the extent applicable, Grantor agrees not to, without Lender's prior written consent:  (A) sell, assign, transfer, convey, option, mortgage, or lease the Collateral; (B) permit any lien, encumbrance or other security interest to be placed on or attach to the collateral; (C) permit any of the Collateral to be attached to real (immovable) property so as to become a "fixture" under state law; (D) do anything or permit anything to be done that may in any way impair Lender's security interest and rights in and to the Collateral; (E) modify, adjust, compromise, settle, waive or forego any rights that Grantor may have with regard to the Collateral. Notwithstanding and other provision of this Agreement to the contrary, to the extent that the Collateral consists of Grantor's inventory, Grantor shall have the right to sell or lease individual items of inventory in the ordinary course of Grantor's business at ordinary prices and under such terms and conditions as Lender may have previously agreed to in writing. Any and all proceeds accruing from the sale, lease or other disposition of the inventory shall be fully, faithfully and promptly accounted for by Grantor, and shall be received by Grantor in trust for Lender, separate and apart from Grantor's other funds, and shall be promptly remitted to Lender to be applied against the secured indebtedness.

AFFIRMATIVE COVENANTS: So long as this Agreement remains in effect, and to the extent applicable, Grantor agrees as follows:

To the extent that the Collateral consists of the Grantor's farm products or inventory, Grantor shall store and exhibit such Collateral for the purpose of processing, sale or lease in the ordinary course of business. Grantor will not, without

having first obtained Lender's prior written consent, use any items of Grantor's farm products or inventory for Grantor's own purpose, or relinquish possession of any such farm products or inventory to third parties.

Grantor will not, and will not permit others to, abandon, waste or destroy the Collateral. Grantor will observe and abide by and cause others to observe and abide by all laws, rules, regulations and ordinances, as well as all policies of insurance, affecting the Collateral or its use. Grantor will promptly pay when due all taxes, local and special assessments and governmental charges of every type and description that may from time to time be imposed assessed or levied against the collateral and the property on which Grantor conducts farming, agricultural or other business operations. Grantor will additionally provide Lender with evidence that such taxes, assessments and governmental charges have been paid in full and in a timely manner. Grantor will further pay when due all claims for work done, services rendered, materials furnished in connection with any of the Collateral so no lien or encumbrance may ever attach to or be filed against the Collateral.

Grantor will not make or permit any alterations to any of the Collateral that may reduce or impair the Collateral's use or value. Grantor will keep, maintain and cause others to keep and maintain any such Collateral in good condition at all times while this Agreement remains in effect. Lender or Lender's agents may periodically inspect the Collateral at all reasonable times. Lender or Lender's agents shall have the further right to inspect and copy Grantor's books and records and to discuss Grantor's affairs and finances with Grantor.

Should Grantor for any reason fail to pay taxes, assessments and other governmental charges when due, or should Grantor fail to repair and maintain the Collateral as required under this Agreement, then Lender shall have the right, at Lender's sole option and without responsibility to do so, to make advances on Grantor's behalf to pay such taxes, assessments and governmental charges, and to make necessary repairs to the Collateral. Further, Lender may from time to time make additional advances in order to obtain current appraisals of the Collateral. Should Grantor (and/or Borrower) default under any other loan or extension of credit secured by the Collateral, or should the collateral become subject to or threatened with seizure and /or sale, then Lender shall have the additional right to cure such defaults or to cause such defaults to be cured, whether by making payments on Grantor's (and/or Borrowers) behalf or by taking such other actions as lender may deem to be necessary and proper within its sole discretion. All such additional sums that Lender may advance for such purposes, as well as Lender's additional expenses as provided under this Agreement shall be considered a part of the indebtedness secured by this Agreement. Grantor will reimburse Lender immediately for all such sums together with interest thereon at the rate of 15 percent per annum from the date of each advance until Lender is repaid in full.

Grantor shall faithfully perform any and all of its obligations under any contracts or agreements that may give rise to Grantor's accounts, chattel paper and/or contract rights on which Lender has been granted a security interest. Grantor agrees not to do, neglect to do, or permit to be done, anything that might cause a modification or termination of any such contract or agreement or the obligations of any obligor or other person thereunder, which may diminish or impair the value of the Collateral or the security rights and interests of Lender therein and hereunder. Grantor further agrees to immediately notify Lender in writing if any default, cancellation or notice of cancellation of any such contract or agreement. Should Grantor for any reason fail to comply with its obligations under any of the above referenced contracts or agreements, Lender may make additional advances on Grantor's behalf and/or take such other action or actions as Lender may deem proper, within its sole judgment, to perform such obligations on Grantor's behalf and to cure and to rectify any such default or defaults. All additional sums that may be advanced by Lender for such purposes, together with interest thereon at the above rate, shall constitute additional indebtedness secured by this Agreement. Upon request by Lender, Grantor agrees to notify individual obligors under Grantor's accounts, chattel paper, contracts and other agreements on which Lender has been granted a security interest, advising such obligors of the fact that their obligations have been collaterally assigned and pledged to Lender. Should Grantor fail to provide such notices for any reason upon request by Lender, Lender may forward appropriate notices to such obligors, either in Grantor's name or in Lender's name. Grantor further agrees that Lender or Lender's agents may periodically contact individual obligors to verify their respective obligations, to determine whether such obligors have any offsets or counterclaims against Grantor, and with regard to such other matters about which Lender may inquire. Lender shall have the right to directly collect and receive all monies, proceeds and/or payments of Grantor's accounts, chattel paper, contracts and agreements subject hereto, as such amounts become due and payable. Lender shall have the further right to notify individual obligors under such accounts, chattel paper, contracts or agreements to pay such proceeds and payments directly to Lender at an address to be designated by Lender, and to do any and all other things as Lender may deem to be necessary and proper, within its sole discretion. Lender shall have the additional right, when appropriate and within Lender's sole discretion, to file suit, either in its own name or in the name of Grantor, to collect any and all such sums that may be due and owing under such accounts, chattel paper, contracts or agreements, and to enforce any guaranties and security therefor. Lender may also take such other actions either in Grantor's name or in the name of Lender, and Lender may deem appropriate within its sole judgment, with regard to collection and payment of the same, including without

limitation, making any compromise or settlement, or releasing any parties or collateral security, without affecting the liability of Grantor under this Agreement or under the indebtedness secured hereby.

SPECIAL COVENANTS FOR CROPS AND FARM PRODUCTS: Grantor further agrees and covenants as follows:

As applies to the current 2017 year crops unless otherwise approved, to the extent applicable, Grantor agrees to use the proceeds of agricultural purpose loans extended by Lender solely for the purpose of planting, producing and harvesting Grantor's crops, and/or for the care, feeding, raising, production and processing of Grantor's farm products or for such additional purpose or purposes as Lender may agree to in writing. Grantor agrees not to use such loan proceeds for any purpose not otherwise agreed to by lender, with Lender having the right while this agreement remains in effect to demand evidence from Grantor that Grantor has in fact used, and will continue to use, the proceeds of such loans for such purposes as approved by Lender.

Grantor agrees to actively pursue and conduct its farming, agricultural and other business operations for as long as this Agreement remains in effect. Grantor further agrees that Lender may from time to time enter upon Grantor's premises for the purpose of ascertaining whether Grantor is properly and prudently conduction its farming, agricultural and business activities.

Grantor agrees promptly to pay when due all costs and expenses associated with the preparation for planting, planting cultivation, irrigation, fertilization, spraying and harvesting of Grantor's crops, as well as to promptly pay when due all costs and expenses related to the care, feeding, rearing, production, storage and processing of Grantor's farm products. Grantor additionally agrees to promptly pay when due all expenses and wages of laborers, overseers and harvesters.

Grantor agrees to furnish Lender with a current and accurate list of any and all potential or intended purchasers, commission merchants, selling agents, brokers, dealers and any other person or persons or entities to or through whom Grantor may sell or otherwise dispose of all or any part of the Collateral, including, the full name, current mailing and business address and telephone numbers of such persons or entities. Grantor further covenants and agrees to provide such lists to Lender by certified mail, to be received by Lender at least five (5) business days after the execution of the Agreement, or 180 calendar days before any such sale or other disposition of the Collateral is contemplated to take place, whichever is earlier. Should any of Lender's crops or farm products or other collateral subject to this Agreement be placed in a warehouse or other facility. Grantor unconditionally agrees to immediately deliver to Lender any and all warehouse receipts and other documents evidencing ownership of such Collateral whether the same may be issued in negotiable or non-negotiable form acceptable to Lender. No purchaser of the Collateral or any cooperative marketing association, warehouseman or purchaser of warehouse receipts will ever be deemed to be the agent of Lender. No payment made to Grantor by any purchaser, cooperative marketing association or purchaser of warehouse receipts will ever be construed to be payment to Lender or to operate as a release of Lender's security interest under this Agreement.

Grantor shall comply promptly, and shall cause others to comply, with all laws, ordinances and regulations of all governmental authorities applicable to the cultivation, production and harvesting of Grantor's crops and to the care, feeding, rearing, production and processing of Grantor's farm products, as well as any way relating to the property on which such crops and farm products are located or to the production, disposition, or use of any other Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's security interest in the collateral, in Lender's opinion, is not jeopardized. Grantor shall not use the Collateral, and shall not permit others to use the Collateral, for any purpose other than those previously agreed to by Lender in writing; but in no event shall any of the Collateral be used in any manner that would damage, depreciate or diminish its value or that may result in cancellation or termination of insurance coverage. Grantor additionally agrees not to do or permit to be done anything that may increase the risk of fire or other hazards to any of Collateral.

Grantor represents and warrants that the Collateral and the property described above never has been and never will be so long as this Agreement remains in effect, used for the generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance, as such terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1930, as amended 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1966, Pub. L. No. 99-499 ("SARA"). the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules and regulations adopted pursuant to any of the foregoing. The representations and warranties contained herein are based upon Grantor's due diligence in investigating the Collateral and the property for hazardous waste. Grantor hereby (a) releases and waives any claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a

breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the indebtedness and the cancellation of this Agreement.

REQUIRED INSURANCE:  So long as this Agreement remains in effect, Grantor shall, at its sole cost, keep and/or cause others at their expense, to keep the Collateral and the above described property and improvements located thereon constantly insured against loss by fire, by hazards included within the term "extended coverage" and by such other hazards (including flood insurance where applicable) as may be required by Lender. Insurance on the Grantor's crops and farm products (and inventor to the extent applicable) shall be in an amount not less than the anticipated market value of such commodities or such other amount or amounts as Lender may approve in writing. Insurance on other Collateral shall be in an amount not less than the full replacement value of the Collateral, or such other amount or amounts as Lender may require or approve in writing. Grantor shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Grantor and Lender as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, possession, operation and condition of the Collateral and the property on which the Collateral is located, and further containing a broad form contractual liability endorsement covering Grantor's obligations to indemnify Lender as provided hereunder. In addition, Grantor shall obtain at its expense such federal or state crop insurance as may be required by Lender.

Grantor may purchase such insurance from any insurance company or broker that is acceptable to Lender, provided that such approval may not be unreasonably withheld. All insurance policies, including renewals and replacements, must also be in form and substance acceptable to Lender, and must additionally contain a lender's loss payable or other endorsement in favor of Lender, providing in part that (a) all proceeds and returned premiums under such policies of insurance will be paid directly to Lender and (b) no act or omission on the part of Grantor, or any of its officers, agents employees or representatives, nor breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Lender. Such policies of insurance must also contain a provision prohibiting cancellation or the alteration of such insurance without at least thirty (30) day's prior written notice to Lender of such intended cancellation or alteration.

Grantor agrees to provide Lender with originals or certified copies of such policies of Insurance. Grantor further agrees to promptly furnish Lender with copies of all renewal notices and, if requested by Lender, with copies of receipts for paid premiums. Grantor shall provide Lender with originals or certified copies of all renewal or replacement policies of insurance no later than fifteen (15) days before any such existing policy or policies should expire. If Grantor's insurance policies and renewals are held by another person, Grantor agrees to supply original or certified copies of the same to Lender within the time periods required above.

Grantor agrees to immediately notify Lender in writing of any material casualty to or accident involving the Collateral, whether or not such casualty or loss is covered by insurance. Grantor further agrees to promptly notify Grantor's insurance company and to submit an appropriate claim and proof of loss to the insurance company in the event that any collateral is lost, damaged, or destroyed as a result of an insured hazard. Lender may submit such a claim and proof of claim to the insurance company on Grantor's behalf, should Grantor fail to do so promptly for any reason. Grantor hereby irrevocably appoints Lender as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance  and to endorse the name of Grantor on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more events of default exist under this Agreement, Lender will not settle or adjust any such claim without the prior approval of Grantor (which approval shall not be unreasonably withheld).

Lender shall have the right to directly receive the proceeds of all insurance protecting the Collateral. In the event that Grantor should receive any such insurance proceeds, Grantor agrees to immediately hold such insurance proceeds in trust and to immediately turn over and to pay such proceeds directly to Lender. All such insurance process may be applied, at Lender's sole option and discretion, in such manner as Lender determine (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or fees necessarily paid or incurred by Lender in this connection) for the purpose of (i) repairing or restoring the lost, damaged or destroyed Collateral; or (ii) reducing the then outstanding balance of the indebtedness.

Lender's receipt of such insurance proceeds and the applications of such proceeds as provided herein shall not, however, affect Lender's security interest under this Agreement. Nothing under this section shall be deemed to excuse Grantor from its obligations to promptly repair, replace or restore any lost or damaged Collateral, whether or not the same may be covered by insurance, whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Lender. Furthermore, unless otherwise confirmed by Lender in writing, the application or release of any insurance proceeds by Lender shall not be deemed to cure or waive any event of default under this Agreement. Any proceeds which have not been

11

disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of Collateral shall be used to repay the indebtedness.

Any and all awards or damages received by Grantor from any governmental authority covering any of the Collateral shall further be paid to Lender and credited to the unpaid balance of the indebtedness.

Any and all awards or damages received by grantor from any governmental authority covering any of the Collateral shall further be paid to Lender and credited to the unpaid balance of the indebtedness.

Should Grantor for any reason fail to maintain insurance on the Collateral as required under this Agreement, then Lender shall have the right again at Lender's sole option and discretion and without any responsibility or liability to do so, to purchase such insurance on Grantor's behalf, including without limitation, the right to purchase insurance protecting only lender's rights and interests in the Collateral. All additional sums that may be advanced by Lender for such purposes, together with interest thereon at the above rate, shall constitute additional indebtedness secured by this Agreement.

EVENTS OF DEFAULT: The following additions or inaction's or both shall constitute events of default under this Agreement.

1. Any failure to pay principal and/or interest under any indebtedness secured by this Agreement when the same shall be due.
2. Any failure to comply with the terms and conditions and representations and warranties set forth in this Agreement.
3. A default under any loan, security agreement or other agreement in favor of Federal Hybrids, Inc. or Eagle Creek Midwest, LLC, that may have a material effect on Grantor's ability to perform under this Agreement or in any way related to the indebtedness.
4. Should Grantor (or Borrower) or any guarantor of the indebtedness be declared to be insolvent or should Grantor cease to conduct its farming, agricultural or business operations as presently conducted, or should a proceeding for readjustment of indebtedness, reorganization, composition or extension under any insolvency or bankruptcy law be brought by any guarantor, or should any guarantor file proceedings for a respite or make a general assignment for the benefit of creditors, or should a receiver for all or any part of any guarantor's property be applied for or appointed.
5. Should any representation or warranty made in connection with the indebtedness prove to be incorrect or misleading in any respect.
6. Should Lender reasonably deem itself to be insecure with regard to repayment of the indebtedness.

RIGHTS AND REMEDIES ON DEFAULT: Should one or more events of default occur or exist under this Agreement and at any time thereafter, Lender shall have all the rights and remedies of a secured party under applicable law. In addition and without limitation, Lender may exercise one or more of the following rights and remedies:

Lender may declare the entire indebtedness to be immediately due and payable, without further notice or demand for payment.

Lender shall have the further right(s), if it chooses to do so, to: (a) refuse to make additional lien advances to Grantor, or to reduce the amount of further loan advances; (b) demand that Grantor provide Lender with such additional collateral security as may then be acceptable to Lender; (c) to commence appropriate seizure, attachment or foreclosure proceedings against the Collateral, where under Lender may cause the Collateral or any parts or parts thereof, to be immediately seized where ever found, and sold in accordance with applicable state law, and(d) subject to requirements of then applicable Louisiana law, Lender may enter upon the property on which the crops and farm products, or any part or parts thereof, may then be located, with Lender thereafter having the right to carry on Grantor's farming, agricultural and other business operations to conclusion, in which event Lender shall have the free use of Grantor's equipment, tools, implements and supplies. Grantor unconditionally agrees to assist Lender in such efforts and not to in any way impair such ongoing operations on the part of Lender. All additional sums that Lender may expand for such purposes shall constitute additional indebtedness secured under this Agreement and shall bear interest from date of advance until reimbursed in full at the above interest rate.

Should any of the Collateral for any reason be located in a state other than Wisconsin or following any default under the indebtedness or under this Agreement, or should there be a subsequent change in Louisiana law permitting self-help remedies with regard to non-possessory collateral, Grantor agrees that Lender may take possession of the collateral in

12

any manner then permitted under the laws of the state in which the collateral is then located or under the laws of Louisiana as then applicable, at Lender's sole option. However, use of a state's laws, other than Louisiana, shall in no way be considered a waiver of the application of Louisiana law as the governing law of this contract. Should Lender for any reason have or acquire possession of the collateral at or following default, Lender may sell the Collateral at public or private sale as authorized by Louisiana law or by the applicable provisions of the Uniform Commercial code in effect in the state where the collateral is then located. If Lender is required by law to give grantor notice of the public or private sale of the Collateral, and Grantor agrees that the requirements of reasonable notice shall be met if Lender mails such notice to Grantor at grantor's last address appearing in Lender's records at least ten (10) days before the time of any public sale or, if disposition is by private sale, at least ten (10) days before the time after which private sale may occur. If public sale is held, there will be sufficient compliance with all requirements of notice to the public by a single publication in a newspaper of general circulation in the parish or county where the Collateral is then located. This notice shall include the time and place of sale, and a brief description of the property to be sold, Grantor further agrees that any such sale shall be conclusively deemed to be conducted in a commercially reasonable manner if made consistent with the standards of similar sales of collateral by commercial banks in the same community in which Lender has its main office.

Grantor recognizes that Lender may not be able to effect the public sale of all or any part of the Collateral and Lender may be compelled or deem it best to resort to one or more private sales to a restricted group of purchasers, at Lender's sole option. However, use of state's laws, other than Louisiana, shall in no way be considered as a waiver of the application of Louisiana law as the governing law of this contract. Grantor further acknowledges that any private sale of the collateral may be at prices and on terms less favorable to Grantor than those of public sales and Grantor unconditionally agrees that such private sales shall be deemed to have been made in a commercially reasonably manner.

Lender shall have the further right, if it chooses to do so, to commence appropriate seizure, attachment or foreclosure proceedings against the Collateral, whereunder Lender may cause the Collateral or any part or parts thereof, to be immediately seized wherever found, and sold whether in term of court or on vacation, under ordinary or executory process, in accordance with applicable state law, to the highest bidder for cash, with or without appraisement, without the necessity of making additional demand upon or notifying Grantor (or Borrower) in default, all of which are expressly waived. For purposes of foreclosure under the Louisiana executory process procedures, Grantor confesses judgment and acknowledges to be indebted unto and in favor of Lender up to the full amount of the indebtedness, in principal, interest, costs, expenses, attorneys' fees and other fees and charges. To the extent permitted under applicable Louisiana law, Grantor additionally waives: (A) the benefit of appraisal as provided in Articles 2332,2336,2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (B) the demand and three (3) days' delay provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (C) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (D) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (E) all of the benefits provided under Articles 2331, 2722, and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above.

Should any other Collateral be seized as an incident to an action for the recognition or enforcement of this Agreement, by seizure, by executory process, sequestration, attachment, writ of fieri facias, foreclosure proceedings or otherwise, Grantor hereby agrees that the court issuing any such order shall, if requested by Lender, or its agent, or any person or persons named by Lender at a time that the seizure, attachment or foreclosure is requested, or at any time thereafter, should be appointed as the keeper of the Collateral as provided under state law. Such keeper shall be entitled to reasonable compensation. Grantor agrees to pay the reasonable fees of such keeper, which are hereby fixed at $50.00 per hour, which compensation of the keeper shall also be secured by the Agreement.

Should it be necessary for Lender to foreclose under this Agreement, all declarations of fact, which are made under an authentic act before Notary Public, in the presence of two witnesses, by a person declaring such facts to be within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, as applicable. Lender may, in addition to the foregoing remedies, or in lieu thereof, in Lender's sole discretion commence an appropriate action against Grantor seeking specific performance of any covenant contained herein. All expenses relating to the sale or other disposition of Collateral, including without limitation, Lender's reasonable attorney's fees and expenses of retaking, holding, insuring, preparing for sale and selling the Collateral shall become part of the indebtedness secured by this Agreement, and shall be payable on demand, with interest at the above rate, from the date of expenditure until Lender is repaid in full.

Grantor agrees that all of the remedies provided under this Agreement shall be cumulative in nature and nothing under this Agreement shall limit or restrict the remedies available to Lender following any event of default.

APPLICATION OF PROCEEDS: Lender may apply any proceeds derived or to be derived from the sale, collection or other disposition of the Collateral first to the reimbursement of any expenses incurred by Lender in connection therewith, including the fees of Lender's attorney and court costs; and then to the payment of any additional sums that Lender may advance on Grantor's behalf under this Agreement, together with interest thereon; and then to the payment of the indebtedness in such order and with such priority as Lender may determine within its sole discretion.

PROTECTION OF LENDER'S SECURITY RIGHTS:  Grantor agrees to be fully responsible for any losses that Lender may suffer as a result of anyone other than Lender asserting any rights or interest in the Collateral. Grantor further agrees to appear in and defend all actions and proceedings purporting to affect Lender's security rights and interest. Should Grantor fail to do what is required of it under this Agreement, or if any action or proceeding is commenced naming Lender as a party, or affecting Lender's security interest, or the rights and powers granted under this Agreement, then Lender may, without releasing Grantor from any of its obligations, do whatever Lender believes is necessary and proper within its sole discretion, including advancing additional sums on Grantor's behalf as provided herein, to protect Lender's security rights and interests.

INDEMNIFICATION OF LENDER:  Grantor further agrees to indemnify, to defend and to hold Lender harmless from any and all claims, suits, obligations, damages, loss, cost, and expenses (including the fees of Lender's attorney), demand, liabilities, penalties, fines and forfeitures of any nature and kind whatsoever, that may be asserted against or incurred by Lender, arising out of or in any way occasioned by this Agreement or the rights and remedies granted to or in favor of Lender hereunder.

MISCELLANEOUS PROVISIONS:  In entering into this Agreement, Grantor is, to the extent applicable, waiving any exemption from seizure with regard to the Collateral to which Grantor may be entitled under applicable state law.

Grantor represents and warrants to Lender that Grantor's correct social security or employer identification number is included on the first page of this Agreement. Grantor additionally agrees to notify Lender in writing should Grantor ever change its name, legal status, or change or obtain a new social security or employer identification number. Grantor further agrees to notify Lender in writing in advance of any change in Grantor's mailing address or the location of Grantor's principal office. Grantor agrees that any failure or delay on the part of Lender to exercise any of the rights and remedies granted under this Agreement shall not constitute a waiver of such rights or remedies. Any waiver or forbearance on the part of Lender shall be effective against Grantor only if agreed to in writing. This Agreement shall be governed and construed in accordance with the laws of the State of Louisiana. The parties agree that the jurisdiction/venue for any court proceeding arising out of or related to this agreement shall lie exclusively in the 5th Judical Court, Richland Parish, Louisiana, except that Lender may waive this provision, at its sole option. If any provision of this Agreement is deemed to be invalid or unenforceable for any reason, such invalidity or unenforceability will not effect the validity and enforceability of the remaining provisions of this Agreement. The caption headings of this Agreement are for convenient reference only and are not to be construed as a summary of each provision of this Agreement. If there is more than one Grantor under this Agreement, their obligation in favor of Lender shall be joint and "several" and "solidary" in nature.

DELAYED RIGHTS:  If Grantor should ever make a payment on , or if any of Grantor's collateral or other property is ever used to pay, a loan or other obligation to Lender of a company as to which Grantor is or may at any time be an "insider" within the context of Section 101(30) of the Bankruptcy Code (11 U.S.C. Section 101(30), Grantor agrees that any rights that it may have to collect from or be reimbursed by such a company or by any other guarantor or surety, whether as a result of subrogation to  Lender's rights or otherwise, will be delayed until the thirteen month anniversary date following full and final payment to Lender.

SPOUSAL INTERVENTION:  Any now unto these presents, to the extent applicable, intervenes Grantor's spouse, appearing herein for the limited purpose of concurring with the granting of a security interest in the Collateral in favor of Lender consistent with state law, without creating any liability to the separate property of Grantor's spouse not subject to this Agreement, as well as for the purpose, to the extent applicable, of waiving any exemption from seizure with regard to the Collateral to which Grantor's spouse may  be entitled under state law. Grantor's spouse further agrees and concurs that Grantor, acting alone or with others, may obtain additional loans or other extensions of credit from Lender, secured by the Collateral subject to this Agreement, without the necessity that Grantor's spouse further agree to or concur in each such additional loan or other extension of credit.

POWER OF ATTORNEY:  Grantor hereby appoints Lender as his attorney-in-fact to endorse Grantor's name on all instruments and other remittances payable to Grantor with respect to the indebtedness or other papers pertaining to Lender's actions in connection with the indebtedness. In addition, Lender shall be entitled, but not required to perform any action or execute any paper required to be taken or executed by Grantor under this agreement and to carry out and enforce all or any portion of the incorporeal rights on which Grantor has granted a security interest (or which Grantor has assigned) to Lender, including, but not limited to, the right to direct any insurer to pay all proceeds directly to

Lender, to file any proof of claim, to settle or compromise any claim, to cancel any policy of insurance, to endorse Grantor's name on any draft or negotiable instrument drawn by any insurer, and to apply for a certificate of title for the Collateral.  Lender's performance of such action or execution of such papers shall not relieve Grantor from any Obligation or cure any default under this agreement.  The powers of attorney described in this paragraph are coupled with an interest and are irrevocable.

☒    CROSS-COLLATERALIZATION:  Borrower hereby acknowledges that collateral pledged to secure other indebtedness in favor of Lender, whether existing now or in the future, is also pledged herein by cross-collateralization to secure the indebtedness represented by the Promissory Note.

SIGNATURES:  I WITNESS WHEREOF, Grantor has executed this Agreement on 5/30/2017.

Crapp Farms Partnership by:

_____
GRANTOR Darrell Carl Crapp- Partner


_____
GRANTOR Tony Darrell Crapp- Partner


_____
GRANTOR Carl Daniel Crapp- Partner


_____
GRANTOR Diana M. Crapp- Partner


_____
BORROWER Darrell Carl Crapp


_____
BORROWER Tony Darrell Crapp


_____
BORROWER Carl Daniel Crapp


_____
BORROWER Diana M. Crapp


_____
INTERVENING SPOUSE


_____
ARM

15

## Agricultural Security Agreement Addendum(s)

Exhibit A

Any and all accessions, additions, replacements, payments for participation in any state or federal farm programs and substitutions (including rights under Commodity Credit Corporation programs, FSA payment in kind, Federal Crop Insurance Program or any general intangibles or programs); all records of any kind related to any of the foregoing; all proceeds (including insurance, general tangibles, rents and account proceeds). Any and all crops/farm products of every kind and description, planted or growing, or to be planted or grown including but not limited to the following:

2017 Crops and the inventory of 2017 crops

2016 and 2017 FSA, CCP, and LDP Government Payments

WI/ Grant 5764, 8154, 208, 226, 332, 353, 9643, 377, 3944, 416, 5563, 5839, 5966, 6102, 6108, 6320, 6402, 6926, 709, 7150, 775, 8064, 8066, 8153, 8154, 8155, 8481, 8747, 9349, 9496, 9497, 9628, 9630, 9632, 9641, 9647

Exhibit B

not applicable

# Guaranty Agreement

In consideration of credit given by Agrifund, LLC ("ARM"), a Delaware corporation, to:

Crapp Farms Partnership

| | |
|---|---|
| Darrell Carl Crapp | Tony Darrell Crapp |
| 5761 Substaation Road | 322 Alona Ln |
| Lancaster, WI 53813 | Lancaster, WI 53813 |
| | |
| Carl Daniel Crapp | Diana M. Crapp |
| 6638 Stage Rd | 5761 Substation Rd |
| Potosi, WI 53820 | Lancaster, WI 53813 |

hereinafter referred to as "PRINCIPAL BORROWER", the undersigned GUARANTOR(S) unconditionally guarantees payment to ARM, Rayville, Louisiana of : 1)The present balance due from the PRINCIPAL BORROWER to ARM, and 2) Payment of any and all future indebtedness from the PRINCIPAL BORROWER to ARM conditioned only as provided below. It is understood and agreed that this guaranty is accepted by ARM and credit extended to the PRINCIPAL BORROWER upon the following conditions:

With regard to the sums owed by PRINCIPAL BORROWER and guaranteed hereby, ARM may, without notice to the undersigned, extended the time for payment and/or accept partial payments, notes, drafts, and/or security, all without in any way affecting the obligations hereunder.

The undersigned waives notice of the acceptance of this guaranty by ARM and notice of all credits extended and sales and deliveries of merchandise made hereunder.

This instrument is intended to be and shall be construed to be a continuing guaranty and shall remain in full force and effect until the undersigned shall have given ARM notice in writing to make no further advances on the security of this guaranty and until such written notice shall be given ARM. Proof of receipt by ARM of such notice shall be on the undersigned. Such notice shall be delivered to ARM at its address shown below. Such revocation when made shall apply only to sales made to the PRINCIPAL BORROWER subsequent to the receipt of such notice of revocation, and any payments thereafter made by the PRINCIPAL BORROWER shall be applied as ARM may elect.

In the event of default by the PRINCIPAL BORROWER in payment of the debt guaranteed hereunder, or any part thereof, recovery thereof may be had directly against the undersigned guarantor without previous notice and/or without requiring the prosecution of the claim against the PRINCIPAL BORROWER.

It is expressly understood and agreed that this guaranty shall not be revoked by the death of the undersigned and that the insolvency or bankruptcy or the PRINCIPAL BORROWER shall in no respect affect the liability of the guarantor under this agreement. If more that on executes this agreement as guarantor, the singular as used herein shall include the plural and the obligations of the guarantors shall be joint and several.

Notice to ARM required hereunder should be delivered to:

**Agrifund, LLC ("ARM")**
**1401 Hudson Lane, STE 300**
**Monroe, LA 71201**

GUARANTOR Darrell Carl Crapp

GUARANTOR Tony Darrell Crapp

GUARANTOR Carl Daniel Crapp

GUARANTOR Diana M. Crapp

## Act of Assignment

Be it known and remembered, that on this day, 5/30/2017, before me, personally came and appeared:

Crapp Farms Partnership
Darrell Carl Crapp                          Tony Darrell Crapp
5761 Substaation Road                       322 Alona Ln
Lancaster, WI 53813                         Lancaster, WI 53813


Carl Daniel Crapp                           Diana M. Crapp
6638 Stage Rd                               5761 Substation Rd
Potosi, WI 53820                            Lancaster, WI 53813

hereinafter referred to as BORROWER, declared that BORROWER is indebted unto Agrifund, LLC ("ARM") in the sum of $4,964,994.00, which sum is due for materials, supplies, services, and related interest charges necessary for the production of all crops, and other related agricultural products during the year of 2017; in evidence of which he has given one Promissory Note, dated 5/30/2017, payable to ARM, principal and interest due on demand "Ne Varietur" of this date by a duly commissioned notary, to identify it herewith; And in order to secure the payment of said note, interest, and all cost, and a late charge up to 2% amount owed (at the discretion of ARM) and including attorney's fees in the event of suit for collection of said debt, the said BORROWER declared that he does by these presents specially assign, pledge, and pawn in favor of said ARM, its heirs and assigns, or any future holder of said note all of the following:

1.  Any rebate payments, including but not limited to gin/grain/mill rebate payments,

2.  Any cottonseed payments, including but not limited to; cottonseed payments to be made by any and all gins, and or any compensation for the 2017 crops that are due or to become due to the said **BORROWER.**

The said BORROWER declared to me, that there is not, at present, any prior assignment or pledge standing against the assignment herein and he bonds himself not to alienate, deteriorate, or encumber said rebate and/or cottonseed payments to the prejudice of this assignee or any future holder of note given herewith.

Thus done and signed in the presence of the undersigned and me, on this date of 5/30/2017 .

BORROWER Darrell Carl Crapp

BORROWER Tony Darrell Crapp

BORROWER Carl Daniel Crapp

BORROWER Diana M. Crapp

---

## ACKNOWLEDGEMENT:

I do hereby acknowledge and agree to the above ACT OF ASSIGNMENT between ARM and BORROWER

REBATOR AUTHORIZED REPRESENTATIVE

18

## Acknowledgment of Credit Limit

Agrifund, LLC ("ARM") has agreed to make:

Crapp Farms Partnership
Darrell Carl Crapp
5761 Substaation Road
Lancaster, WI 53813

Tony Darrell Crapp
322 Alona Ln
Lancaster, WI 53813

Carl Daniel Crapp
6638 Stage Rd
Potosi, WI 53820

Diana M. Crapp
5761 Substation Rd
Lancaster, WI 53813

an agricultural loan for the 2017 crop year. The total amount of credit agreed to extend the undersigned customer shall not exceed $4,964,994.00. The extension of this credit is to the sole discretion of ARM and subject to the clauses and conditions in our Agricultural Security Agreement and Promissory Note.

This credit limit is based upon the intended acres, crop mix, and crop insurance type and levels that were communicated to ARM. If intended planted acres, crop mix, and/or crop insurance type and levels change, I agree to promptly notify ARM. I agree to farm the entirety of the represented crops and acres according to agriculture practices and standards required by federal crop insurance.

I have read, understand, and agree to the clauses and conditions in our Agricultural Security Agreement and Promissory Note. I also acknowledge this agreement and the above credit limit.

This acknowledgment is dated 5/30/2017

BORROWER Darrell Carl Crapp

BORROWER Tony Darrell Crapp

BORROWER Carl Daniel Crapp

BORROWER Diana M. Crapp

## Acknowledgment of Cash Advance Policy & Procedures

It is the policy of Agrifund, LLC ("ARM") to prudently extend credit for the purpose of agriculture loans. For certain cases, our loan approval board will pre-approve planned cash advances. The Board will only approve cash advances for the specific purpose of raising crops secured by a first lien and subject to the clauses and conditions in our Agricultural Security Agreement and Promissory Note. In addition, the following specific policies and procedures apply to cash advances:

1.  Any cash advances should be planned for and factored into the loan at the time the loan is made.

2.  It is to the sole discretion of ARM to extend or to suspend the extension of all cash advances.

3.  Bills are the sole responsibility of the customer and are not to be mailed directly to ARM. ARM makes no agreement, explicit or implied, to pay other suppliers.

4.  All non-planned cash advances that have not been budgeted require an approved *Application for Extension*.

5.  Non-Planned cash advances require a minimum of a two day processing period from the time the bill is presented or until an *Application for Extension* has been approved.

6.  All crop proceeds will be applied to outstanding debt until entirety of the debt is paid. Release of any crop proceeds including but not limited to deficiency payments can only be done by the way of an approved application for extension.

I have read and understand all of the above Cash Advance Policy and Procedures.

BORROWER Darrell Carl Crapp

BORROWER Tony Darrell Crapp

BORROWER Carl Daniel Crapp

BORROWER Diana M. Crapp

20

## Authorization to Release Borrower Information

I voluntarily authorized and request disclosure (including paper, oral and electronic interchange) of any information related to my farming operation as requested by Agrifund, LLC ("ARM").

This includes specific permission to release the following:

- Crop Insurance Summary of Coverage
- Schedule of Insurance
- APH Reporting
- Acreage Reporting
- Settlement Sheets and/or Tickets
- Grain or other Crop Contracts
- Claim History
- FSA information including, but not limited to FSA 156, FSA 509B, FSA 578, Farm Plans, Leases, etc., relating to the entity or individual named below
- Any NRCS information including by not limited to CSP information relating to the entity or individual named below

I authorize the use of a copy (including electronic copy) of this form for the disclosure of the information described above. This authorization applies to below named BORROWER(S) as well as other entities BORROWER(S) may be associated with.

This authorization will remain in effect indefinitely. If no outstanding balance is owed ARM, the undersigned may provide a written revocation of this authorization to ARM.

This notice is dated 5/30/2017

Crapp Farms Partnership by:

BORROWER Darrell Carl Crapp

BORROWER Tony Darrell Crapp

BORROWER Carl Daniel Crapp

BORROWER Diana M. Crapp

## ACH Authorization

I authorize Agrifund, LLC ("ARM") to initiate electronic deposits to my checking account.

I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I further acknowledge that deposits into this account are to be used for the explicit purpose of the associated loan. This authority will remain in effect until I have cancelled it in writing.

_____

SOCIAL SECURITY OR TID

_____

FINANCIAL INSTITUTION NAME (PLEASE PRINT)

_____

ROUTING NUMBER AT FINANCIAL INSTITUTION

_____

ACCOUNT NUMBER AT FINANCIAL INSTITUTION

_____

FINANCIAL INSTITUTION CITY AND STATE

_____

SIGNATURE

_____

5- 31- 17

DATE

## Notice to Buyer of Security Interest in Farm Products

**BUYER**
Eastland Feed and Grain Gavilon

**SECURED PARTY**
Agrifund, LLC ("ARM")
1401 Hudson Lane, STE 300
Monroe, LA 71201

**BORROWER(S)**
Crapp Farms Partnership
Darrell Carl Crapp
5761 Substaation Road
Lancaster, WI 53813

Tony Darrell Crapp
322 Alona Ln
Lancaster, WI 53813

Carl Daniel Crapp
6638 Stage Rd
Potosi, WI 53820

Diana M. Crapp
5761 Substation Rd
Lancaster, WI 53813

**SECURITY INTEREST:**  You are hereby notified pursuant to the Federal Food Security Act of 1985 that ARM (the "Secured Party") holds a security interest in the Farm Products, as described below. The name and address of the Secured Party are shown above.  This Notice is effective for a period of one year from the date of your receipt of this Notice.

**FARM PRODUCTS:**  The Secured Party holds a security interest in all of the following described property

| Farm Product | Amount | Crop Year | State | County |
|---|---|---|---|---|
| ALL CROPS | ALL | 2017 | Wisconsin | ALL |

**DESCRIPTION OF PROPERTY:**  The following is a reasonable description of the property:

All crops growing in the above state(s) for the above crop year

**PAYMENT OBLIGATIONS:**  The following payment obligations are applicable to this Notice as conditions for waiver or release of the security interest in the Farm Products:

**Proceed checks are to be issued jointly to borrower and Agrifund, LLC, the secured party.**

**ACKNOWLEDGEMENT:** Please acknowledge receipt of this Notice by signing below and returning to the Secured Party at the address shown above.

This Notice is dated 5/30/2017

_____

ARM

---

ACKNOWLEDGEMENT

The undersigned acknowledges receipt of this Notice

_____

BUYER

22

## Notice to Buyer of Security Interest in Farm Products

| BUYER | SECURED PARTY |
|---|---|
| AOM | Agrifund, LLC ("ARM") |
| | 1401 Hudson Lane, STE 300 |
| Buscobel, WI | Monroe, LA 71201 |

**BORROWER(S)**

Crapp Farms Partnership
Darrell Carl Crapp
5761 Substaation Road
Lancaster, WI 53813

Tony Darrell Crapp
322 Alona Ln
Lancaster, WI 53813

Carl Daniel Crapp
6638 Stage Rd
Potosi, WI 53820

Diana M. Crapp
5761 Substation Rd
Lancaster, WI 53813

**SECURITY INTEREST:** You are hereby notified pursuant to the Federal Food Security Act of 1985 that ARM (the "Secured Party") holds a security interest in the Farm Products, as described below. The name and address of the Secured Party are shown above. This Notice is effective for a period of one year from the date of your receipt of this Notice.

**FARM PRODUCTS:** The Secured Party holds a security interest in all of the following described property

| Farm Product | Amount | Crop Year | State | County |
|---|---|---|---|---|
| ALL CROPS | ALL | 2017 | Wisconsin | ALL |

**DESCRIPTION OF PROPERTY:** The following is a reasonable description of the property:

All crops growing in the above state(s) for the above crop year

**PAYMENT OBLIGATIONS:** The following payment obligations are applicable to this Notice as conditions for waiver or release of the security interest in the Farm Products:

**Proceed checks are to be issued jointly to borrower and Agrifund, LLC, the secured party.**

**ACKNOWLEDGEMENT:** Please acknowledge receipt of this Notice by signing below and returning to the Secured Party at the address shown above.

This Notice is dated 5/30/2017

_____

ARM

### ACKNOWLEDGEMENT

The undersigned acknowledges receipt of this Notice

_____

BUYER

24

## Notice to Buyer of Security Interest in Farm Products

| BUYER | SECURED PARTY |
|---|---|
| Big River Energy | Agrifund, LLC ("ARM") |
| | 1401 Hudson Lane, STE 300 |
| Dyersville, IA | Monroe, LA 71201 |

**BORROWER(S)**

| | |
|---|---|
| Crapp Farms Partnership | |
| Darrell Carl Crapp | Tony Darrell Crapp |
| 5761 Substaation Road | 322 Alona Ln |
| Lancaster, WI 53813 | Lancaster, WI 53813 |
| | |
| Carl Daniel Crapp | Diana M. Crapp |
| 6638 Stage Rd | 5761 Substation Rd |
| Potosi, WI 53820 | Lancaster, WI 53813 |

**SECURITY INTEREST:**  You are hereby notified pursuant to the Federal Food Security Act of 1985 that ARM (the "Secured Party") holds a security interest in the Farm Products, as described below. The name and address of the Secured Party are shown above. This Notice is effective for a period of one year from the date of your receipt of this Notice.

**FARM PRODUCTS:**  The Secured Party holds a security interest in all of the following described property

| Farm Product | Amount | Crop Year | State | County |
|---|---|---|---|---|
| ALL CROPS | ALL | 2017 | Wisconsin | ALL |

**DESCRIPTION OF PROPERTY:**  The following is a reasonable description of the property:

All crops growing in the above state(s) for the above crop year

**PAYMENT OBLIGATIONS:**  The following payment obligations are applicable to this Notice as conditions for waiver or release of the security interest in the Farm Products:

**Proceed checks are to be issued jointly to borrower and Agrifund, LLC, the secured party.**

**ACKNOWLEDGEMENT:** Please acknowledge receipt of this Notice by signing below and returning to the Secured Party at the address shown above.

This Notice is dated 5/30/2017

_____

ARM

_____

ACKNOWLEDGEMENT

The undersigned acknowledges receipt of this Notice

_____

BUYER

25

## Cross-Collateralization & Pledge Agreement

THIS CROSS-COLLATERALIZATION AND PLEDGE AGREEMENT (this "**Agreement**") is made this date of 5/30/2017 by Agrifund, LLC ("**ARM**") or ("**Lender**"), and the following **Borrower(s)**:

Crapp Farms Partnership
Darrell Carl Crapp                          Tony Darrell Crapp
5761 Substaation Road                       322 Alona Ln
Lancaster, WI 53813                         Lancaster, WI 53813


Carl Daniel Crapp                           Diana M. Crapp
6638 Stage Rd                               5761 Substation Rd
Potosi, WI 53820                            Lancaster, WI 53813


And "**Pledgor(s)**" or "**Related Borrower(s)**":

Tony Darrell Crapp

1.  **RECITALS**
    a.  Lender has made a loan to Borrower in the original principal amount of $4,964,994.00 ("**Loan**"). The Loan is secured by a recorded mortgage ("**Instrument**") upon real or immovable property identified in Exhibit A hereto and other property included within the definition of "Mortgaged Property" in the Instrument

    b.  Contemporaneously with the making of the Loan, Lender is making other loans (collectively, "**Related Loans**") to Borrower and/or affiliates of Borrower, secured by Mortgages (collectively, "**Related Instruments**") upon other property (collectively, "**Related Properties**"), all as more fully set forth in the following table:

| Related Borrower | Related Loan Amount | Related Property | Property Location |
|---|---|---|---|
| Tony Darrell Crapp | $1,619,935.00 | 2017 Crops | Wisconsin |
|  |  | 2017 Crops | Wisconsin |
|  |  | 2017 Crops | Wisconsin |
|  |  | 2017 Crops | Wisconsin |

    c.  Borrower acknowledges that a condition of Lender making the Loan and the Related Loans is that the Mortgaged Property serve as collateral for each of the Related Loans and that each of the Related Properties serve as collateral for the Loan. Borrower and Related Borrower are executing this Agreement to satisfy such condition. Borrower and Related Borrower further acknowledge that the benefits derived by them from this Agreement entered into or to be entered into in connection with the Related Loans are equivalent to the burdens imposed upon Borrower and the Mortgaged Property by this Agreement, notwithstanding that the Loan and the Related Loans may be of differing amounts

2.  **Definitions.** For purposes of this Agreement, the following terms shall have the meanings indicated:

    •  "**Event of Default**" shall have the meaning set forth in Section 4.
    •  "**Foreclosure**" means a judicial or non-judicial foreclosure of or trustee's sale under the Instrument or a Related Instrument, a deed in lieu of such foreclosure or sale, a sale of any of the Total Property pursuant

to lawful order of a court of competent jurisdiction in a bankruptcy case filed under Title 11 of the United States Code, or any other similar disposition of any of the Total Property.

- "**Indebtedness**" means the "Indebtedness" as defined in the Instrument, exclusive of any sums payable by Borrower solely by reason of this Agreement.
- "**Loans**" means the Loan and the Related Loans.
- "**Related Borrowers**" means the original borrower under each of the Related Loans (which original borrower may be the Borrower named in this Agreement), and any successor to the interest of each such borrower in any of the Related Properties who acquires such Related Property subject to, or who assumes the obligations under, a Related Instrument.
- "**Related Indebtedness**" means the aggregate of the "Indebtedness" as defined in each of the Related Instruments.
- "**Related Loan Documents**" means the "Loan Documents" as defined in each of the Related Instruments.
- "**Total Indebtedness**" means the aggregate of the Indebtedness plus the Related Indebtedness.
- "**Total Loan Documents**" means the "Loan Documents" as defined in the Instrument and the Related Loan Documents. This Agreement is among the Loan Documents are defined in the Instrument, and the Cross-Collateralization Agreements entered into in connection with the Related Loans are among the Related Loan Documents.
- "**Total Property**" means the aggregate of the Mortgaged Property and the "Mortgaged Property" described in each of the Related Instruments.

Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the instrument

3.   **Assumption and Integration of Related Indebtedness; Obligations Absolute**

Borrower and Pledgor/Related Borrower hereby acknowledge that:
a.   Borrower and Pledgor/Related Borrower shall pay not only the Indebtedness, but all of the Related Indebtedness in accordance with the Related Loan Documents. Borrower and the Pledgor/Related Borrowers are jointly and severally liable for the payment of the Total Indebtedness. Lender at its option may treat the Loan and each of the Related Loans as separate and independent obligations of Borrower or Pledgor/Related Borrower, or may treat some or all of the Loans, and all or any part of the Total Indebtedness, as a single, integrated indebtedness of Borrower or Pledgor/Related Borrower.
b.   No invalidity, irregularity or unenforceability of all or any part of the Related Indebtedness shall affect, impair or be a defense to the recovery by Lender of the Indebtedness.
c.   It is the intention of Lender, Borrower, and Pledgor/Related Borrower that Borrower's and the Pledgor/Related Borrower's obligations to pay the Indebtedness and Related Indebtedness shall be independent, primary, and absolute, and shall be performed without demand by Lender and shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any of the Related Loan Documents, and without regard to any circumstance, other than payment in full of the Related Indebtedness, which might otherwise constitute a legal or equitable discharge of a borrower, a mortgagor, a surety, or a guarantor. Borrower waives, to the fullest extent permitted by law, all rights to require Lender to proceed against any Pledgor/Related Borrower or against any guarantor of any of the Total Indebtedness or to pursue any other right or remedy Lender may now or hereafter have against any Pledgor/Related Borrower or any collateral for any of the Total Indebtedness.

4.   **Amendment of Instrument to Grant Additional Security.** The Instrument is hereby amended to provide that the Instrument secures the obligation of Borrower and the Pledgor/Related Borrowers to pay the Related Indebtedness as well as the obligation of Burrower and the Pledgor/Related Borrowers to pay the Indebtedness. Borrower hereby irrevocably mortgages, grants, conveys, pledges and assigns to Lender the Mortgaged Property, to secure to lender payment of the Related Indebtedness and performance of the covenants and agreement contained in the Related Loan Documents, as well as to secure to Lender payment of the Indebtedness and performance of the covenants and agreements contained in the Loan Documents.

5.   **Events of Default.**  Each of the following events shall constitute an "**Event of Default**" under this Agreement:

    a.   Any nonpayment when due (whether by the mere passage of time or acceleration as permitted herein, or as provided in the documentation evidencing the Collateral or any and all Indebtedness, Related Indebtedness or obligation of Borrower or Pledgor/Related Borrower to Lender) of any interest, any principal or any advance on the Indebtedness or permitted by the documentation evidencing the Collateral; or

    b.   Any failure of Borrower or Pledgor/Related Borrower to comply with, or the occurrence of any act or omission of Borrower or Pledgor/Related Borrower, or any event which is in violation of, any term, condition, or covenant contained in, this Agreement or the documentation evidencing any of the Collateral or obligations of Borrower or Pledgor/Related Borrower owed to the Lender;

    c.   Death or dissolution of either Borrower, Pledgor/Related Borrower or guarantor of Borrower's or Pledgor's/Related Borrower's obligations hereunder; or

    d.   Pledgor/Related Borrower or any guarantor of Borrower's or Pledgor's/Related Borrower's obligations hereunder shall generally not pay its debts as they become due, admit in writing its inability to pay its debts, have called a general meeting of creditors, or make a general assignment for the benefit of creditors; or

    e.   Pledgor/Related Borrower or any guarantor of Borrower's or Pledgor's/Related Borrower's obligations hereunder become insolvent, or apply or petition for bankruptcy or other relief from creditors; or

    f.   Pledgor/Related Borrower or any guarantor of Borrower's or Pledgor's/Related Borrower's obligations hereunder take any action to authorize any of the actions set forth above in subparagraphs (d) or (e) above; or

    g.   Any warranty, representation or certification of Borrower or Pledgor/Related Borrower on any financial statement, report, schedule or other information made or furnished to Lender is incorrect, false or misleading in any material respect on the date made; or

    h.   In the event Mortgagee deems, at its option and in its sole opinion, that the prospect of payment or performance of any obligation, existing now or hereafter, secured by this Act is impaired or that the value of the Property is no longer sufficient to adequately secure the obligations, existing now or hereafter, of Mortgagor to Mortgagee; or

    i.   The Collateral, or the property encumbered by the Collateral, or any part or parcel thereof, be seized in the execution of a writ of executory process, attachment, fieri facias or any other legal process, or an order for the sale of the Collateral, property encumbered by the Collateral, or any part or parcel thereof be issued in any judicial proceeding, and such writ of executory process, attachment, fieri facias or any other legal process or order for the sale of the Collateral, property encumbered by the Collateral, or any part or parcel thereof, so issued in any judicial proceeding be not released, revoked, stayed or set aside within ten (10) days from issuance thereof, other than as authorized by the bankruptcy court in the Western District of Wisconsin, Case No. 17-11601.

    j.   Either Borrower, Pledgor/Related Borrower or any guarantor of Borrower's or Pledgor's/Related Borrower's obligation hereunder fails upon request to furnish to Lender a financial statement and income statement attested to by them or verified by a public accountant; or

    k.   Passage of legislation making it illegal for Lender to pay any taxes referred to in the documentation of Collateral and/or the Indebtedness, or making the payment of such taxes by Lender would result in the violation of the usury laws of the State of Louisiana.

6.   **Remedies.**  Then and in each and every such case, the whole Indebtedness hereby secured may, at the option of the Lender and without notice to Borrower, Pledgor/Related Borrower or any party to the Indebtedness, be declared to be immediately due and payable, anything in the Collateral to the contrary notwithstanding, and Borrower, Pledgor/Related Borrower, or any party to the Indebtedness does by these presents consent, agree and stipulate that, in the event of any such default, it shall be lawful for Lender, and Borrower, Pledgor/Related Borrower, or any

party to the Indebtedness or the Collateral do hereby authorize Lender to cause all and singular the Collateral or any security thereof to be seized and sold under judicial process without appraisement, appraisement being hereby expressly waived, as an entirety or in parcels, as Lender may determine, to the highest bidder for cash, or on such terms as may be acceptable to Lender, or under Louisiana Revised Statutes Section 10:9-501 through Section 10:9-505 and Section 10:9-508 or any other Laws of the state of Louisiana. In case the Indebtedness should be placed in the hands of an attorney-at-law (salaried, corporate, or any other attorney) to institute legal proceedings to recover thereof or any part thereof, in principal or interest, or to protect the interest of the Lender, and the successors or assigns thereof, or in case the same should be placed in the hands of an attorney for collection, compromise or other action, the Borrower, Pledgor/Related Borrower, or any party to the Indebtedness hereby agrees to pay all cost incurred by the Lender, including reasonable costs and fees of attorneys (salaried, corporate or any other attorney) and other costs provided for in the Collateral, in addition to paying all principal and interest due, costs, advances, taxes and default penalty interest due, in order to redeem the collateral according to Louisiana Revised Statutes Section 10:9-506.

7.  In the event the Collateral or any security thereof is seized as an incident to an action for the recognition or the enforcement of said herein declared Collateral by executory process, ordinary process, sequestration, writ of fieri facias, or otherwise, Borrower(s), Pledgor/Related Borrowers or any other party to the Indebtedness and Lender hereby agree that the Court issuing any such order shall, if petitioned for by Lender, direct the Sheriff to appoint as a keeper of the Collateral, or any security thereof, the Lender, or any agent designated by Lender or any person named by the Lender at the time such seizure is effected. This designation is made pursuant to Louisiana Revised Statutes Section 9:5136 through Section 9:5140.1, inclusive, as the same may be amended, and Lender shall be entitled to all the rights and benefits afforded thereunder including reasonable compensation.

8.  Upon the occurrence and during the continuance of the Event of Default hereunder or under any other agreement between Lender and Borrower or Pledgor/Related Borrower, Lender may suspend future withdrawals from any and all Funds Held and/or Future Payment accounts in the name of Borrower or Pledgor/Related Borrower.

9.  Upon the occurrence and during the continuance of any Event of Default hereunder or under any other agreement between Lender and Borrower or Pledgor/Related Borrower, or if Borrower or Pledgor/Related Borrower becomes insolvent, however evidenced, Lender is hereby authorized at any time to set-off and apply any and all funds in any Funds Held and Future Payment Fund Accounts, that may be established by Borrower or Pledgor/Related Borrower at any time against any and all of the Indebtedness secured by this Agreement.  The rights of Lender under this provision are in addition to other rights and remedies (including without limitation other rights of set-off) which Lender may have.

10. Lender may perform any of Borrower's or Pledgor's/Related Borrower's defaulted covenants or agreements of this Agreement and of the documentation evidencing the Collateral and/or the Indebtedness to such extent as Lender elects and Lender may pay such taxes, liens, judgments, or assessments, obtain and pay for such insurance, or advance such attorney's fees, expenses and costs which Lender determines are necessary to protect its interests and Borrower or Pledgor/Related Borrower agree to immediately pay to Lender all amounts so advanced with interest as provided in documentation evidencing the Collateral and/or the Indebtedness, and all amounts so advanced shall be secured hereby.

11. Borrower and Pledgor/Related Borrower agree that Lender, at Lender's option and without any obligation to do so, (1) may employ attorneys, experts, arbitrators, investigators, keepers, appraisers and surveyors and/or (2) incur costs, expenses and fees and/or (3) may appear in any suit, administrative or regulatory hearing and litigate any matters, including but not limited to eminent domain proceedings. Bankruptcy proceedings, partition suits and any other legal proceedings, whether a party plaintiff, defendant, intervenor or otherwise, affecting the security of the Collateral, this Agreement, any instruments relating hereto, and/or the interests, rights, obligations of Borrower or Pledgor/Related Borrower and/or Lender associated herewith and/or any instruments relating hereto and/or order to preserve, protect and maintain the security of the collateral and/or the rights or interests of Lender and/or to collect or attempt to collect the debts and/or obligations associated herewith relating hereto.

30

12. Borrower and Pledgor/Related Borrower agree to immediately pay and satisfy, when incurred by either Borrower or Pledgor/Related Borrower or Lender, any and all costs, expenses, and fees expended in order to maintain, and ensure compliance with any and all provisions of this Agreement and/or any instrument relating hereto, including but not limited to costs, expenses, fees for taxes, insurance, attorneys, experts, arbitrators, investigators, witnesses, appraisers, surveyors, keepers, recordation, repairs, assessments, liens, judgments or encumbrances.

13. The Borrower(s) and any other party to the Indebtedness and Related Indebtedness, including but not limited to the Pledgor/Related Borrower(s), do furthermore by these presents hereby confess judgment in favor of Lender for the full amount of said Indebtedness and Related Indebtedness in principal, interest and attorney's fees and for all other costs and any sums that the Lender may advance during the life of said pledge for the payment of premiums of insurance, payment of taxes and charges, making of repairs, or for the protection and preservation off the security of Collateral as authorized elsewhere in this Agreement up to an amount equal to one and one-half the face amount of said Indebtedness and Related Indebtedness, and expressly waives:  (a)  the benefit of appraisement, as provided in Articles 2332, 2336, 2723, and 2724, Louisiana Code of Civil Procedure, and all other laws conferring the same; (b)  the demand and three (3) days delay accorded by Articles 2639 and 2721, Louisiana Code of Civil Procedure; (c)  the notice of seizure required by Articles 2293 and 2721, Louisiana Code of Civil Procedure;  (d)  the three (3) days delay provided by Articles 2331 and 2722, Louisiana Code of Civil Procedure;  and (e) the benefit of the other provisions of Articles 2331, 2722 and 2723, Louisiana Code of Civil Procedure, and any other laws of the State of Louisiana not specifically mentioned above which would prevent the immediate seizure and sale of the Security or Collateral.

14. Pledgor/Related Borrower expressly ratifies, consents to and adopts any and all agreements which Borrower has made or may hereafter make with bank regarding the use of said Collateral, and Pledgor/Related Borrower further authorizes Lender at any time to deliver the Collateral or any part thereof to Borrower or any party to the Indebtedness and Lender shall thereafter be discharged from all liability and responsibility therefor.

15. Pledgor/Related Borrower understands and agrees that Lender's sole duty with reference to the Collateral shall be to use reasonable care in the custody of the Collateral in Lender's possession, which shall not include any steps necessary to preserve rights against prior parties nor the duty to send notices, perform services or take any action in connection with the management of the Collateral.

16. **Notices.**  All notices to Borrower/Related Borrower under this Agreement shall be in writing and shall be given in the manner provided in the Instrument for notices to Borrower/Related Borrower.  All notices to Lender by Borrower/Related Borrower under this Agreement shall be in writing and shall be given in the manner in the Instrument for notices to Lender.

17. **Governing Law.**  This Agreement shall be governed by and construed under the law of the State of Louisiana. Pledgor agrees that any action arising out of this agreement or any additions or substitutions therefor may be brought in any competent court in the State of Louisiana.

18. **No Partnership.**  This Agreement is not intended to, and shall not, create a partnership or joint venture among the parties, and no party to this Agreement shall have the power or authority to bind any other party except as explicitly provided in this Agreement.

19. **Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, successors, and assigns.

20. **Severability.**  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity of any other provision, and all other provisions shall remain in full force and effect.

21. **Waiver; No Remedy Exclusive.**  Any forbearance by a party to this Agreement in exercising any right or remedy given under this Agreement or existing at law or in equity shall not constitute a waiver of or preclude the exercise of that or any other right or remedy.  Unless otherwise explicitly provided, no remedy under this Agreement is

31

intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity.

Thus done and signed in the presence of the undersigned and me, on this date of 5/30/2017

Crapp Farms Partnership by:

BORROWER Darrell Carl Crapp- Partner

BORROWER Tony Darrell Crapp- Partner

BORROWER Carl Daniel Crapp- Partner

BORROWER Diana M. Crapp- Partner

PLEDGOR/ RELATED BORROWER Tony Darrell Crapp

PLEDGOR/ RELATED BORROWER

PLEDGOR/ RELATED BORROWER

PLEDGOR/ RELATED BORROWER

ARM

## AUTHORIZATION LETTER

This Authorization Letter (this "Authorization") dated 5/30/2017 relates to (a) loans (the "Loans") made or to be made to the undersigned (the "Borrower") by AGRIFUND, LLC ("Agrifund") and (b) insurance policies related to such Loans (the "Insurance Policies"). The Borrower acknowledges and agrees that Agrifund is one of its creditors, and as one of several conditions precedent to Agrifund making the Loans, Agrifund requires that the Borrower (a) execute and deliver this Authorization and the assignment of indemnity attached to this Authorization as **Exhibit A** (the "AOI") and (b) authorize Agrifund to complete the AOI and submit it to the applicable insurance provider as detailed below.

A. The Borrower acknowledges and agrees that Agrifund and its assignees may, from time to time, assign, transfer, convey and/or grant security interests (each, an "Assignment") in the Loans and the Insurance Policies and any documents, instruments, and agreements evidencing or relating thereto to any other person or entity or to any other person or entity acting as an agent, subagent or trustee on behalf of any such assignee (each, an "Assignee").

B. As part of any such Assignment, the Borrower authorizes Agrifund to complete the AOI by inserting an Assignee's name and address on the AOI, inserting the Insurance Policy numbers, and providing any other information required to complete such assignment.

C. The Borrower further authorizes Agrifund to cause the AOI to be executed by the Assignee and the required witnesses in the spaces provided for such signatures.

D. The Borrower further authorizes Agrifund to submit such completed and executed AOI to the applicable insurance provider and to take all other actions Agrifund deems necessary or desirable to cause the Assignee to be the "creditor" under the AOI in lieu of Agrifund.

**If the Borrower is an individual:**

By: _Darrell Carl Crapp_

Name: Darrell Carl Crapp

**If the Borrower is a corporation, limited liability company, or partnership:**

Crapp Farms Partnership
[FULL LEGAL NAME OF BORROWER]

By: _Darrell Carl Crapp_

Name: _DARRELL CARL CRAPP_

Title: _PARTNER_

37

## Exhibit A

**Assignment of Indemnity**

(See attached)

# EXHIBIT B

# DISTRIBUTOR SECTION

## Ag-Input Inter-Creditor Agreement

**THIS AGREEMENT,** made and entered into this day between the following entity and individuals (hereafter referred to as "BORROWER"):

Crapp Farms Partnership
Darrell Carl Crapp
5761 Substaation Road
Lancaster, WI 53813

Tony Darrell Crapp
322 Alona Ln
Lancaster, WI 53813

Carl Daniel Crapp
6638 Stage Rd
Potosi, WI 53820

Diana M. Crapp
5761 Substation Rd
Lancaster, WI 53813

, and **Federal Hybrids, Inc.** (hereafter referred to as "DISTRIBUTOR"), and **Agrifund, LLC ("ARM")**

WHEREAS, BORROWER is desirous of carrying on certain farming operations and is obtaining financing on said farm from ARM and DISTRIBUTOR for the 2017 Crop Year, under the following terms and conditions:

ARM, BORROWER, and DISTRIBUTOR agree to enter into this inter-creditor agreement, for the purposes of funding the cash and product needs of the above named operation, and therefore agree as follows:

1. ARM will fund cash expenses in an amount up to but not to exceed, $4,964,994.00 , plus accrued interest, to be secured by a first lien on (a) all crops planted by BORROWER in 2017; (b) BORROWER'S 2017 crop insurance payments; (c) the 2016 government payment due to BORROWER which BORROWER anticipates receiving in late 2017 ; (d) the 2017 government payment due to BORROWER which BORROWER anticipates receiving in 2018; and (e) all proceeds of the foregoing (the "Collateral").
2. DISTRIBUTOR will provide crop inputs to BORROWER, specifically seed for planting corn as described in DISTRIBUTOR's letter dated May 23, 2017, to BORROWER, in an amount not to exceed, $869,404.00, plus accrued interest, to be secured by a second lien behind ARM on all Collateral.
3. ARM, DISTRIBUTOR, and BORROWER further agree and understand, that all checks representing Collateral or proceeds thereof shall be made payable jointly to ARM, DISTRIBUTOR, and BORROWER and that once the line established by ARM has been paid in full, ARM will relinquish to DISTRIBUTOR any and all proceeds until such time that the line with DISTRIBUTOR has also been paid in full.
4. ARM, DISTRIBUTOR, and BORROWER agree that both of the ARM and DISTRIBUTOR lines of credit are non-revolving and that no crop proceeds will be released to pay other indebtedness until ARM line of credit is paid in full firstly and then DISTRIBUTOR's line of credit has  been paid in full.
5. ARM and DISTRIBUTOR agree to freely exchange information concerning balances and advances and that such information will be provided in a timely manner when requested. Also, each creditor shall agree to and notify the other prior to making any additional advances above and beyond the original line amounts, it being understood, however, that neither ARM nor DISTRIBUTOR shall make any additional advances above and beyond the original line amounts unless such additional advances have been approved and authorized by the United States Bankruptcy Court for the Western District of Wisconsin.
6. The BORROWER hereby agrees to execute all documents necessary to create and perfect the lien positions mentioned in this agreement.  BORROWER also agrees to hold ARM and DISTRIBUTOR harmless for any Collateral proceeds forwarded as agreed above.

Signatures on Following Page

44

SIGNATURES: I WITNESS WHEREOF, Grantor has executed this Agreement on 5/30/2017.

Crapp Farms Partnership by:

_____

BORROWER Darrell Carl Crapp- Partner

_____

BORROWER Tony Darrell Crapp- Partner

_____

BORROWER Carl Daniel Crapp- Partner

_____

BORROWER Diana M. Crapp- Partner

_____

DISTRIBUTOR Federal Hybrids, Inc.

_____

ARM Agrifund, LLC

**IMPORTANT:  READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED.  YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

## Promissory Note

**Dated:** 5/30/2017

FOR VALUE RECEIVED, the undersigned Borrower(s), promises to pay to the order of Federal Hybrids, Inc., the full sum of $869,404.00 together with interest at the rate of (9.00%) percent per annum on the outstanding principal balance from date until paid.

Borrower shall pay this Note in one (1) payment of all outstanding principal plus accrued unpaid interest on 3/15/2018.

Borrower may prepay this Note in whole or in part at any time without penalty.  All payments on this Note shall be applied first to accrued and unpaid interest, second to any and all costs and expenses due hereunder and/or under any agreement securing this Note, and third to the unpaid principal balance hereof. All payments due hereunder shall be delivered to

Federal Hybrids, Inc.
209 3rd St Ne, W. Bend, IA 50597

or at such other place as Federal Hybrids, Inc. may from time to time designate in writing, in lawful money of the United States of America.

In the event of Borrower's default under the terms and conditions of this Note and/or the terms and conditions of the attached security agreement executed by Borrower in favor of Federal Hybrids, Inc., Federal Hybrids, Inc. shall have the right, at Federal Hybrids, Inc.'s sole option, to increase the interest rate under this Note to a default rate (the "Default Rate") equal to eighteen (18.00%) percent per annum (provided, however, that in no event shall the interest rate under this Note exceed the highest rate permitted by law) and to further declare this Note to be in default and to accelerate the maturity and insist upon immediate payment in full of the unpaid principal balance then outstanding under this Note, plus accrued interest at the Default Rate Federal Hybrids, Inc. shall further be entitled upon Borrower's failure to pay this Note when due to prospectively increase the interest rate to the Default Rate provided hereinabove.

Should this Note be placed in the hands of an attorney for collection, then Borrower agrees to pay reasonable attorney's fees together with all court costs incurred in the collection of this Note.

No delay or omission on the part of Federal Hybrids, Inc. in exercising any right hereunder shall operate as a waiver of such right or of any other remedy under this Note.  A waiver on one occasion shall not be construed as a waiver of any such right or remedy on a future occasion. Borrower hereby waives presentation for payment, demand, notice of non-payment and protest, all pleas of division or discussion, and consents that time of payment may be extended without notice thereof.

And now appears the undersigned Guarantor(s) who acknowledges and agrees that Guarantor is and shall be bound with Borrower, jointly and severally, for the faithful performance of this Note and all obligations due by Borrower hereunder. All makers, endorsers, sureties, guarantors and other accommodation parties hereby waive presentment for payment, protest, notice of demand, notice of dishonor and notice of nonpayment and consent, without affecting their liability hereunder, to any and all extensions, renewals, amendments, modifications, substitutions and alterations of any of the terms of this Note and to the release of or failure by Federal Hybrids, Inc. to exercise any rights against any party liable for or any property securing payment of this Note.

46

This Note shall be governed and construed in accordance with the laws of the State of Iowa.  If any provision of this Note is deemed illegal or unenforceable, such portion shall be stricken from this Note, but the balance thereof shall remain in full force and effect.

Crapp Farms Partnership by:

BORROWER Darrell Carl Crapp- Partner

GUARANTOR Darrell Carl Crapp

BORROWER Tony Darrell Crapp- Partner

GUARANTOR Tony Darrell Crapp

BORROWER Carl Daniel Crapp- Partner

GUARANTOR Carl Daniel Crapp

BORROWER Diana M. Crapp- Partner

GUARANTOR Diana M. Crapp

47

## Security Agreement

**CREDITOR**
Federal Hybrids, Inc.
209 3rd St Ne, W. Bend, IA 50597

**BORROWER(s)**

Crapp Farms Partnership
Darrell Carl Crapp
5761 Substaation Road
Lancaster, WI 53813

Tony Darrell Crapp
322 Alona Ln
Lancaster, WI 53813

Carl Daniel Crapp
6638 Stage Rd
Potosi, WI 53820

Diana M. Crapp
5761 Substation Rd
Lancaster, WI 53813

CREDITOR and BORROWER, whose addresses appear above, agree as follows:

1. **Security Interest/Collateral**
   BORROWER hereby grants to CREDITOR a security interest in all the following collateral, together with all
   substitutions, replacements, products and proceeds thereof, whether now owned or hereafter acquired
   (collectively, the "Collateral"):  (a) all crops planted by BORROWER in 2017; (b) BORROWER'S 2017 crop
   insurance payments; (c) the 2016 government payment due to BORROWER which BORROWER anticipates
   receiving in late 2017 ; (d) the 2017 government payment due to BORROWER which BORROWER
   anticipates receiving in 2018; (e) all farm products, grains, feed, seed, fertilizers, agricultural chemicals and
   other supplies used or produced by BORROWER in connection with BORROWER'S 2017 crops; and (f) all
   BORROWER's accounts, accounts receivable, prepayments, chattel paper, general intangibles, payment
   intangibles, documents of title, bills of lading, warehouse receipts, instruments and notes arising from or in
   connection with BORROWER'S 2017 crops.

2. **Indebtedness**
   The security interest in the Collateral is given to secure the payment and performance of all debts, liabilities
   and obligations owed by BORROWER to CREDITOR of any nature, including, without limitation, those
   arising under any promissory note, invoice, contract, credit agreement, understanding, accounts, guaranty, loan
   agreement, mortgage, deed of trust, stock pledge agreement, security agreement (including this Agreement)
   and any modifications, replacements, substitutions, extensions, refinancings, or renewals of any of the
   foregoing, together with expenses, including attorney fees, incurred or paid by CREDITOR in the preservation
   or enforcement of CREDITOR's rights under any of the foregoing all whether now existing or hereafter
   created or otherwise arising.  These obligations shall be collectively referred to herein as the "Indebtedness."

3. **Preservation of Collateral/Inspection/Inventory**
   BORROWER hereby agrees to do all things necessary to maintain, preserve, and protect the Collateral and to
   be responsible to CREDITOR for any loss or damage thereto.  BORROWER agrees not to cause any waste or
   unreasonable depreciation of the Collateral.  The risk of loss of the Collateral shall be on BORROWER at all
   times and BORROWER shall promptly pay when due all taxes, assessments, liens or encumbrances levied on
   or against the Collateral hereunder or for its use or operations, except such as it may in good faith contest or as
   to which a bona fide dispute may arise.  BORROWER shall allow access to the Collateral and any documents
   or records related thereto for inspections by CREDITOR on demand, and shall provide upon request by
   CREDITOR a detailed inventory of all Collateral including the addresses and legal descriptions of land on
   which any crops are growing or will be grown,; or any farm products, or other Collateral are stored or
   otherwise located.  BORROWER shall maintain insurance acceptable to CREDITOR including appropriate
   crop insurance, listing CREDITOR as an additional insured thereon.  CREDITOR may (but shall not be
   obligated to) obtain such insurance as CREDITOR deems appropriate, including "single interest" insurance the
   cost of which shall be added to the Indebtedness owed by BORROWER and secured by this Agreement.

48

4. **Cooperation**

BORROWER will from time to time, at its expense, perform all acts and execute all documents requested by CREDITOR, including the obtaining, executing, delivering or filing of financing statements, effective financing statements, amendments, assignments of government payments, or insurance proceeds, and renewals thereof, in order to create, perfect, maintain and enforce a valid lien upon, pledge of, or security interest in all of the Collateral in CREDITOR's favor. CREDITOR is expressly authorized by BORROWER to file financing statements and effective financing statements on BORROWER's behalf, without BORROWER's signature to the extent allowed by the Uniform Commercial Code ("UCC") or other applicable law; or to sign as necessary on behalf of BORROWER, any documents necessary or desirable to perfect or maintain CREDITOR's security interest in all of the Collateral under the UCC, the Food Security Act or other applicable law. BORROWER shall provide upon request to CREDITOR any financial statements, state and federal tax returns, and accounting reports, as CREDITOR shall reasonably request.

5. **Power of Attorney**

BORROWER hereby appoints CREDITOR as its true and lawful attorney in-fact, irrevocably, with full power of substitution to do the following:  (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from, or in connection with the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment of the Collateral; (c) to settle or compromise any and all claims arising with respect to the Collateral, and, in the place and stead of BORROWER, to execute and deliver its release and settlement for any such claim; (d) to execute on BORROWER's behalf all documents necessary to assign or direct payments of any government subsidies, allocations, or payments of any nature and of any insurance proceeds of any nature; and (e) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of BORROWER, or otherwise, which in the discretion of CREDITOR are necessary or advisable for the preservation of the Collateral. This power is coupled with an interest in the Collateral; and is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by CREDITOR in writing.

6. **Notice of Sale of Collateral, Crop, Farm Products, and Livestock**

BORROWER shall, at least seven (7) days prior to any sale, transfer, or consignment of crops or other farm products deliver to CREDITOR a written list of all buyers, commission merchants, and selling agents (including addresses and phone numbers) to or through whom BORROWER may sell any farm products as defined under the Federal Food Security Act of 1985 ("FSA"). CREDITOR is hereby authorized to give written or oral notice to any person of its security interest as required or permitted under the UCC, the FSA, or other applicable law. CREDITOR is further authorized to instruct the recipient of such notice to issue all proceeds from the sale of the Collateral directly to CREDITOR or jointly to BORROWER and CREDITOR whether or not the BORROWER is in default hereunder. CREDITOR may disclose the Social Security or taxpayer identification number of BORROWER, together with such other information as must or may be included for an effective notice under law.

7. **Affirmative Representations, Warranties and Covenants**

BORROWER represents, covenants, and warrants the following: (a) The information supplied and statements made by BORROWER in any financial, credit or accounting statement or credit applications or in any reports, lists, or statements submitted to CREDITOR are true and correct when made, and have not become untrue or incorrect by subsequent actions or events that have not been disclosed to CREDITOR by BORROWER in writing; (b) The person executing this Agreement is duly authorized and empowered to execute this Agreement on BORROWER's behalf; and, the execution, delivery and performance hereof are within BORROWER's power, have been duly authorized, are not in contravention of law or the terms of BORROWER's Charter, Articles, Bylaws or other incorporation papers (when a corporation) or of any indenture, agreement or undertaking to which BORROWER is a party or by which it is bound; and (c) BORROWER shall immediately notify CREDITOR if BORROWER's place of organization, or principal

49

place of business changes from the address listed herein or if any Collateral is to be removed from the BORROWER's principal place of business.

8.  **Events of Default**

BORROWER shall be in default under this Agreement upon the occurrence of any of the following events or conditions: (a) Failure by BORROWER to timely pay any Indebtedness to CREDITOR, including, but not limited to principal, interest, or finance charges, when due; (b) Breach, default, termination, or failure to perform by BORROWER of any obligation, covenant, warranty, agreement, or promise, under any contract, agreement, invoice, guaranty, note, mortgage, deed of trust, security agreement, stock pledge, or undertaking in favor of CREDITOR, or any affiliate of CREDITOR, or any third party including, without limitation, those existing under this Agreement; (c) Any warranty, representation, or statement including financial statements and inventories of Collateral provided by BORROWER to CREDITOR are false or misleading in any material respect; (d) This agreement, or any related note, contract, agreement, open account, invoice or guaranty ceases to be in full force and effect or is in any manner deemed unenforceable, including the failure of any such documents to create or maintain a valid perfected security interest; (e) The commencement of any suit for foreclosure or forfeiture proceeding against BORROWER, entry of any judgment, restraining order, or injunction against BORROWER, or the instigation of any action to enforce any such judgment, restraining order or injunction, which in CREDITOR's sole discretion materially and adversely effects BORROWER's operations or ability to repay the Indebtedness or perform its obligations under this Agreement; (f) Death, dissolution, termination of existence, or insolvency of BORROWER; appointment of a receiver over any of the property of BORROWER; assignment for the benefit of CREDITOR or, with the exception of the Chapter 11 bankruptcy proceeding currently pending in the United States Bankruptcy Court for the Western District of Wisconsin as Case No. 17-11601 (the "Bankruptcy Case"), the commencement of any proceeding under any bankruptcy or insolvency laws by or against BORROWER.  Insolvency means BORROWER's inability to generally pay its debts in the ordinary course of business as they become due or that BORROWER's liabilities exceed its assets.  It is understood by the parties that the continuation of BORROWER's solvency is an integral and necessary condition of the CREDITOR's willingness to extend credit to BORROWER; (g) the sale of any of the Collateral without CREDITOR's prior express consent; and (h) the occurrence of a default or an Event of Default (as defined therein) under the Agreed Order: (I) Authorizing Debtor in Possession to Incur Post-Petition Secured Indebtedness; (II) Granting Security Interests and Priority Liens pursuant to 11 U.S.C. § 364; (III) Approving the Assumption and Sublease of Certain Unexpired Farm Leases Related Thereto; and (IV) Authorizing Debtor's Limited Use of Cash Collateral entered by the court in the Bankruptcy Case.

9.  **Remedies Upon Default**

Upon the default of BORROWER and without any notice to BORROWER, CREDITOR shall have all the rights and remedies available under this Agreement by statute, contract, at law and/or in equity, including but not limited to the right to declare all Indebtedness owed to CREDITOR immediately due and payable and to peacefully remove any and all of the Collateral from BORROWER's premises, custody or control, and dispose of the same as allowed under the Uniform Commercial Code; to enter upon the premises where any crops are being grown, and at CREDITOR's discretion using BORROWER's equipment, machinery, wells and other improvements of any nature perform any and all actions necessary or desirable to grow, care for, maintain, harvest, store, preserve and protect said crops and any farm products or inventory; and enter upon any premises where any Collateral consisting of livestock are located to feed, inoculate, and care for any such livestock utilizing at CREDITOR's discretion, BORROWER's equipment or improvements.  CREDITOR may require BORROWER to deliver to CREDITOR all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral.  CREDITOR may require BORROWER to assemble the Collateral and make it available to CREDITOR at a place to be designated by CREDITOR.  If the Collateral contains other goods not covered by this Agreement at the time of repossession, BORROWER agrees CREDITOR may take such other goods, provided that CREDITOR makes reasonable efforts to return them to BORROWER after repossession.  BORROWER acknowledges and agrees that one principal consideration CREDITOR is receiving in exchange for its extension of credit to BORROWER is the ability to setoff or net against amounts owed by BORROWER to CREDITOR, any credit balances or amounts owed (including any pre-paid amounts) to BORROWER by CREDITOR, or any parent, subsidiary or affiliate of CREDITOR.

50

BORROWER therefore agrees that CREDITOR may so net and setoff any such obligations whether owed directly between BORROWER and CREDITOR, or owed between BORROWER and any parent, subsidiary, or affiliate of CREDITOR.

10. **Remedies Cumulative**

All of CREDITOR's rights and remedies, whether evidenced by this Agreement or by any other agreement, note, contract or understanding between BORROWER and CREDITOR, shall be cumulative and may be exercised singularly or concurrently. Election of CREDITOR to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of BORROWER under this Agreement, after BORROWER's failure to perform, shall not affect CREDITOR's right to declare a default and to exercise its remedies.

11. **Miscellaneous**

   a.  BORROWER, on request of CREDITOR, from time to time, will execute and deliver such documents as may be necessary to perfect and maintain perfected as valid liens upon the Collateral granted to CREDITOR pursuant to this Agreement, and to fully consummate the transactions contemplated by this Agreement, that certain promissory note in the original principal amount of $869,404.00 issued by BORROWER and made payable to CREDITOR, and CREDITOR's letter dated May 23, 2017, to BORROWER.

   b.  All agreements, covenants and warranties are severable, and in the event any of them shall be held to be invalid, this Agreement shall be interpreted as if such invalid agreement or covenant was not contained herein;

   c.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective affiliates, heirs, successors and assigns;

   d.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral and written, among the parties hereto with respect to the subject matter hereof;

   e.  All representations, warranties and covenants made in or pursuant to this Agreement are continuing, and shall survive the execution hereof;

   f.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute the same Agreement;

   g.  This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa;

   h.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, IN ANY SUIT OR PROCEEDING RELATING TO THIS AGREEMENT, THE PARTIES MUTUALLY WAIVE TRIAL BY JURY;

   i.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THIS AGREEMENT MAY BE ENFORCED IN A COURT OF COMPETENT JURISDICTION AND BORROWER WAIVES ANY ARGUMENT THAT SUCH FORUM IS NOT CONVENIENT; and

   j.  All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if given in writing and delivered personally, or by facsimile and confirmed by mail, or mailed by registered, certified or express mail, postage prepaid, or reputable overnight courier, to the address stated above for BORROWER and CREDITOR.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this document as of 5/30/2017

**BORROWER(s)**

Crapp Farms Partnership by:

BORROWER Darrell Carl Crapp- Partner

Darrell Carl Crapp

BORROWER Tony Darrell Crapp- Partner

Tony Darrell Crapp

BORROWER Carl Daniel Crapp- Partner

Carl Daniel Crapp

BORROWER Diana M. Crapp- Partner

Diana M. Crapp

**CREDITOR:**

Federal Hybrids, Inc.

## Continuing Unconditional Guaranty

FOR VALUABLE CONSIDERATION, including the inducement of CREDITOR to extend credit to BORROWER as hereinafter defined, receipt of which is hereby acknowledged, the undersigned (whether one or more "Guarantor"), (jointly and severally if more than one) absolutely and unconditionally guaranty to CREDITOR (as hereinafter defined), the full and prompt payment of all Indebtedness (as hereinafter defined) which exist now or may arise in the future owing from the following or any successor, affiliate, or assign thereof (hereinafter referred to as "BORROWER"):

**CREDITOR**
Federal Hybrids, Inc.
209 3rd St Ne, W. Bend, IA 50597

**BORROWER(s)**

Crapp Farms Partnership
Darrell Carl Crapp
5761 Substaation Road
Lancaster, WI 53813

Tony Darrell Crapp
322 Alona Ln
Lancaster, WI 53813

Carl Daniel Crapp
6638 Stage Rd
Potosi, WI 53820

Diana M. Crapp
5761 Substation Rd
Lancaster, WI 53813

This Guaranty is made without any agreement or expectation of indemnity from BORROWER.

"Indebtedness" means all debts, liabilities and obligations owing by BORROWER to CREDITOR of any nature, including, without limitation, those arising under any promissory note, account, invoice, contract, understanding, or loan agreement, mortgage, deed of trust, stock pledge agreement or agreement, and any extension, renewal, or replacement of any of the foregoing, whether now existing or hereafter created between BORROWER and CREDITOR, including, without limitation, all attorney's fees, filing fees, court costs, other costs and expenses incurred in the enforcement of any such debt or obligation. Guarantor's obligations under this Guaranty are unconditional and continuing, and are not subject to any setoffs, adjustments or credits and apply to each BORROWER if more than one is described above.

CREDITOR may enforce this Guaranty without first resorting to the BORROWER or realizing upon any collateral interest granted by BORROWER or any other persons. Guarantor agrees that CREDITOR has full authority to and may, without notice to or further consent from Guarantor or BORROWER and without in any manner affecting Guarantor's liability hereunder: (a) substitute or release any security; (b) release in whole or part BORROWER, Guarantor, surety or any other person who may be responsible for payment of all or a portion of the Indebtedness; (c) renew, extend or modify, in whole or part, the terms relating to payment of the Indebtedness including extending the time for payment; (d) settle or compromise the terms of the Indebtedness; (e) delay or forbear from exercising CREDITOR's rights against BORROWER, Guarantor, any third party, or against any collateral given as security for the Indebtedness; (f) accept partial payments from BORROWER or anyone else on account of Indebtedness; (g) fail to perfect any security interest or otherwise impair any collateral given as security for the Indebtedness; (h) release or substitute any collateral given as security for the Indebtedness; (i) procure additional security or guaranties of persons who agree to be liable for any of the Indebtedness; (j) delay, refuse or fail to enforce the collection of the Indebtedness; (k) extend new, additional, or unrelated credit to BORROWER; and (l) assign the Indebtedness, in whole or part, to any third party; all without releasing Guarantor from any of the obligations contained herein.

Guarantor waives notice of acceptance of this Guaranty, notice of the creation, existence of maturity of all Indebtedness, notice of default or extension of time, protest, presentment, demand for payment, notice of dishonor and diligence in collection.

Notwithstanding anything to the contrary in this Guaranty, Guarantor hereby irrevocably waives all rights Guarantor may have at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of CREDITOR) to seek contribution, indemnification or any other form of reimbursement from BORROWER, any other guarantor, or any other person now or hereafter primarily or secondarily liable for any obligations of BORROWER to CREDITOR, for any disbursement made by Guarantor, or either of them, under or in connection with this Guaranty or otherwise.

53

**GUARANTOR AGREES TO INDEMNIFY AND HOLD CREDITOR HARMLESS FROM AND AGAINST ANY LIABILITY ASSERTED AGAINST CREDITOR BASED UPON ANY CLAIM OR LEGAL ACTION FILED AGAINST CREDITOR BASED IN WHOLE OR PART UPON A CLAIM UNDER 11 U.S.C. §§ 544, 547(b), 548(a) OR 550 RESULTING FROM OR CONNECTED WITH THIS GUARANTY.**

Guarantor hereby understands, acknowledges and agrees that the invalidity of any provision of this Guaranty as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

Guarantor represents and warrants to CREDITOR that: (i) Guarantor has had an opportunity to review the terms of this Guaranty; (ii) understands the terms hereof and enters into this Guaranty freely and voluntarily; (iii) this Guaranty is given to guaranty a non-consumer business debt; (iv) the Guaranty is given voluntarily by the Guarantor, who is actively involved in the BORROWER's business operations or will otherwise benefit there from such that good and valuable consideration in addition to any other consideration sufficient to support this Guaranty has been received; and (v) the individual executing this guaranty is fully authorized and empowered to enter into this guaranty on behalf of Guarantor, and the same is fully enforceable according to its terms.

This Guaranty shall be effective upon delivery to CREDITOR, without further act, condition or acceptance by the CREDITOR, shall be binding upon the Guarantor and the heirs and assigns of the Guarantor, and shall inure to the benefit of the CREDITOR and its successors and assigns. This Guaranty represents the final agreement between the parties with respect to the subject matter hereof and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. This Guaranty may be modified only by a written agreement signed by both Guarantor and CREDITOR. THERE IS NO OTHER AGREEMENT BETWEEN GUARANTOR AND CREDITOR RELATED TO THIS GUARANTY.

Any invalidity or enforceability of any provision or application of this Guaranty shall not affect other lawful provisions and application hereof, and to this end, the provisions of this Guaranty are declared to be severable.

This Guaranty is continuing and covers all Indebtedness whether now existing or future Indebtedness; and regardless whether at any point or time the Indebtedness to CREDITOR may have been paid in full or otherwise extinguished. This Guaranty shall remain in full force and effect until any existing or future Indebtedness owed to CREDITOR is paid in full. Notwithstanding the irrevocable nature of this Guaranty, if Guarantor delivers notice of the revocation thereof to CREDITOR and if the effectiveness of such revocation is upheld in any appropriate court action, Guarantor shall nevertheless remain liable under this Guaranty with respect to (i) all Indebtedness in existence at the time of CREDITOR's receipt of such notice of revocation, (ii) any Indebtedness arising from future advances which CREDITOR is, at the time of such receipt, committed to make, even though such future advances are made after CREDITOR's receipt of such notice, and (iii) any amendments, modifications, renewals, refinancing, extensions of, or other liabilities arising out of, any such Indebtedness described in (i) or (ii) whether occurring before or after CREDITOR's receipt of such notice of revocation.

This Guaranty shall be governed and construed in accordance with the laws of the State of Iowa. Should CREDITOR be required to hire an attorney to enforce the terms of this Guaranty or should litigation be required to enforce this Guaranty, Guarantor agrees to pay to CREDITOR its reasonable attorney's fees, costs and out-of-pocket expenses incurred in the enforcement hereof.

THIS GUARANTY MAY BE ENFORCED IN ANY COURT OF APPROPRIATE JURISDICTION SITTING IN THE STATE OF IOWA AND GUARANTOR WAIVES ANY ARGUMENT THAT SUCH FORUM IS INCONVENIENT. TO THE EXTENT PERMITTED UNDER APPLICABLE LAW CREDITOR AND GUARANTOR WAIVE THEIR RIGHTS TO ANY JURY TRIAL WITH RESPECT TO ANY LITIGATION ARISING UNDER, OR IN CONNECTION WITH THIS GUARANTY.

NOTICE TO WISCONSIN MARRIED PERSONS: No provision of any Marital Property Agreement, unilateral statement under Wis. Stats. Section 766.59 or court decree under Wis. Stats. Section 766.70 adversely affects the interest of CREDITOR, prior to the time credit is granted or a credit plan is entered into, is furnished with a copy of the Agreement, statement or decree or has actual knowledge of the adverse provision.

Guarantor, by signing below, acknowledges its credit history and financial condition may be a necessary factor in the extension of credit and evaluation of this Guaranty, and hereby expressly consents to and authorizes CREDITOR to obtain, review, and utilize a credit report on the undersigned from time to time as CREDITOR deems appropriate.

If this guaranty is signed by more than one party, each such party acknowledges and agrees that they shall be jointly and severally liable hereunder, and that such liability shall continue and survive the incapacity, lack of authority, death or disability of one or more Guarantor and shall not operate to release or excuse the liability of any other guarantor

54

hereunder.  The terms hereof shall apply to each Guarantor jointly and severally as if they had each executed a separate guaranty.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this document as of 5/30/2017

**Guarantor(s):**

GUARANTOR Darrell Carl Crapp

GUARANTOR Tony Darrell Crapp

GUARANTOR Carl Daniel Crapp

GUARANTOR Diana M. Crapp

# EXHIBIT C

# PROMISSORY NOTE

$450,000

_May 31_, 2017

     FOR VALUE RECEIVED, the undersigned, Crapp Farms Partnership, a general partnership located in the State of Wisconsin (hereinafter designated as "Borrower"), promises to pay to the order of Eagle Creek Midwest LLC, a limited liability company (hereinafter referred to as "Lender"), (Lender and any holder of this Note from time to time are each hereinafter sometimes referred to as "Holder"), at c/o UBS Farmland Investors LLC, 4415 W. Harrison, #238, Hillside, IL 60162 , or such other place as may hereinafter be designated from time to time in writing by the Holder hereof, the principal sum of Four Hundred Fifty Thousand and 00/100 Dollars ($450,000.00) (the "Loan Amount"), together with interest from the date hereof until fully paid, at the rates hereinafter provided, on the Loan Amount, from time to time, advanced and remaining unpaid (hereinafter referred to as the "Principal Balance"). The Principal Balance and interest shall be due as follows:

     A.    Commencing as of the date hereof and continuing through the Maturity Date, interest shall accrue, but not compound, on the Principal Balance at an annual fixed rate equal to 10% (the "Interest Rate"). The annual Interest Rate for the Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

     B.    Borrower shall pay the entire Loan Amount with accrued interest upon the earlier of March 18, 2018 (the "Maturity Date"). On the Maturity Date, the entire remaining Loan Amount and all accrued and unpaid interest shall be paid in full. **The Payment then due is a balloon payment.**

     C.    The outstanding principal balance of this Note may be prepaid at any time at the option of Borrower, in whole or in part. All payments and prepayments shall, at the option of the Lender, be applied first to any prepayment premium, second to accrued interest due on the Note, and lastly to principal (with respect to prepayment to installments of principal, they shall be applied in inverse order of their maturity on the Note).

     D.    This Note is secured, in part, by a Security Agreement (the "**Security Agreement**") of even date herewith, and pursuant to the terms and conditions contained therein which are to be kept and performed by Borrower and are hereby made a part of this Note, to the same extent and with the same force and effect as if they were fully set forth herein.

     Time is of the essence hereof. In the Event of Default in the payment of any principal or interest due hereunder or in the payment or performance of anything by Borrower to be paid or performed under any of the terms and conditions in this Note, the Holder at its option and without further notice, demand or presentment for payment to Borrower or others, may declare immediately due and payable the Principal Balance and interest accrued thereon, together with any

reasonable attorneys' fees incurred by Holder in collecting or enforcing payment thereof, whether suit be brought or not, and all other sums due by Borrower hereunder, anything herein to the contrary notwithstanding, and payment thereof may be enforced and recovered in whole in or in part at any time by one or more of the remedies provided to Holder in this Note.

The remedies of Holder as provided herein shall be cumulative and concurrent and may be pursued singly, successively or together, at the sole discretion of Holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

Borrower waives presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note.

Holder shall not be deemed by any act of omission or commission to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by the Holder, and then only to the extent specifically set forth in the writing. A waiver with reference to one event shall not be construed as continuing or as a bar to or waiver of any right or remedy as to a subsequent event.

All agreements herein are expressly limited so that in no contingency or event whatsoever shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If from any circumstances whatsoever fulfillment of any provision hereof at the time performance of such provisions shall be due shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then the obligation to be fulfilled shall be reduced to the limit of such validity and if from any circumstance the Holder shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.

This instrument shall be governed by and construed according to the laws of the State of Wisconsin.

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note the day and year first above written.

BORROWER:
**CRAPP FARMS PARTNERSHIP**

By: _Darell Crapp_

Darrell Crapp, Managing Partner

1295212.1

## SECURITY AGREEMENT

1.    <u>Grant</u>. On this <u>31</u> day of <u>May</u>, 2017, Crapp Farms Partnership, a partnership with its principal place of business at 5761 Substation Road, Lancaster, WI 53813 (hereinafter called "**Debtor**"), for valuable consideration, receipt whereof is acknowledged, grants to Eagle Creek Midwest LLC a limited liability company (hereinafter called "**Secured Party**") a security interest in, and mortgages to Secured Party, the following described property and interests in property of Debtor (hereinafter called the "**Collateral**"):

The proceeds from crops planted by the Debtor in 2017;the Debtor's 2017 crop insurance payment; the 2016 government payment due to Debtor which Debtor anticipates receiving in late 2017;and the 2017 government payment due to Debtor which the Debtor anticipates receiving in 2018.

to secure payment of the following obligations of Debtor to Secured Party (all hereinafter called the "**Obligations**"):

i.      All obligations and liabilities of Debtor to Secured Party arising out of that certain $450,000 Promissory Note dated <u>May 31, 2017</u>.

2.    <u>Warranties and Covenants of Debtor</u>. Debtor warrants and covenants that:

(a)    Except for the security interest granted hereby and the security interest granted to Ag Resource management ("ARM") and Federal Hybrids, Inc ("Federal Hybrids"), Debtor is the owner of the Collateral free from any adverse lien, security interest or encumbrance; and Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

(b)    No Financing Statement covering any of the Collateral or any proceeds thereof is on file in any public office, except in favor of The Debtor shall immediately notify the Secured Party in writing of any change in name, address, identity or corporate structure from that shown in this Agreement and shall also upon demand furnish to the Secured Party such further information and shall execute and deliver to Secured Party such financing statements and other documents in form satisfactory to Secured Party and shall do all such acts and things as Secured Party may at any time or from time to time reasonably request or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the Obligations, subject to no adverse liens or encumbrances; and Debtor will pay the cost of filing the same or filing or recording this agreement in all public offices wherever filing or recording is deemed by Secured Party to be necessary or desirable. A carbon, photographic or other reproduction of this agreement is sufficient as a financing statement.

(c)    Debtor will not sell or offer to sell, assign, pledge, lease or otherwise transfer or encumber the Collateral or any interest therein, without the prior written consent of Secured Party.

(d)    Debtor shall keep the Collateral at all times insured against risks of loss or damage by fire (including so-called extended coverage), theft and such other casualties as

Secured Party may reasonably require, including collision in the case of any motor vehicles, all in such amounts, under such forms of policies, upon such terms, for such periods and written by such companies or underwriters as Secured Party may approve, losses in all cases to be payable to Secured Party and Debtor as their interests may appear. All policies of insurance shall provide that Secured Party's interest therein shall not be invalidated by the act, omission or neglect of anyone other than Secured Party and for at least ten days' prior written notice of cancellation to Secured Party. Debtor shall furnish Secured Party with certificates of such insurance or other evidence satisfactory to Secured Party as to compliance with the provisions of this paragraph. Secured Party may act as attorney for Debtor in making, adjusting and settling claims under and cancelling such insurance and endorsing Debtor's name on any drafts drawn by insurers of the Collateral.

(e)      Debtor will keep the Collateral free from any adverse lien, security interest or encumbrance and in good order and repair, shall not waste or destroy the Collateral or any part thereof, and shall not use the Collateral in violation of any statute, ordinance or policy of insurance thereon.

Secured Party may examine and inspect the Collateral at any reasonable time or times, wherever located.

(f)      Debtor will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note or notes evidencing the Obligations.

3.      Additional Rights of Parties. At its option, Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance on the Collateral upon failure by the Debtor, after having been requested to do so, to provide insurance satisfactory to the Secured Party, and may pay for the maintenance, repair, and preservation of the Collateral. To the extent permitted by applicable law, Debtor agrees to reimburse Secured Party on demand for any payment made, or any expense incurred by Secured Party pursuant to the foregoing authorization. Until default Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this agreement and not inconsistent with any policy of insurance thereon.

4.      Events of Default. Debtor shall be in default under this agreement upon the occurrence of any of the following events or conditions, namely: (a) default in the payment or performance of any of the Obligations or of any covenants or liabilities contained or referred to herein or in any of the Obligations; (b) any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor proving to have been false in any material respect when made or furnished; or (c) loss, theft, substantial damage, destruction, sale or encumbrance to or any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon.

5.      Remedies. UPON DEFAULT AND AT ANY TIME THEREAFTER, SECURED PARTY MAY DECLARE ALL OBLIGATIONS SECURED HEREBY IMMEDIATELY DUE AND PAYABLE AND SHALL HAVE THE REMEDIES OF A SECURED PARTY UNDER THE UNIFORM COMMERCIAL CODE OF WISCONSIN, including without limitation the

- 2 -

right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose may, so far as Debtor can give authority therefor, with or without judicial process, enter (if this can be done without breach of the peace), upon any premises on which the Collateral or any part thereof may be situated and remove the same therefrom (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the Uniform Commercial Code of Wisconsin); and the Secured Party shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to Debtor's right of redemption in satisfaction of the Debtor's Obligations as provided in the Uniform Commercial Code of Wisconsin. Secured Party without removal may render the Collateral unusable and dispose of the Collateral on the Debtor's premises. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party for possession at a place to be designated by Secured Party which is reasonably convenient to both parties. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtor at least 5 days' notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Debtor shown at the beginning of this agreement at least ten days before the time of the sale or disposition. Secured Party may buy at any public sale. The net proceeds realized upon any such disposition, after deduction for the expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorney's fees and legal expenses incurred by Secured Party, shall be applied in satisfaction of the Obligations secured hereby. The Secured Party will account to the Debtor for any surplus realized on such disposition and the Debtor shall remain liable for any deficiency.

The remedies of the Secured Party hereunder are cumulative and the exercise of any one or more of the remedies provided for herein or under the Uniform Commercial Code of Wisconsin shall not be construed as a waiver of any of the other remedies of the Secured Party so long as any part of the Debtor's Obligation remains unsatisfied.

6. General. No waiver by Secured Party of any default shall operate as a waiver of any other default or of the same default on a future occasion. All rights of Secured Party hereunder shall inure to the benefit of its successors and assigns; and all obligations of Debtor shall bind its successors or assigns. If there be more than one Debtor, their obligations hereunder shall be joint and several. This agreement shall become effective when it is signed by Debtor.

All rights of the Secured Party in, to and under this agreement and in and to the Collateral shall pass to and may be exercised by any assignee thereof. The Debtor agrees that if the Secured Party gives notice to the Debtor of an assignment of said rights, upon such notice the liability of the Debtor to the assignee shall be immediate and absolute. The Debtor will not set up any claim against the Secured Party as a defense, counterclaim or set-off to any action brought by any such assignee for the unpaid balance owed hereunder or for the possession of the Collateral, provided that Debtor shall not waive hereby any right of action to the extent that waiver thereof is expressly made unenforceable under applicable law.

If any provision of this agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this agreement.

- 3 -

Secured Party:

By: _____
Its:

Debtor:

By: _Darnell Briggs_____
Its: _Partner_

1287024.1

# GUARANTY

Dated: _May 31, 2017_

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Eagle Creek Midwest ("Lender"), to make a loan or extend other accommodations to Crapp Farms Partnership ("Borrower"), or to engage in any other transactions with Borrower, the undersigned hereby absolutely and unconditionally guarantee to the Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, the obligation of Borrower to Lender evidenced by or arising out of the following: that certain $450,000.00 Promissory Note executed by Borrowers to Lender on _May 31, 2017_ and any extensions, renewals or replacements thereof (hereinafter referred to as the "Indebtedness").

The undersigned further acknowledge and agree with Lender that:

1.    No act or thing need occur to establish the liability of the undersigned hereunder, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the undersigned or modify, reduce, limit or release the liability of the undersigned hereunder.

2.    This is an absolute, unconditional and continuing guaranty of payment of the Indebtedness and shall continue to be in force and be binding upon the undersigned, whether or not all Indebtedness is paid in full, until this guaranty is revoked prospectively as to future transactions, by written notice actually received by the Lender, and such revocation shall not be effective as to Indebtedness existing or committed for at the time of actual receipt of such notice by the Lender, or as to any renewals, extensions and refinancings thereof. If there be more than one undersigned, such revocation shall be effective only as to the one so revoking. The death or incompetence of the undersigned shall not revoke this guaranty, except upon actual receipt of written notice thereof by the Lender and then only as to the decedent or the incompetent and only prospectively, as to fixture transactions, as herein set forth.

3.    The undersigned shall be liable for all Indebtedness, without any limitation as to amount, plus accrued interest thereon and all attorneys' fees, collection costs and enforcement expenses referable thereto.  Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the undersigned hereunder. The Lender may apply any sums received by or available to the Lender on account of the indebtedness from Borrowers or any other person (except the undersigned), from their properties, out of any collateral security or from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the undersigned hereunder.

4.    The undersigned will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the undersigned against any person liable to payment of the Indebtedness, or as to any collateral security therefore, unless and until all of the Indebtedness shall have been fully paid and discharged.

5.    The undersigned will pay or reimburse the Lender for all costs and expenses (including

reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings.

6.      Whether or not any existing relationship between the undersigned and Borrowers has been changed or ended and whether or not this guaranty has been revoked, the Lender may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Indebtedness, without any consent or approval by the undersigned and without any notice to the undersigned. The liability of the undersigned shall not be affected or impaired by any of the following acts or things (which the Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty without notice to or approval by the undersigned): (i) any acceptance of collateral security, guarantors, accommodations, parties or sureties for any or all Indebtedness; (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (iii) any waiver or indulgence granted to Borrowers, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (iv) any full or partial release of, settlement with, or agreement not to sue, Borrowers or any other guarantor or other person liable in respect of any Indebtedness; (v) any discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal thereof or substitution therefore; (vi) any failure to obtain collateral security (including rights of setoff for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Indebtedness or any evidence thereof, (ix) any order of application of any payments or credits upon Indebtedness.

7.      The undersigned waive any and all defenses, claims and discharges of Borrowers, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the undersigned will not assert, plead or enforce against the Lender any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality, or unenforceability which may be available to Borrowers or any other person liable in respect of any Indebtedness, or any setoff available against the Lender to Borrowers or any such other person, whether or not on account of a related transaction. The undersigned expressly agree that the undersigned shall be and remain liable for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrowers or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

8.      The undersigned waive presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness. The Lender shall not be required first to resort for payment of the Indebtedness to Borrowers or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this guaranty, except as provided in the Note.

9.      If any payment applied by the Lender to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Borrowers or any other obligor), the Indebtedness to

which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such Indebtedness as fully as if such application had never been made.

10.     The liability of the undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the undersigned to the Lender as guarantor or otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

11.     This guaranty shall be enforceable against each person signing this guaranty. If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each of every particular and shall be fully binding upon and enforceable against either, any or all of the undersigned. This guaranty shall be effective upon delivery to the Lender, without further act, condition or acceptance by the Lender, shall be binding upon the undersigned and the heirs, representatives, successors and assigns of the undersigned and shall inure to the benefit of the Lender and its participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this guaranty shall not affect other lawful provisions and application hereof, and to this end the provisions of this guaranty are declared to be severable. This guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the undersigned and the Lender. This guaranty shall be governed by the laws of the State of Wisconsin. The undersigned waives notice of the Lender's acceptance hereof.

IN WITNESS WHEREOF, this guaranty has been duly executed by the undersigned the day and year first above written.

_____
DARRELL C. CRAPP

_____
DIANA M. CRAPP

STATE OF WISCONSIN     )
                       ) ss.
COUNTY OF              )

The foregoing was acknowledged before me this _31st_ day of _May_, 2017 by _Darrell C. Crapp_and_Diana M Crapp_.

_____
(Notary Public) Cheryl Watson
Expires: 6/9/2017

1218898.1                          -3-

# EXHIBIT D

<u>CASH FARM LEASE</u>
(RE)

### Section 1 – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one of more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

50 acres known as the Al Wepking Farm

LANDLORD:    Al Wepking            TENANT:        Crapp Farms
             10526 Liberty Ridge Rd               5761 Substation Rd.
             Lancaster, WI 53813                  Lancaster, WI  53813
             Phone: 608-723-2861                  Phone: 608-558-6832

Term Begins: March 1, 2016          Security Deposit:  None

Term Ends:   December 31, 2016       Use:  Growing Crops

### RENT

Rent to be $225.00 per acre.  $11,250 cash, payable April 1, 2016.

Note:  Al Wepking will apply septic to these acres.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS LEASE EXECUTED this 1rst day of March, 2016.

Lease Holder Signature:              Tenant Signature:

_____              _____

Al Wepking                           Crapp Farms by Darrell Crapp

## FARM LEASE

This agreement made and entered into this 17th day of May, 2016 by and between Robert F. and Joan B. Book, 11 South Hershey Ave., Leola, PA. 17540 (Owner) and Crapp Farms Partnership, 5761 Substation Rd., Lancaster, WI 53813 (Tenant) for valuable consideration and the mutual promises and obligations of the parties, it is agreed:  The Tenant agrees to rent 453 acres from Owner for farming purposes the property hereinafter described starting Jan. 1, 2017 and ending Dec. 31, 2020 and agrees to pay $200.00 per acre as rent with the amounts set forth below at the times stated.

1.  $45,300 on or before Feb. 15, 2017
2.  $45,300 on or before Nov. 15, 2017
3.  $45,300 on or before Feb. 15, 2018
4.  $45,300 on or before Nov. 15, 2018
5.  $45,300 on or before Feb. 15, 2019
6.  $45,300 on or before Nov. 15, 2019
7.  $45,300 on or before Feb. 15, 2020
8.  $45,300 on or before Nov. 15, 2020

1. Owner shall be entitled to receive the CRP rental payments on any acres enrolled in the CRP program.

Tenant shall be entitled to receive the payments from FSA applicable to the premises under the agriculture marketing transition act for the period of Tenant's tenancy under this lease so long as Tenant is not in default under this lease.

2. The description of the premises is:

Those portions of farmland in the "Troester Farm" and "Eggers Farm" described on the attached exhibit "A" purchased by Owner.  (Description attached may contain more land than Owner is purchasing.)

3. Tenant agrees not to allow junk and debris to accumulate on or about the premises.

4. Tenant shall maintain all of the fences on the property.  Owner shall provide the materials and Tenant shall provide the labor for fence repair.

5. Tenant shall farm the premises on the contour, maintain presently existing conservation practices, cooperate with owner regarding additional conservation practices which Owner may reasonably request, farm the premises in accordance with good farming practices and shall generally follow the crop rotation practices now in effect and shall follow the farm plan for the premises developed by the soil conservation service and ASCS (now FSA).

6. Tenant shall timely report acreages to FSA and other governmental agencies and take all other actions as may be requested by Owner to maintain crop bases and acreages and to qualify for FSA and other governmental programs and benefits.

7. At the termination of this lease for any reason Tenant hereby agrees to execute and deliver any and all releases or other documents requested by Owner from time to time to release, waive, surrender and renounce any claim of Tenant to continue to participate in any FSA or other governmental programs.

1 | Page

## FARM LEASE

entitlements or benefits on account of or arising out of occupancy of these premises to permit Owner, and future owners and tenants, to participate in such programs on these premises solely or in conjunction w/others.  This agreement shall survive the termination of this lease.

8. Tenant shall cut all noxious weeds before they go to seed upon the premises, including ditches and fence lines and shall comply with all laws, ordinances and regulations concerning the destruction of noxious weeds.

9. Owner, his agents and representatives, shall have the right to enter upon the premises at all reasonable times in order to view and inspect same and to make any repairs that they deem necessary or desirable, to show the premises to prospective purchasers or tenants and to do fall tillage if the Tenant will not be renting the premises the following year, provided same does not damage Tenant's crops.

10. Tenant shall not be permitted to sublease all or any portion of the premises without the prior written consent of Owner.

11. This lease shall not automatically renew.

12. Owner shall notify Tenant on or before Sept. 1, 2020 as to Owner's willingness to rent the premises to Tenant for the year 2021 and subsequent years.  The parties shall then negotiate the terms of such lease. If the parties do not reach agreement on the terms of a lease for such subsequent year or years, this lease shall terminate at its expiration date, Dec. 31, 2020 and Owner shall have the right to enter the premises for the purpose of fall tillage provided same does not damage or hinder Tenant's crops and harvesting thereof.

13. Tenant shall not cut green trees on the premises or permit waste to the premises.

14. This agreement is a lease and shall not be construed as creating a partnership, joint venture or any other arrangement between the parties other than Landlord and Tenant.  Neither party may bind the other in dealing with third parties nor charge to the credit of the other.

15. Owner shall insure the premises and improvements thereto owned by Owner.  Tenant shall insure Tenant's property.  Tenant shall maintain federal crop insurance and hail insurance in amounts sufficient to insure timely payment of the rents due under this lease.  Tenant shall also maintain liability insurance and workmen's compensation insurance covering Tenant's employees working on the premises.

16. It is further agreed and understood between the parties that if at any time during this lease, Tenant fails to make payments called for herein or otherwise fails to perform any obligation of his under this lease or otherwise violates the terms hereof and upon receiving notice that said payments have not been made or that said obligation not performed or of said breach from Owner and Tenant fails to cause said payments to be paid, or said obligation performed, or said breach corrected within (5) days of said notice, said failure shall, at Owner's option, terminate this lease and render same null and void, and any crops, feed or grain on the above described premises owned, planted, harvested or to be harvested by Tenant shall thenceforth carry a lien for the balance of the rent which shall become immediately due, payable and owing upon the termination of said lease by Tenant to Owner.  A failure of Owner to elect to terminate this lease as to any failure, violation or breach shall not bar Owner from any election as to any subsequent failure, violation or breach.

## FARM LEASE

17. It is further agreed that at the termination of said tenancy, Tenant will surrender the possession of said premises peacefully and quietly and in as good repair and operating condition as they now are except for ordinary wear and tear.

18. If Tenant does not vacate the premises promptly at the expiration of this lease term or upon termination of this lease for any reason, Tenant shall not be considered a holdover tenant nor shall such failure to vacate the premises create a periodic tenancy of any kind nor a renewal of an agriculture tenancy nor create any right in the Tenant to occupy the premises whatsoever.

19. Tenant agrees to pay all reasonable costs, attorney's fees and expenses that are paid or incurred by Owner in enforcing this lease and obtaining possession of the premises upon its termination.

20. This lease shall be binding upon the respective parties, their heirs, assigns and personal representatives, as the case may be.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of this date above first written.

5-25-2016

Robert F. Book

Crapp Farms Partnership by Darrell Crapp

Joan B. Book

## CASH FARM LEASE
### (RF)

#### Section I – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one of more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

98.5 acres - $200/acre located in Harrison Twp.

LANDLORD:    Grenith Cherry
P.O. Box 85
Benton, WI 53803

TENANT:  Crapp Farms
5761 Substation Rd,
Lancaster, WI  53813

Term Begins:  January 1, 2017

Security Deposit:  None

Term Ends:   December 31, 2017

Use:  Growing Crops

*DC*
*$225 bu*

RENT *DC  DC  $22162 ⁵⁹/₁₀₀*

Rent to be $~~200.00~~ per acre at 98.5 acres for a total of $~~19,700~~ to be paid by May 15, 2017.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS LEASE EXECUTED this ___25___ day of ___April  2017___.

Lease Holder Signature:

*Grenith Cherry*

Grenith Cherry

Tenant Signature:

*Crapp Farms Darrell Crapp*

Crapp Farms by Darrell Crapp

<u>CASH FARM LEASE</u>
(RE)

Section 1 – Opening, Rent. Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one of more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

14 acres known as the Ken Crary property.

| LANDLORD: | Crary Builders, Inc | TENANT: | Crapp Farms |
|---|---|---|---|
| | 7255 Cross Country Rd. | | 5761 Substation Rd. |
| | Verona, WI  53593 | | Lancaster, WI  53813 |
| | Phone: 608-575-0697 | | Phone: 608-558-6832 |

Term Begins:  January 1, 2016          Security Deposit:  None

Term Ends:   December 31, 2018         Use:  Growing Crops

RENT

1/2/16 - $3,920   ($280/Acre)
1/2/17 - $4,060   ($290/Acre)
1/2/18 - $4,200   ($300/Acre)

In the event Crapp Farms no longer holds the lease on the adjoining property, this lease becomes null and void unless otherwise agreed upon in writing.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS LEASE EXECUTED this 2nd day of December, 2015.

Lease Holder Signature:                    Tenant Signature:

*Kenn Bary Pres.*                          *Crapp Farms Darell Crapp*

Crapp Farms by Darrell Crapp

## CASH FARM LEASE
### (RE)

Section 1 – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one or more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

8 acres located in South Lancaster

LANDLORD:      Todd Wolf                    TENANT:        Crapp Farms Partnership
               9051 Hwy 35.61,81                          5761 Substation Rd.
               Lancaster, WI 53813                        Lancaster, WI 53813
                                                          Phone: 608-558-6832

Term Begins: April ___, 2017              Security Deposit:  None

Term Ends:  March 31, 2018                Use:  Growing Crops

Price of corn to be determine by using Peavey Grain of Dubuque, IA's average monthly prices from November 1 through October 31.

Half of rent payment will be $600.00. ($150.00 per acre based on below $3.00 corn.) due on _____, 2017.

Half of rent payment will be $600.00. ($150.00 per acre based on below $3.00 corn.) due on November 1, 2017.

Additional payment will be made on November 1 of crop year of Peavey's monthly average price for year exceeds $2.99 per bushel.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors, and assigns.

THIS LEASE EXECUTED this _____ day of _____, 2017.

Lease Holder Signature:                   Tenant Signature:


_____          _____
Todd Wolf                                 Crapp Farms Partnership by Darrell Crapp

# LEASE

### Section 1 – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one of more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

8 acres located in South Lancaster

**Landlord:** Todd Wolf                    **Tenant:** Crapp Farms

      9051 Hwy 35.61,81 Lancaster, WI 53813   5761 Substation Rd. Lancaster, WI 53813

Term Begins: April 1, 2011                 Security Deposit:  None

Term Ends:  March 31, 2014                 Use:  Growing Crops

| CORN PRICE | Below $3.00 | $3.00-$4.00 | $4.01-$4.50 | $4.51-$5.00 | $5.01-or above |
|---|---|---|---|---|---|
| LAND RENT | $150 | $160 | $170 | $180 | $190 |

Price of corn to be determined by using Peavey Grain of Dubuque, IA's average monthly prices from November 1 through October 31.

April 1 half of rent payment will be $600.00 ($150.00 per acre based on below $3.00 corn).

November 1 half of rent payment will be $600.00 ($150 per acre based on below $3.00 corn).

Additional payment will be made on November 1 of crop year if Peavey's monthly average price for year exceeds $2.99 per bushel.

The Landlord and Tenant intend that this lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS LEASE EXECUTED this          day of                    , 2010 .

Tenant Signature:                          Landlord Signature:

_____          _____

Crapp Farms by Darrell Crapp               Todd Wolf

## AMENDED CASH FARM LEASE
(RE)

### Section I - Opening, Rent, Signatures, Etc

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one or more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

2.98 acres crop land

| | | | |
|---|---|---|---|
| LANDLORD: | Economy Feed Mill<br>Box 427<br>Bloomington, WI 53804<br>Phone  608-994-2364 | TENANT | Crapp Farms<br>5761 Substation Rd<br>Lancaster, WI 53813<br>Phone: 608-558-6932 |

Term Begins  January 1, 2016

Term Ends   December 31, 2018

Security Deposit  None

Use   Growing Crops

### RENT

$225 per acre.

$670.50 cash, payable on or before March 1

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS AMENDED LEASE EXECUTED this 1st day of _December_, 2015

Lease Holder Signature

_Roger A Taylor_

Tenant Signature:

_Crapp Farms Darrell Crapp_

Crapp Farms by Darrell Crapp

## CASH FARM LEASE
### (RF)

Section 1 – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one of more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

534.5 acres known as the Tom Oyen Farm-Platteville @ $225 per acre = $120,262.50
377.8 acres – Platteville
105.2 acres – Terry
17.5 acres – Sod-bust Pasture
34 acres - Potosi

Landlord: Tom Oyen
    7515 Shady Rd.
    Platteville, WI 53818

Tenant: Crapp Farms
    5761 Substation Rd.
    Lancaster, WI 53813

Term Begins: January 1, 2017

Security Deposit: None

Term Ends: December 31, 2017

Use: Growing Crops

### RENT

Rent will be $120,262.50 due on May 15, 2017
Final acres to be determined after FSA certification

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS LEASE EXECUTED this **25** day of _April_

Lease Holder Signature:

Tom Oyen

Tenant Signature:

Crapp Farms by Darrell Crapp

## CASH FARM LEASE
### (RE)

Section I – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one or more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described

100 acres @ $225 per acre located in Eden Township – Fire Number 496

| LANDLORD: | Ron Wienkes<br>103 S. Pier Road<br>Bagley, WI 53801 | TENANT: | Crapp Farms Partnership<br>5761 Substation Rd.<br>Lancaster, WI 53813<br>Phone: 608-558-6832 |
| --- | --- | --- | --- |

Term Begins: January 1, 2017

Security Deposit:  None

Term Ends:  December 31, 2017

Use:  Growing Crops

*NK₁   RW        $22,500*

First half of rent in the amount of ~~$11,250~~ due on *MAY 15,* ~~2017, and second half of rent in the amount of $11,250 due on~~ *November 15* ~~2017~~

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors, and assigns.

THIS LEASE EXECUTED this *21* day of *APRIL*, 2017.

Lease Holder Signature:

Tenant Signature:

Ron Wienkes

Crapp Farms Partnership by Darrell Crapp

## CASH FARM LEASE
### (RE)

Section I – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one or more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

312.38 crop acres x $235 per acre = $73,409.30
22.13 pasture acres x $40 per acre = $885.20

Total rent due = $74,294.50

LANDLORD:          Betty Schurman          TENANT:          Steve Adrian
                   909 Ridge Avenue                         12722 CTY V
                   Lancaster, WI 53813                      GLEN HAVEN   53810
                   Phone: 608-723-7493                      Phone: 794-2622

Term Begins: 4-19 , 2017          Security Deposit: None

Term Ends: December 31, ~~2018~~ X See addendum          Use: Growing Crops
                              2017

$37,147.25 cash, payable on or before APRIL 15th , $37,147.25 cash payable on or before November 15.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors, and assigns.  Tenant has the right to sublease the above-described acres upon written consent by Landlord.

THIS LEASE EXECUTED this 19 day of APRIL

Lease Holder Signature:          Tenant Signature:

X _Betty Schurman_          _Stephen P. Adrian_
Betty Schurman                   Steve Adrian


SUBLEASE ACKNOWLEDGEMENT: Landlord consents to Tenant subleasing the above-described acres to Crapp Farms Partnership. _Crapp Farm Darrell Crapp_


X _Betty Schurman_          _Stephen P. Adrian_
Betty Schurman                   Steve Adrian

Grant Farm, AFF 47 – 2017 Lease                                                      1

## AMENDED AND RESTATED LEASE AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED LEASE AND SECURITY AGREEMENT, made this _____ day of _____, 2017 (the "Effective Date"), by and between **Eagle Creek Midwest LLC**, hereinafter referred to as "Lessor", and Crapp Farms Partnership hereinafter referred to as "Lessee".

### R E C I T A L S

A.  Lessor and Lessee executed that certain Lease and Security Agreement dated November 20, 2015 and relating to the Demised Premises (defined below) (the "Original Lease").

B.  Lessor and Lessee desire to amend and restate the Original Lease in the manner set forth herein.

C.  This Amended and Restated Lease and Security Agreement (this "Lease") will constitutes the entire agreement between Lessor and Lessee with respect to the subject matter hereof and shall supersede the Original Lease and all previous agreements and understandings, oral or written, with respect thereto.

### W I T N E S S E T H:

1.  Lessor leases to Lessee the Property in _____Grant_____ County _____Wisconsin_____, described below, together with all improvements located thereon, hereinafter referred to as "Demised Premises". The Demised Premises may be used only for agricultural and related purposes. The Lessor reserves for itself all oil, gas, hydrocarbon, geothermal, mineral, recreational and hunting rights.

    _____
    See attached Exhibit A for a legal description
    _____

2.  **TERM**.
    The term of this lease shall be for the period commencing on the Effective Date, and expiring on December 31, 2017, or after all of the crops on the Demised Premises have been harvested, whichever occurs first (the "Term"). However, this lease shall not terminate until May 31, 2018 on the grain storage. **NO FURTHER NOTICE OF TERMINATION SHALL BE REQUIRED.**

3.  **CASH RENT**.
    3.1  Lessee agrees to pay to Lessor cash rent for the Demised Premises comprised of 8,717.0+/- cropland acres, the pasture and non-tillable acres, grain system, and the other improvements on the farm. The cash rent shall be due and payable to Lessor in the following amount and manner:

    | Rental Year | Due Date | Rental Payment |
    |---|---|---|
    | 2017 | March 1, 2017 | $2,500,000.00 |

    3.2  If the Lessee does not pay the annual rental on or before March 1, 2017, then without limiting any legal or equitable rights or remedies available to Lessor at law:

    a.  This lease shall immediately end and Lessor may then lease the Property to another party;
    b.  Any tillage, fertilizer, or other items provided by the Lessee in preparation for the crops shall be the property of the Lessor without obligation to reimburse Lessee; and
    c.  Lessee shall repay to Lessor any farm program payments received for the lease year.

    3.3  Lessee agrees to submit a cropping plan for approval on or before April 1, 2017 showing the location, number of acres and crops to be planted during the Term of the Lease on the Demised Premises. Lessee agrees not to plant soybeans following soybeans. It is agreed that the crops and acreages listed on that plan will be planted unless an amended plan is submitted and approved by Lessor in writing prior to planting. Lessee also agrees to annually report the actual FSA certified acres and yield of each crop harvested no later than December 1, 2017.

    The production evidence needs to be verified by delivery sheets or other means acceptable to the Lessor and the local county FSA office.

3.4   Any amounts due and unpaid hereunder shall bear interest at the annual rate of 18%, or the highest rate permitted under Wisconsin law, whichever is less, from the date due until the date received by Lessor.  All amounts paid in excess of the cash rents stated herein are deemed to be additional rent under the terms of this Lease.  Such delay interest shall be payable along with the delinquent rental payment.  Unless otherwise directed by Lessor all rental and other amounts due hereunder shall be payable to Eagle Creek Midwest LLC and delivered to Hertz Farm Management, Inc., P.O. Box 467, 700 W. Bridge Street, Monticello, Illinois, 61856, Attention: Brent Bidner.

3.5   Lessee's obligation to pay cash rent and/or any other liability, obligation or covenant of Lessee to Lessor throughout the Term of this Lease, shall be secured pursuant to Article 9 of the Uniform Commercial Code. Thus, Lessee hereby grants to Lessor a security interest securing all rents payable from Lessee to Lessor, as well as the faithful performance and strict fulfillment of all other liabilities, obligations and covenants of the Lessee under the terms and conditions set forth in this Lease and any amendment hereto, and Lessor shall have the right to file a "UCC Financing Statement" describing the collateral covered as all of Lessee's right, title and interest in and to the farm products, including crops grown, growing or to be grown on the Farmland and the proceeds of any sale of such crops grown, produced or cultivated on the Farmland throughout the Term of this Lease.

3.6   The Lessee agrees to submit to the Farm Manager a cropping plan (including: tillage system, pesticide program with rates to be applied, seed, fertilizer with amount applied, and areas of each crop to be planted) for the entire property no later than April 1, 2017.  Said cropping plan must be approved by Lessor and Farm Manager prior to planting.

3.7   The Lessee agrees to submit to the Farm Manager results of Fertility Tests and a proposed Fertilizer Program on or before April 1, 2017.  Said Fertilization Program must be satisfactory to the Farm Manager and Lessor.  The Lessee agrees to apply minimum fertilizer amounts, expressed in pounds per acre, to maintain long-term soil fertility, according to the following:

| | $P_2O_5$ | $K_2O$ |
|---|---|---|
| Corn | 80 | 60 |
| Soybeans | 50 | 85 |
| Wheat | 50 | 35 |
| Alfalfa | 25 | 120 |
| Silage | Will be based on removal. | |

Invoices will be submitted to substantiate fertilizer applications.  Lessor reserves the right to reduce minimum fertilizer amounts based on soil test at their sole discretion.  Lessee will receive no refund for fertilizer carryover as the end of this lease.

4.   **GRAIN STORAGE AND IMPROVEMENTS**
The Lessee shall, as an accommodation to the Lessee, be permitted to store grain in the grain bins and use the improvements on the Demised Property.  All grain and equipment must be removed from the grain bins and improvements by May 31, 2018.  The Lessee's privilege to store grain and equipment shall be at the Lessee's sole risk and the Lessor shall not be liable or responsible for any loss, damage or spoilage to the grain that the Lessee may store in the grain bins or equipment in the improvements located on the Demised Premises.  It is hereby agreed that Lessee has inspected the storage bins, grain dryers, and other improvements located on the Demised Premises prior to signing of this lease and hereby acknowledges the condition of the same, and hereby accepts the same as such, as is, where is without warranty by Lessor. Lessee agrees to use the grain bins and improvements exclusively for the storage of grain owned by Lessee and for no other use. Lessee shall comply with all applicable laws, rules, ordinances and regulations in connection with its use of the grain bins and improvements.

5.   **LESSOR SHALL:**
5.1   Pay all state and county real estate taxes on the Demised Premises.

5.2   Warrant and defend the Lessee's possession against any and all persons as long as this lease remains in effect and the Lessee is not in default under the terms of this Lease.

5.3    Lessee shall maintain the soil pH at an average of 6.2 for each field by applying lime as needed. Limestone expense shall be paid 100% by Lessee. If the Lessee applied limestone during this lease and does not continue to lease the Demised Premises, the Lessor agrees to reimburse the Lessee as follows: The Lessee will present the receipt of the cost of the limestone and the limestone will be depreciated using the cost at a rate of 25% annually. All pell lime will be considered depleted in the year it is applied.

6.    **LESSEE SHALL**:

6.1    Farm said Demised Premises and care for and cultivate said crops and land in a good and farmer like manner, and in accordance with the best standards of Grant County, Wisconsin, and keep said Demised Premises and the whole thereof, free and clear of weeds and noxious plants, and further, mow at least  5  times all roadsides, ditch banks, and fence rows between the dates of April 1, 2017 and November 1, 2017 and disk all set aside and fallow lands not planted to crops  1  time subject to the FSA requirements.

6.2    Comply with and abide by all of the mandatory provisions and regulations of any acreage control or crop support program set forth by the United States Government, and maintain the base acreages on said Demised Premises at not less than the same number of base acres as existed at the inception of this Lease as established by the United States Government.

6.3    Use the Demised Premises solely for lawful purposes. Lessee shall, at all times in the use of the Demised Premises and in the performance of this Lease, comply with all laws, ordinances, decrees, orders, rules, and regulations, including but not limited to all environmental laws, statutes, rules, regulations, and ordinances, of any lawful authority, agency or governmental unit having jurisdiction over the Demised Premises.

6.4    If a Conservation Plan has been required on the Demised Premises, then a copy of such plan will be provided to the Lessor for Lessor's prior approval. Lessee agrees to strictly abide by the terms, requirements and conditions of the Conservation Plan approved by Lessor.

6.5    Comply with State Workmen's Compensation requirements on all employees.

6.6    Furnish at its own cost and expense, all finance, labor, tools, power, utilities, irrigation water, fuel, materials, supplies, machinery and equipment necessary or convenient in the farming of said Demised Premises, and in the production, harvest and sale of the crops grown thereon.

6.7    At all times during the term of this Lease and at Lessee's expense, Lessee will procure, maintain and keep in force general public liability insurance of not less than Five Million Dollars ($5,000,000.00) insuring against bodily injury, death, or property damage occurring on or about the Demised Premises as the result of the Lessee's occupancy and farming of the Demised Premises; and name the Lessor, UBS Farmland Investors LLC, Eagle Creek Midwest LLC, and Hertz Farm Management, Inc. as additional insured and furnish Lessor with a copy of the endorsement and of all renewals and replacement policies. Lessee shall provide written notice to Lessor at least thirty (30) days prior to cancellation, termination or any change of such insurance.

6.8    Maintain federal crop insurance on all insurable crops grown and assign all rights under the insurance proceeds to Lessor in the case of a default under any of the terms and conditions of the Lease.

6.9    Pay all expenses and liabilities incurred in farming the Demised Premises and not allow any liens to attach to or be filed against said Demised Premises as a result of the Lessee's farming or operation thereof.

6.10    Lessee will strictly follow label restrictions in the use of pesticides, herbicides, fertilizers and other toxic or hazardous substances. Lessee shall handle and dispose of all hazardous substances in a manner approved by the U.S. Environmental Protection Agency and applicable state laws and regulations.

6.11    Lessee shall not apply any pesticide, herbicide or chemical product on the Demised Premises which may leave a residue that will adversely affect the growing of crops which may be planted on the Demised Premises following the termination of this lease. Upon the termination of this lease, Lessee

shall furnish to Lessor a written list of the chemicals applied to the Demised Premises, the quantity and dates of application. Lessee shall also use care in the application of chemicals to the crops grown on the Demised Premises so as to avoid damage to crops grown on adjacent parcels of land owned by third parties. Lessee shall indemnify and hold harmless the Lessor from any claims, liability, penalties, fines, loss, damage or expenses, including attorney's fees, resulting from the Lessee's use, application, or storage of chemicals, pesticides, or herbicides on the Demised Premises.

6.12   No toxic or hazardous substances will be disposed of on the Demised Premises; however, all hazardous substances will be disposed of in a manner approved by applicable County, State and Federal Environmental Protection Agency regulations.

6.13   Lessee will not bury any tanks, equipment or substances of any type on the premises without the prior written consent of the Lessor.

6.14   Global Positioning. Any and all data obtained through global positioning on the property is jointly owned by Lessor and Lessee. Lessee agrees to provide to Lessor or Lessor's agent, a copy of any and all global positioning information they have on paper, computer disk(s), or other electronic media.

7.   **SALE OF DEMISED PREMISES**.
In the event that Lessor enters into a sale agreement with regard to all or any portion of the Demised Premises during the Term of this Lease, then Lessor shall give Lessee notice of the intended sale and the expected date of closing. In the event the sale closes, this Lease shall expire at the end of the crop year during which the notice is first received, and possession of individual tracts shall revert to Lessor as harvest is substantially completed on each tract. Once Lessee receives such notice of intended sale, Lessee shall not perform any additional work in preparation of the succeeding crop year, such as seeding or fertilizing, without the specific, written permission of Lessor.

8.   **CONDEMNATION**.
In the event of the appropriation or condemnation by any competent authority, for a public or quasi-public use or purpose, of the entire Demised Premises, then and in that event, the term of this Lease shall cease and terminate from the date when the possession of the Demised Premises shall be required for such use or purpose. In the event of such an appropriation or of an appropriation of only part of the Demised Premises, there shall be no apportionment of the award, but the entire award shall go to the Lessor. The current cash rent payment shall, however, be prorated.

9.   LESSOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE DEMISED PREMISES, THE LOCATION OF ITS BOUNDARIES, OR AS TO THE FITNESS OR SUITABILITY OF THE DEMISED PREMISES FOR ANY USE WHICH LESSEE MAY INTEND TO MAKE THEREOF AND LESSEE ACCEPTS THE DEMISED PREMISES IN "AS IS" CONDITION.

10.   **LESSOR'S ACCESS**.
Lessor or persons designated by Lessor shall have access to said Demised Premises at all times for the purpose of inspecting the same and crops growing thereon.

11.   **ASSIGNMENT AND SUBLETTING**.
Lessee shall not, without first obtaining the written consent of the Lessor, assign this Lease, or any interest herein, or sublet all or any part of the Demised Premises. The Lessor may withhold its consent to the assignment of this Lease, and to any sublease, in its sole and absolute discretion. In the event of a permitted assignment or subletting, Lessee shall remain liable for the prompt payment of all rent required to be paid hereunder and for the performance of all of the terms, covenants and conditions herein undertaken by Lessee.

12. **RE-ENTRY**.
In the event Lessor elects to terminate this Lease in the manner provided at Paragraph 23 below, or if Lessee otherwise neglects or abandons the crops growing on the Demised Premises or any fallow land or "set-aside" land, then Lessor or persons designated by Lessor shall have the right to immediately re-enter upon the Demised Premises and care for, grow and harvest the crops and/or care for the fallow land or "set-aside" land, and charge against Lessee's interest, if any, in said crops or charge Lessee the additional cost for all expenses incurred by Lessor in caring for, growing and/or harvesting said neglected or abandoned crops or fallow land or "set-aside" land.

13. **ATTORNEY'S FEES: EXPENSES**.
Lessee agrees to pay upon demand all of Lessor's costs and expenses, including attorneys' fees and Lessor's legal expenses incurred in connection with the enforcement of this Lease.  Lessor may pay someone else to help enforce this Agreement and Lessee shall pay the costs and expenses of such enforcement.  Costs and expenses include Lessor's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgement collection services.  Lessee also shall pay all court costs and such additional fees as may be directed by the court.

14. **BINDING EFFECT**.
This lease shall be binding upon and inure to the benefit of the parties hereto, their representatives, heirs, administrators, successors and assigns as herein limited.  The obligations of the Lessee hereunder shall further be joint and several.

15. **LANDLORD AND TENANT RELATIONSHIP**.
The relationship hereby created is that of landlord and tenant and no other.  Nothing contained in this Lease shall create or be construed as creating a partnership, joint venture, or employment relationship between Lessor and Lessee.  Neither Lessor nor Lessee shall be liable, except as otherwise expressly provided in this Lease, for any obligations or liabilities incurred by the other.  Lessee expressly agrees to indemnify and hold Lessor and this property of Lessor, including said Demised Premises, free and harmless from any and all obligations and liabilities incurred by Lessee in conducting farming or other operations, whether conducted pursuant to this lease or otherwise, on said Demised Premises.

16. **LIABILITY**.
It is further understood and agreed that Lessor shall not be liable for debts or liabilities contracted or incurred by Lessee, nor shall Lessee allow any labor, mechanic or material liens to attach to said Demised Premises and improvements.  The Lessor shall not be liable for any accident to persons or properties which may occur on the Demised Premises during the term of this lease, and the Lessee hereby agrees to indemnify and save harmless the said Lessor from any and all such liability.

17. **MAINTENANCE OF EQUIPMENT AND IMPROVEMENTS**.
It is hereby agreed that Lessee has inspected the equipment and all improvements located on said Demised Premises, including, but not limited to wells and pumping plants herein described, if any, prior to the signing of this lease and hereby acknowledges the condition of the same, and hereby accepts the same as such, as is, where is without warranty by Lessor.  Lessee hereby agrees to at all times maintain the above ground portions of said equipment and improvements.  Upon the termination of this lease to return the same to the Lessor in as good condition and repair as they now are, usual wear and tear and acts of God alone excepted.  Lessee further agrees to accept full charge of said equipment and other improvements and agrees to meet with a representative of the Lessor and a third party for the inspection of said equipment and other improvements at the time possession is returned to said Lessor.

The expenses for maintaining the land and improvements will be as follows:  <u>The Lessor agrees to pay for all maintenance and repairs that cost in excess of $100.  All repairs and improvements are subject to the Lessor or Lessor's agents approval, if the cost is above $1,000.  If repairs or improvements are done without approval, the Lessee will pay for the cost of the repairs or maintenance that were done.  Payments for all repairs and maintenance need to be documented by invoices from the vendor and submitted to the Farm Manager within 90 days of when the work was completed.  If repairs need to be done because of the negligence of the Lessee, his employees or vendors, the Lessee will be responsible for all of the costs to restore the property to its proper working condition.</u>

18. **IMPROVEMENTS, ALTERATIONS AND ADDITIONS**.
The Lessee shall not make any improvements, alterations or additions to the Demised Premises without the Lessor's prior written consent.  The Lessee agrees that any improvements, additions or alterations, made during the term of the Lease, shall become and remain the property of the Lessor.

19. **DEFAULT**.
Lessee shall be in default under this Lease if (i) Lessee fails to pay, on or before the day such payment is due, any installment of rent or any other payment of money required by this Lease to be paid; or (ii) Lessee fails to keep or perform any covenant or condition, other than the payment of money, required to be kept or performed by the Lessee under this Lease and said failure continues for thirty (30) days  after written notice thereof is given by Lessor, provided that Lessee shall not be in default if Lessee shall commence in good faith to remedy said failure within said thirty (30) day period and thereafter diligently pursues such remedy.  Upon default, Lessor may reenter the Demised Premises or any part thereof, either with or without process of law, and expel or remove the Lessee or any person or persons occupying the Demised Premises.  Lessor shall have the right upon such reentry to remove from the Demised Premises all or any of the personal property of Lessee's located therein and may place the same in storage in a public warehouse at the expense of Lessee.  Lessor may exercise said right of reentry or taking possession of the Demised Premises with or without terminating this Lease.  No such reentry or taking of possession of the Demised Premises by Lessor shall be construed as an election on its part to terminate this Lease unless written notice of such election is given by Lessor to Lessee or unless such termination is decreed by a Court of competent jurisdiction.  Lessor may relet the Demised Premises, or any part thereof, upon reentry for all or any part of the remainder of the term of this Lease at such rental and upon such terms and conditions as Lessor deems commercially feasible.  Rentals collected by Lessor from such reletting shall be applied first to the reasonable expenses which may be incurred by Lessor in reletting the Demised Premises, and next, to the expenses of retaking possession of the Demised Premises, including attorney's fees, and next to the payment of rent of any other indebtedness past due or which becomes due from Lessee to Lessor pursuant to this Lease.  Should the rentals collected from such reletting be insufficient to cover the foregoing items, Lessee shall pay the deficiency to Lessor upon written demand by Lessor.  The specific remedies contained in this paragraph are in addition to any other remedies provided at law or in equity in the State of  Wisconsin

20. **INDEMNIFICATION**.
The Lessee shall indemnify and hold the Lessor, UBS Farmland Investors LLC, Eagle Creek Midwest LLC, Hertz Farm Management, Inc., and the property of the Lessor, including said Demised Premises and the use of the grain bins and improvements, free and harmless from any and all claims, liability, loss, damage, or expenses resulting from Lessee's occupation and use of said Demised Premises including any claim, liability, loss or damage arising by reason of the injury to or death of any person or persons or by reason of damage to any property caused by the condition of said Demised Premises, the condition of any improvements or personal property in or on said Demised Premises, injury, illness or death of any person as a result of defective or contaminated crops, livestock or agricultural products, or the acts or omissions of Lessee or any person in or on said Demised Premises with the express or implied consent of Lessee.  The duties of Lessee under this paragraph to indemnify and hold the Lessor, UBS Farmland Investors LLC, Eagle Creek Midwest LLC, and Hertz Farm Management, Inc., and the property of the Lessor free and harmless from any such claim, liability, loss, or damage shall extend to any claim, liability, loss, or damage arising by reason of the injury to or death of (I) the Lessee, (2) any agent, officer, or employee of the Lessee, or (3) any independent contractor hired by Lessee to perform work or render services on said Demised Premises.

The Lessee shall further indemnify and hold harmless the Lessor, its directors, officers, employees, agents, subsidiaries, and successors from and against any and all claims, costs, counsel fees, expenses, liabilities, obligations, losses, damages, fines, penalties, cleanup costs, asbestos abatement costs and consequential damages by or on behalf of any person, corporation, entity or Federal, State or local government authority, arising in any manner whatsoever from or out of any environmental contamination or asbestos related problem of the subject property not caused by the Lessor, where such liability arises under any applicable Federal, State or local statutes, law, rule, regulation, or ordinance, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Clean Air Act and or any State or local equivalent to those Federal Laws.

21. **WAIVER.**
Lessee hereby waives and releases any and all claims and causes of actions that it has or may have, now or in the future, against the Lessor, or any of the Lessor's officers, directors, employees, agents, subsidiaries, and successors for any and all liabilities, obligations, losses, damages, fines, penalties, cleanup costs, asbestos abatement costs or consequential damages that may incur as a result of, or in relation to the Lessee's Lease and use of the subject property, including, but not limited to those arising from or relating to any environmental contamination of the subject property or otherwise arising from or relating to any applicable Federal, State or local statutes, law, rule, regulation, or ordinance, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recover Act, the Toxic Substance Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Clean Air Act and or any State or local equivalent to those Federal Laws.

22. **NOTICES**.
Any and all notices or demands by or from Lessor to Lessee, or Lessee to Lessor shall be in writing.  They shall be served either personally or by certified mail or by telegraphic method.  If served personally, service shall be conclusively deemed made at the time of service.  If served by certified mail, service shall be conclusively deemed made 48 hours after deposit thereof in the United States mail, postage prepaid, addressed to the party to whom such notice or demand is to be given as hereafter provided.  If served by telegraphic method, notice shall be conclusively deemed made at the time the telegraphic agency shall confirm to the sender delivery thereof to the addressee.

Any notice or demand to Lessor shall be given unto it at:

**Eagle Creek Midwest LLC**
c/o UBS Farmland Investors LLC
4415 W. Harrison, #238
Hillside, IL 60162
Attn:  Brian C. Duke

and to:

**Hertz Farm Management, Inc.**
700 W. Bridge St., PO Box 467
Monticello, IL 61856
Attn:  Brent R. Bidner

Any notice or demand to Lessee shall be given unto it at:

Crapp Farms Partnership
6638 Stage Road
Potosi, WI 53820
Attn: Darrell Crapp

Said addresses may be changed from time to time by notice given in accordance with the provisions of this paragraph.

23. **TERMINATION**.
On the last day of the term of this Lease, or on sooner termination as herein provided, Lessee shall peaceably and quietly leave and yield to the Lessor the Demised Premises together with the appurtenances all in good working order, condition and repair, reasonable wear and tear and damage caused by fire or other unavoidable casualty, and permitted alterations excepted.  All permits and approvals which may be in the name of Lessee shall forthwith be assigned or transferred to Lessor.  If Lessor leases all or any portion of the Demised Premises to another party after termination, the new Lessee or Lessees shall be entitled to take possession of the Demised Premises immediately following Lessee's completion of harvest thereon, notwithstanding the termination date.

24. This Lease shall be construed according to the laws of the State of  _Wisconsin_ .

25. Time is of the essence of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this agreement on the day and year first above written.

**LESSOR:**                                              **LESSEE:**
Eagle Creek Midwest LLC                                  Crapp Farms Partnership

By:_____    By: _____
   Brian C. Duke, Vice President                            Darrell Crapp, Managing Partner

                                                         E-mail: crappfarms@tds.net_____

**EXHIBIT A**

8,717.0 +/- acres cropland, pasture and  non-tillable acres, grain system, and other improvements.

9,833.743 +/- acres total

## LEASE AND SECURITY AGREEMENT

THIS LEASE AND SECURITY AGREEMENT, made this _____ day of _____, 2015, by and between **Eagle Creek Midwest LLC**, hereinafter referred to as "Lessor", and Crapp Farms Partnership hereinafter referred to as "Lessee".

W I T N E S S E T H:

1. Lessor leases to Lessee the Property in ___Grant___ County_Wisconsin_____, described below, together with all improvements located thereon, hereinafter referred to as "Demised Premises". The Demised Premises may be used only for agricultural and related purposes. The Lessor reserves for itself all oil, gas, hydrocarbon, geothermal, mineral, recreational and hunting rights.

   See attached Exhibit A for a legal description

2. **TERM**. The term of this lease shall be for the period commencing January 1, 2016 , and expiring on December 31, 2018, or after all of the crops on the Demised Premises have been harvested, whichever occurs first. However, this lease shall not terminate until May 31, 2019 on the grain storage. **NO FURTHER NOTICE OF TERMINATION SHALL BE REQUIRED.**

3. **CASH RENT**.
   3.1   Lessee agrees to pay an annual rental for 8,627.0+/- cropland acres, the pasture and non-tillable acres, grain system, and the other improvements on the farm. Following is a summary of the rent payments and when they are due:

   | Rental Year | Due Date | Rental Payment |
   |---|---|---|
   | 2016 | January 15, 2016 | $2,895,560 |
   | 2017 | January 16, 2017 | $2,981,830 |
   | 2018 | January 15, 2018 | $3,068,100 |

   3.2   If the Lessee does not pay the annual rental on or before January 15 of each year, then without limiting any legal or equitable rights or remedies available to Lessor at law:

   a.   This lease shall immediately end and Lessor may then lease the Property to another party;
   b.   Any tillage, fertilizer, or other items provided by the Lessee in preparation for the crops shall be the property of the Lessor without obligation to reimburse Lessee; and
   c.   Lessee shall repay to Lessor any farm program payments received for the lease year.

   3.3   Lessee agrees to submit a cropping plan for approval on or before April 1 each year showing the location, number of acres and crops to be planted during the term of the Lease on the Demised Premises. Lessee agrees not to plant soybeans following soybeans. It is agreed that the crops and acreages listed on that plan will be planted unless an amended plan is submitted and approved by Lessor in writing prior to planting. Lessee also agrees to annually report the actual FSA certified acres and yield of each crop harvested no later than December 1.

   The production evidence needs to be verified by delivery sheets or other means acceptable to the Lessor and the local county FSA office.

   3.4   Any amounts due and unpaid hereunder shall bear interest at the annual rate of 18%, or the highest rate permitted under Wisconsin law, whichever is less, from the date due until the date received by Lessor. All amounts paid in excess of the cash rents stated herein are deemed to be additional rent under the terms of this Lease. Such delay interest shall be payable along with the delinquent rental payment. Unless otherwise directed by Lessor all rental and other amounts due hereunder shall be payable to Eagle Creek Midwest LLC and delivered to Hertz Farm Management, Inc., P.O. Box 467, 700 W. Bridge Street, Monticello, Illinois, 61856, Attention: Brent Bidner.

3.5    The Lessee agrees to submit to the Farm Manager a cropping plan (including: tillage system, pesticide program with rates to be applied, seed, fertilizer with amount applied, and areas of each crop to be planted) for the entire property no later than  April 1  each year.  Said cropping plan must be approved by Lessor and Farm Manager prior to planting.

3.6    The Lessee agrees to submit to the Farm Manager results of Fertility Tests and a proposed Fertilizer Program on or before April 1 each year.  Said Fertilization Program must be satisfactory to the Farm Manager and Lessor.  The Lessee agrees to apply minimum fertilizer amounts, expressed in pounds per acre, to maintain long-term soil fertility, according to the following:

|  | $P_2O_5$ | $K_2O$ |
|---|---|---|
| Corn | 80 | 60 |
| Soybeans | 50 | 85 |
| Wheat | 50 | 35 |
| Alfalfa | 25 | 120 |
| Silage | Will be based on removal. | |

Invoices will be submitted to substantiate fertilizer applications.  Lessor reserves the right to reduce minimum fertilizer amounts based on soil test at their sole discretion.  Lessee will receive no refund for fertilizer carryover as the end of this lease.

4.    **GRAIN STORAGE AND IMPROVEMENTS**
The Lessee shall, as an accommodation to the Lessee, be permitted to store grain in the grain bins and use the improvements on the Demised Property.  All grain and equipment must be removed from the grain bins and improvements by May 31, 2019.  The Lessee's privilege to store grain and equipment shall be at the Lessee's sole risk and the Lessor shall not be liable or responsible for any loss, damage or spoilage to the grain that the Lessee may store in the grain bins or equipment in the improvements located on the Demised Premises.  It is hereby agreed that Lessee has inspected the storage bins, grain dryers, and other improvements located on the Demised Premises prior to signing of this lease and hereby acknowledges the condition of the same, and hereby accepts the same as such, as is, where is without warranty by Lessor.

5.    **LESSOR SHALL:**
5.1    Pay all state and county real estate taxes on the Demised Premises.

5.2    Warrant and defend the Lessee's possession against any and all persons as long as this lease remains in effect and the Lessee is not in default under the terms of this Lease.

5.3    Lessee shall maintain the soil pH at an average of 6.2 for each field by applying lime as needed.  Limestone expense shall be paid 100% by Lessee.  If the Lessee applied limestone during this lease and does not continue to lease the Demised Premises, the Lessor agrees to reimburse the Lessee as follows:  The Lessee will present the receipt of the cost of the limestone and the limestone will be depreciated using the cost at a rate of 25% annually.  All pell lime will be considered depleted in the year it is applied.

6.    **LESSEE SHALL**:
6.1    Farm said Demised Premises and care for and cultivate said crops and land in a good and farmer like manner, and in accordance with the best standards of Grant County, Wisconsin, and keep said Demised Premises and the whole thereof, free and clear of weeds and noxious plants, and further, mow at least  5  times all roadsides, ditch banks, and fence rows between the dates of April 1  and November 1 and disk all set aside and fallow lands not planted to crops  1  time subject to the FSA requirements.

6.2    Comply with and abide by all of the mandatory provisions and regulations of any acreage control or crop support program set forth by the United States Government, and maintain the base acreages on said Demised Premises at not less than the same number of base acres as existed at the inception of this Lease as established by the United States Government.

6.3    Use the Demised Premises solely for lawful purposes.  Lessee shall, at all times in the use of the Demised Premises and in the performance of this Lease, comply with all laws, ordinances, decrees, orders, rules, and regulations, including but not limited to all environmental laws, statutes, rules, regulations, and ordinances, of any lawful authority, agency or governmental unit having jurisdiction over the Demised Premises.

6.4    If a Conservation Plan has been required on the Demised Premises, then a copy of such plan will be provided to the Lessor for Lessor's prior approval.  Lessee agrees to strictly abide by the terms, requirements and conditions of the Conservation Plan approved by Lessor.

6.5    Comply with State Workmen's Compensation requirements on all employees.

6.6    Furnish at its own cost and expense, all finance, labor, tools, power, utilities, irrigation water, fuel, materials, supplies, machinery and equipment necessary or convenient in the farming of said Demised Premises, and in the production, harvest and sale of the crops grown thereon.

6.7    At all times during the term of this Lease and at Lessee's expense, Lessee will procure, maintain and keep in force general public liability insurance of not less than Five Million Dollars ($5,000,000.00) insuring against bodily injury, death, or property damage occurring on or about the Demised Premises as the result of the Lessee's occupancy and farming of the Demised Premises; and name the Lessor, UBS AgriVest LLC, Eagle Creek Midwest LLC, and Hertz Farm Management, Inc. as additional insured and furnish Lessor with a copy of the endorsement and of all renewals and replacement policies.

6.8    Maintain federal crop insurance on all insurable crops grown and assign all rights under the insurance proceeds to Lessor in the case of a default under any of the terms and conditions of the Lease.

6.9    Pay all expenses and liabilities incurred in farming the Demised Premises and not allow any liens to attach to or be filed against said Demised Premises as a result of the Lessee's farming or operation thereof.

6.10    Lessee will strictly follow label restrictions in the use of pesticides, herbicides, fertilizers and other toxic or hazardous substances.  Lessee shall handle and dispose of all hazardous substances in a manner approved by the U.S. Environmental Protection Agency and applicable state laws and regulations.

6.11    Lessee shall not apply any pesticide, herbicide or chemical product on the Demised Premises which may leave a residue that will adversely affect the growing of crops which may be planted on the Demised Premises following the termination of this lease.  Upon the termination of this lease, Lessee shall furnish to Lessor a written list of the chemicals applied to the Demised Premises, the quantity and dates of application.  Lessee shall also use care in the application of chemicals to the crops grown on the Demised Premises so as to avoid damage to crops grown on adjacent parcels of land owned by third parties.  Lessee shall indemnify and hold harmless the Lessor from any claims, liability, penalties, fines, loss, damage or expenses, including attorney's fees, resulting from the Lessee's use, application, or storage of chemicals, pesticides, or herbicides on the Demised Premises.

6.12    No toxic or hazardous substances will be disposed of on the Demised Premises; however, all hazardous substances will be disposed of in a manner approved by applicable County, State and Federal Environmental Protection Agency regulations.

6.13    Lessee will not bury any tanks, equipment or substances of any type on the premises without the prior written consent of the Lessor.

6.14    Global Positioning.  Any and all data obtained through global positioning on the property is jointly owned by Lessor and Lessee.  Lessee agrees to provide to Lessor or Lessor's agent, a copy of any and all global positioning information they have on paper, computer disk(s), or other electronic media.

7. **SALE OF DEMISED PREMISES**.  In the event that Lessor enters into a sale agreement with regard to all or any portion of the demised premises during the term of this lease, then Lessor shall give Lessee notice of the intended sale and the expected date of closing.  In the event the sale closes, the lease shall expire at the end of the crop year during which the notice is first received, and possession of individual tracts shall revert to Lessor as harvest is substantially completed on each tract.  Once Lessee receives such notice of intended sale, Lessee shall not perform any additional work in preparation of the succeeding crop year, such as seeding or fertilizing, without the specific, written permission of Lessor.

8. **CONDEMNATION**.  In the event of the appropriation or condemnation by any competent authority, for a public or quasi-public use or purpose, of the entire Demised Premises, then and in that event, the term of this Lease shall cease and terminate from the date when the possession of the Demised Premises shall be required for such use or purpose.  In the event of such an appropriation or of an appropriation of only part of the Demised Premises, there shall be no apportionment of the award, but the entire award shall go to the Lessor.  The current rental shall, however, be prorated.

9. LESSOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE DEMISED PREMISES, THE LOCATION OF ITS BOUNDARIES, OR AS TO THE FITNESS OR SUITABILITY OF THE DEMISED PREMISES FOR ANY USE WHICH LESSEE MAY INTEND TO MAKE THEREOF AND LESSEE ACCEPTS THE DEMISED PREMISES IN "AS IS" CONDITION.

10. **LESSOR'S ACCESS**.  Lessor or persons designated by Lessor shall have access to said Demised Premises at all times for the purpose of inspecting the same and crops growing thereon.

11. **ASSIGNMENT AND SUBLETTING**.  Lessee shall not, without first obtaining the written consent of the Lessor, assign this Lease, or any interest herein, or sublet all or any part of the Demised Premises.  The Lessor may withhold its consent to the assignment of this Lease, and to any sublease, in its sole and absolute discretion.  In the event of a permitted assignment or subletting, Lessee shall remain liable for the prompt payment of all rent required to be paid hereunder and for the performance of all of the terms, covenants and conditions herein undertaken by Lessee.

12. **RE-ENTRY**.  In the event Lessee neglects or abandons the crops growing on the Demised Premises or any fallow land or "set-aside" land, Lessor or persons designated by Lessor shall have the right to immediately re-enter upon the Demised Premises and care for, grow and harvest the crops and/or care for the fallow land or "set-aside" land, and charge against Lessee's interest, if any, in said crops or charge Lessee the additional cost for all expenses incurred by Lessor in caring for, growing and/or harvesting said neglected or abandoned crops or fallow land or "set-aside" land.

13. **ATTORNEY'S FEES: EXPENSES**. Lessee agrees to pay upon demand all of Lessor's costs and expenses, including attorneys' fees and Lessor's legal expenses incurred in connection with the enforcement of this Lease & Security Agreement.  Lessor may pay someone else to help enforce this Agreement and Lessee shall pay the costs and expenses of such enforcement.  Costs and expenses include Lessor's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgement collection services.  Lessee also shall pay all court costs and such additional fees as may be directed by the court.

14. **BINDING EFFECT**.  This lease shall be binding upon and inure to the benefit of the parties hereto, their representatives, heirs, administrators, successors and assigns as herein limited.  The obligations of the Lessee hereunder shall further be joint and several.

15. **LANDLORD AND TENANT RELATIONSHIP**.  The relationship hereby created is that of landlord and tenant and no other.  Nothing contained in this Lease shall create or be construed as creating a partnership, joint venture, or employment relationship between Lessor and Lessee.  Neither Lessor nor Lessee shall be liable, except as otherwise expressly provided in this Lease, for any obligations or liabilities incurred by the other.  Lessee expressly agrees to indemnify and hold Lessor and this property of Lessor, including said Demised Premises, free and harmless from any and all obligations and liabilities incurred by Lessee in conducting farming or other operations, whether conducted pursuant to this lease or otherwise, on said Demised Premises.

16. **LIABILITY**. It is further understood and agreed that Lessor shall not be liable for debts or liabilities contracted or incurred by Lessee, nor shall Lessee allow any labor, mechanic or material liens to attach to said Demised Premises and improvements. The Lessor shall not be liable for any accident to persons or properties which may occur on the Demised Premises during the term of this lease, and the Lessee hereby agrees to indemnify and save harmless the said Lessor from any and all such liability.

17. **MAINTENANCE OF EQUIPMENT AND IMPROVEMENTS.** It is hereby agreed that Lessee has inspected the equipment and all improvements located on said Demised Premises, including, but not limited to wells and pumping plants herein described, if any, prior to the signing of this lease and hereby acknowledges the condition of the same, and hereby accepts the same as such, as is, where is without warranty by Lessor. Lessee hereby agrees to at all times maintain the above ground portions of said equipment and improvements. Upon the termination of this lease to return the same to the Lessor in as good condition and repair as they now are, usual wear and tear and acts of God alone excepted. Lessee further agrees to accept full charge of said equipment and other improvements and agrees to meet with a representative of the Lessor and a third party for the inspection of said equipment and other improvements at the time possession is returned to said Lessor.

    The expenses for maintaining the land and improvements will be as follows:  The Lessor agrees to pay for all maintenance and repairs that cost in excess of $100.  All repairs and improvements are subject to the Lessor or Lessor's agents approval, if the cost is above $1,000.  If repairs or improvements are done without approval, the Lessee will pay for the cost of the repairs or maintenance that were done.  Payments for all repairs and maintenance need to be documented by invoices from the vendor and submitted to the Farm Manager within 90 days of when the work was completed.  If repairs need to be done because of the negligence of the Lessee, his employees or vendors, the Lessee will be responsible for all of the costs to restore the property to its proper working condition.

18. **IMPROVEMENTS, ALTERATIONS AND ADDITIONS**. The Lessee shall not make any improvements, alterations or additions to the Demised Premises without the Lessor's prior written consent. The Lessee agrees that any improvements, additions or alterations, made during the term of the Lease, shall become and remain the property of the Lessor.

19. **DEFAULT**. Lessee shall be in default under this Lease if (i) Lessee fails to pay, on or before the day such payment is due, any installment of rent or any other payment of money required by this Lease to be paid; or (ii) Lessee fails to keep or perform any covenant or condition, other than the payment of money, required to be kept or performed by the Lessee under this Lease and said failure continues for thirty (30) days  after written notice thereof is given by Lessor, provided that Lessee shall not be in default if Lessee shall commence in good faith to remedy said failure within said thirty (30) day period and thereafter diligently pursues such remedy. Upon default, Lessor may reenter the Demised Premises or any part thereof, either with or without process of law, and expel or remove the Lessee or any person or persons occupying the Demised Premises. Lessor shall have the right upon such reentry to remove from the Demised Premises all or any of the personal property of Lessee's located therein and may place the same in storage in a public warehouse at the expense of Lessee. Lessor may exercise said right of reentry or taking possession of the Demised Premises with or without terminating this Lease. No such reentry or taking of possession of the Demised Premises by Lessor shall be construed as an election on its part to terminate this Lease unless written notice of such election is given by Lessor to Lessee or unless such termination is decreed by a Court of competent jurisdiction. Lessor may relet the Demised Premises, or any part thereof, upon reentry for all or any part of the remainder of the term of this Lease at such rental and upon such terms and conditions as Lessor deems commercially feasible. Rentals collected by Lessor from such reletting shall be applied first to the reasonable expenses which may be incurred by Lessor in reletting the Demised Premises, and next, to the expenses of retaking possession of the Demised Premises, including attorney's fees, and next to the payment of rent of any other indebtedness past due or which becomes due from Lessee to Lessor pursuant to this Lease. Should the rentals collected from such reletting be insufficient to cover the foregoing items, Lessee shall pay the deficiency to Lessor upon written demand by Lessor. The specific remedies contained in this paragraph are in addition to any other remedies provided at law or in equity in the State of  Wisconsin .

20. **INDEMNIFICATION**.  The Lessee shall indemnify and hold the Lessor, UBS AgriVest LLC, Eagle Creek Midwest LLC, Hertz Farm Management, Inc., and the property of the Lessor, including said Demised Premises, free and harmless from any and all claims, liability, loss, damage, or expenses resulting from Lessee's occupation and use of said Demised Premises including any claim, liability, loss or damage arising by reason of the injury to or death of any person or persons or by reason of damage to any property caused by the condition of said Demised Premises, the condition of any improvements or personal property in or on said Demised Premises, injury, illness or death of any person as a result of defective or contaminated crops, livestock or agricultural products, or the acts or omissions of Lessee or any person in or on said Demised Premises with the express or implied consent of Lessee.  The duties of Lessee under this paragraph to indemnify and hold the Lessor, UBS AgriVest LLC, Eagle Creek Midwest LLC, and Hertz Farm Management, Inc., and the property of the Lessor free and harmless from any such claim, liability, loss, or damage shall extend to any claim, liability, loss, or damage arising by reason of the injury to or death of (l) the Lessee, (2) any agent, officer, or employee of the Lessee, or (3) any independent contractor hired by Lessee to perform work or render services on said Demised Premises.

The Lessee shall further indemnify and hold harmless the Lessor, its directors, officers, employees, agents, subsidiaries, and successors from and against any and all claims, costs, counsel fees, expenses, liabilities, obligations, losses, damages, fines, penalties, cleanup costs, asbestos abatement costs and consequential damages by or on behalf of any person, corporation, entity or Federal, State or local government authority, arising in any manner whatsoever from or out of any environmental contamination or asbestos related problem of the subject property not caused by the Lessor, where such liability arises under any applicable Federal, State or local statutes, law, rule, regulation, or ordinance, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Clean Air Act and or any State or local equivalent to those Federal Laws.

21. **WAIVER**.  Lessee hereby waives and releases any and all claims and causes of actions that it has or may have, now or in the future, against the Lessor, or any of the Lessor's officers, directors, employees, agents, subsidiaries, and successors for any and all liabilities, obligations, losses, damages, fines, penalties, cleanup costs, asbestos abatement costs or consequential damages that may incur as a result of, or in relation to the Lessee's Lease and use of the subject property, including, but not limited to those arising from or relating to any environmental contamination of the subject property or otherwise arising from or relating to any applicable Federal, State or local statutes, law, rule, regulation, or ordinance, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recover Act, the Toxic Substance Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Clean Air Act and or any State or local equivalent to those Federal Laws.

22. **NOTICES**.  Any and all notices or demands by or from Lessor to Lessee, or Lessee to Lessor shall be in writing.  They shall be served either personally or by certified mail or by telegraphic method.  If served personally, service shall be conclusively deemed made at the time of service.  If served by certified mail, service shall be conclusively deemed made 48 hours after deposit thereof in the United States mail, postage prepaid, addressed to the party to whom such notice or demand is to be given as hereafter provided.  If served by telegraphic method, notice shall be conclusively deemed made at the time the telegraphic agency shall confirm to the sender delivery thereof to the addressee.

Any notice or demand to Lessor shall be given unto it at:

     **Eagle Creek Midwest LLC**
     c/o UBS AgriVest LLC
     4415 W. Harrison, #238
     Hillside, IL 60162
     Attn:  Brian C. Duke

     and to:

     **Hertz Farm Management, Inc.**
     700 W. Bridge St., PO Box 467
     Monticello, IL 61856
     Attn:  Brent R. Bidner

Any notice or demand to Lessee shall be given unto it at:

> Crapp Farms Partnership
> 6638 Stage Road
> Potosi, WI 53820
> Attn: Darrell Crapp

Said addresses may be changed from time to time by notice given in accordance with the provisions of this paragraph.

23. **TERMINATION**.  On the last day of the term of this Lease, or on sooner termination as herein provided, Lessee shall peaceably and quietly leave and yield to the Lessor the Demised Premises together with the appurtenances all in good working order, condition and repair, reasonable wear and tear and damage caused by fire or other unavoidable casualty, and permitted alterations excepted.  All permits and approvals which may be in the name of Lessee shall forthwith be assigned or transferred to Lessor.  If Lessor leases all or any portion of the Demised Premises to another party after termination, the new Lessee or Lessees shall be entitled to take possession of the Demised Premises immediately following Lessee's completion of harvest thereon, notwithstanding the termination date.

24. This Lease shall be construed according to the laws of the State of _Wisconsin_.

25. Time is of the essence of this Agreement.


        **IN WITNESS WHEREOF**, the parties hereto have executed this agreement on the day and year first above written.

**LESSOR:**                                            **LESSEE:**
Eagle Creek Midwest LLC                                Crapp Farms Partnership


By:_____    By: _____
    Brian C. Duke, Vice President              Darrell Crapp, Managing Partner

                                               E-mail: crappfarms@tds.net_____

**EXHIBIT A**

8,627.0 +/- acres cropland, pasture and  non-tillable acres, grain system, and other improvements.

9,833.743 +/- acres total

**TOWNSHIP PLAT MAP**



**TOWNSHIP PLAT MAP**



**TOWNSHIP PLAT MAP**



**TOWNSHIP PLAT MAP**



**TOWNSHIP PLAT MAP**



## TOWNSHIP PLAT MAP



## TOWNSHIP PLAT MAP



## TOWNSHIP PLAT MAP



## TOWNSHIP PLAT MAP



**TOWNSHIP PLAT MAP**



**TOWNSHIP PLAT MAP**



CASH FARM LEASE
(RE)

Section 1 – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one or more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

9.5 acres known as the Weaver Farm.

LANDLORD:   Daniel Weaver
            9411 Lucey Ln
            Lancaster, WI 53813
            Phone:  608-723-7845

TENANT:     Crapp Farms
            5761 Substation Rd
            Lancaster, WI  53813
            Phone: 608-558-6832

Term Begins: January 1, 2016

Term Ends:   December 31, 2018

Security Deposit:  None

Use:  Growing Crops

RENT

$200/acre for a total of $1,900 cash payable on May 15.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors and assigns.

THIS LEASE EXECUTED this **25** day of *April*

Lease Holder Signature:

Daniel Weaver

Tenant Signature:

Crapp Farms by Darrell Crapp

CASH BUILDING LEASE
(RE)

Section 1 – Opening, Rent, Signatures, Etc.

BY THIS LEASE, in several Sections and in consideration of the rent to be paid and the mutual covenants and agreements hereinafter set forth, the Landlord, herein so called whether one or more, leases to the Tenant, herein so called whether one or more, the Premises hereinafter described.

1,200 HEAD WEAN-FINISH BARN located at 13804 Hwy 61, Fennimore, WI.

LANDLORD:       Jim Wilson & Kevin Wilson   TENANT:        Crapp Farms Partnership
                13804 Hwy 61                               5761 Substation Rd.
                Fennimore, WI 53809                        Lancaster, WI 53813
                Phone: 608-222-6596                        Phone: 608-558-6473

Term Begins: Arrival of ISO Wean Pigs approximately 4-21- , 2017

Term Ends:  September 30, 2017 or end date of market contract delivery period

$3,900.00 cash, payable monthly.  ($39 per pig space per year.) to include:

Two person labor fees
Additional labor for loading fat hogs or other chores.
Pressure washing
Electrical
Fuel
Maintenance and repairs

ADDITIONAL COMMENTS

Labor personnel will provide Crapp Farms with death loss, vaccinations and overall pig health information via phone text, fax or e-mail monthly.
Crapp Farms agrees to provide one monthly visit from a local veterinarian for an overview of herd health.
If more than one monthly visit is necessary, approval from Crapp Farms is required.
Rental agreement will be reviewed one year prior to expiration to discuss renewal.

The Landlord and Tenant intend that this Lease and the covenants and agreements herein contained shall be binding upon them, their heirs, legal representatives, successors, and assigns.

THIS LEASE EXECUTED this 21 day of April 2017 .

Lease Holder Signature:                    Tenant Signature:

_James F Wilson_                           _Crapp Farms Partnership By TC_
Jim Wilson                                 Crapp Farms Partnership by Tony Crapp

_Kevin Wilson_
Kevin Wilson

*WILSONS*

**Landlord**
**Sunset View Farm**
**Kevin R. Wilson**
**James F. Wilson**
**13804 US Highway 61**
**Fennimore, WI 53809**

**Tenant**
**Crapps & Sons Farms**
**5761 Substation Rd.**
**Lancaster, WI 53813**

*2015 &*
*2016*

**Crapps & Sons Farms agree to rent 176.5 tillable acres at $300 an acre for two years.  Two payments are due.  First payment April 1st, 2015 and April 1st, 2016 and second payment due October 1st, 2015 and October 1st, 2016 of each year.  Tenant also agrees to pay  soil and land conservation fees.**

*52,950 ÷ 2 = $26,475*

_Kevin R. Wilson_
**Kevin R. Wilson, Landlord**

_James F Wilson_
**James F. Wilson, Landlord**

_Crapp Farms Danell Crapp_
**Tenant**

_10/7/14_
**Date**

# EXHIBIT E

## CRAPP FAMILY ENTITIES
## CASH FLOW BUDGET

| | Budget 6/1/2017 6/30/2017 | Budget 6/1/2017 7/31/2017 | Budget 7/1/2017 7/31/2017 | Budget 8/1/2017 8/31/2017 | Budget 9/1/2017 9/30/2017 | Budget 10/1/2017 10/31/2017 | Budget 11/1/2017 11/30/2017 | Budget 12/1/2017 12/31/2017 | Calculated Total |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Gross Receipts or Sales | 19,340 | 105,000 | 91,500 | 100,000 | 95,000 | 75,000 | 55,000 | 10,000 | 550,840 |
| 3rd Party Revenue - Excavating | 96,075 | 215,000 | 215,000 | 151,000 | 159,000 | 305,000 | 280,000 | 280,000 | 1,701,075 |
| 3rd Party Revenue - Trucking | | | | | | | | | |
| **Resale of Purchased Livestock** | | | | | | | | | |
| Purch Cattle Sold | 324,534 | 344,256 | 360,448 | 282,464 | | 398,944 | 231,504 | 200,200 | 2,142,350 |
| Purch Pigs Sold | 42,076 | 42,000 | | 211,866 | 148,382 | 211,866 | | 317,875 | 974,065 |
| Resale of Purchased Livestock Total | 366,610 | 386,256 | 360,448 | 494,330 | 148,382 | 610,810 | 231,504 | 518,075 | 3,116,415 |
| **Revenue Total** | 482,025 | 706,256 | 666,948 | 745,330 | 402,382 | 990,810 | 566,504 | 808,075 | 5,368,330 |
| **Cost Of Goods Sold** | | | | | | | | | |
| **Cost of Purchased Livestock Sold** | | | | | | | | | |
| Feeders -90# Calves | | 36,400 | 36,000 | | 24,000 | 43,200 | 24,000 | | 163,600 |
| *(See Below)* *Cattle Grower Gain | | 87,816 | 50,260 | 87,816 | 50,260 | | 87,816 | 50,260 | 414,228 |
| Sows/Pigs - 12# Piglets | | 42,000 | 42,000 | 57,350 | 38,850 | 57,350 | 38,850 | 44,400 | 320,800 |
| Cost of Purchased Livestock Sold Total | 0 | 166,216 | 128,260 | 145,166 | 113,110 | 100,550 | 150,666 | 94,660 | 898,628 |
| **Bedding Cost** | | | | | | | | | |
| Bedding Supply | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 1,600 |
| Bedding Cost Total | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 1,600 |
| **Feed and Supplement Cost** | | | | | | | | | |
| Complete Feed | | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 147,000 |
| Distillers | 3,708 | 11,400 | 12,450 | 9,050 | 7,550 | 10,450 | 9,050 | 14,450 | 78,108 |
| Additives | 11,636 | 14,700 | 17,050 | 26,850 | 9,950 | 30,150 | 10,650 | 9,550 | 130,536 |
| Corn Shelled | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 420,000 |
| Earlage | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 21,600 |
| Feed Haylage | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 20,000 |
| Feed Corn Silage | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 2,800 | 22,400 |
| Feed Hay | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 42,400 |
| Feed Meds | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 35,200 |
| Feed Preparation | | 1,300 | 1,350 | 1,250 | 1,350 | 1,350 | 1,350 | 1,350 | 9,300 |
| Gluten | 2,630 | 10,125 | 11,750 | 10,125 | 11,750 | 10,125 | 11,750 | 10,125 | 78,380 |
| Premix | 1,602 | 8,700 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 79,302 |
| Soybean Meal | 13,386 | 18,000 | 21,188 | 21,188 | 21,188 | 21,188 | 21,188 | 21,188 | 158,514 |
| Feed and Supplement Cost Total | 103,162 | 155,425 | 166,488 | 171,163 | 154,488 | 175,963 | 156,688 | 159,363 | 1,242,740 |
| **Cost Of Goods Sold Total** | 103,362 | 321,841 | 294,948 | 316,529 | 267,798 | 276,713 | 307,554 | 254,223 | 2,142,968 |
| **Gross Margin** | 378,663 | 384,415 | 372,000 | 428,801 | 134,584 | 714,097 | 258,950 | 553,852 | 3,225,362 |

| Expenses | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Insurance Expense** | | | | | | | | | |
| Insurance-Liability | 1,112 | 1,112 | 1,112 | 1,112 | 1,112 | 1,112 | 1,112 | 2,791 | 9,463 |
| Insurance Livestock | 2,280 | 2,280 | 2,280 | 2,280 | 2,280 | 2,280 | 2,280 | 2,280 | 15,960 |
| Insurance-Equipment | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 4,151 |
| Insurance-Vehicle | 5,643 | 5,643 | 3,065 | 5,790 | 5,712 | 12,435 | 8,500 | 8,500 | 52,223 |
| **Insurance Expense Total** | 9,628 | 9,628 | 9,628 | 9,775 | 9,697 | 16,420 | 14,164 | 12,485 | 81,797 |
| **Labor Expense** | | | | | | | | | |
| Insurance- Life | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 677 | 5,416 |
| Medical Expenses | 0 | 125 | 178 | 432 | | 178 | | 117 | 2,277 |
| Labor Taxes | 7,960 | 5,752 | 6,623 | 6,093 | 7,519 | 6,552 | 6,356 | 6,582 | 53,437 |
| Labor Wages | 100,997 | 85,078 | 82,141 | 84,918 | 89,108 | 151,037 | 95,666 | 81,184 | 784,129 |
| Pension 401K Match | 650 | 3,408 | 3,110 | 3,065 | 3,518 | 3,309 | 2,369 | 3,727 / 3,239 | 5,434 |
| Uiota Tax Expense | | | | | | | | | 24,961 |
| Worker's Comp | 16,120 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 43,720 |
| **Labor Expense Total** | 110,284 | 111,160 | 100,394 | 114,238 | 106,460 | 169,413 | 111,026 | 96,399 | 919,374 |
| **Benefits Expense** | | | | | | | | | |
| Health Insurance | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 15,104 |
| **Benefits Expense Total** | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 15,104 |
| **Fuel Expense** | | | | | | | | | |
| Diesel | 42,295 | 57,525 | 53,417 | 68,976 | 58,360 | 57,600 | 54,500 | 64,009 | 456,682 |
| Fuel/Gas | 0 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 700 |
| **Fuel Expense Total** | 42,295 | 57,625 | 53,517 | 69,076 | 58,460 | 57,700 | 54,600 | 64,109 | 457,382 |
| **Marketing Expense** | | | | | | | | | |
| Checkoff | 844 | 844 | 844 | 844 | 844 | 844 | 844 | 844 | 6,752 |
| Commission | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 | 1,491 | 11,928 |
| | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 5,680 |
| **Marketing Expense Total** | 3,045 | 3,045 | 3,045 | 3,045 | 3,045 | 3,045 | 3,045 | 3,045 | 24,360 |
| **Professional Expense** | | | | | | | | | |
| Lite Engineer at Job Site - Excavating | | | 24,000 | | 8,000 | 8,000 | | | 40,000 |
| PD Software - Trucking | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 8,800 |
| **Professional Expense Total** | 1,100 | 1,100 | 25,100 | 1,100 | 9,100 | 9,100 | 1,100 | 1,100 | 48,800 |
| **Rent/Lease Expense (Veh, Mach. & Eq)** | | | | | | | | | |
| Lease Expense (Veh, Mach, & Eq) | 21,469 | 21,469 | 21,469 | 21,469 | 25,915 | 36,104 | 24,916 | 21,469 | 194,280 |
| Rent Equipment - Excavating | 9,873 | 13,494 | 8,940 | 9,176 | 10,000 | 10,000 | 5,000 | 21,469 | 56,483 |
| Repair Equipment - Excavating | 0 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 70,000 |
| Rent Equipment - Trucking | 1,788 | 1,788 | 1,788 | 1,788 | 1,788 | 1,788 | 1,788 | 1,788 | 14,304 |
| Lease Expense - Excavating | | | | 4,446 | 14,635 | 3,447 | | | 22,528 |
| Lease Expense - Trucking | 19,681 | 19,681 | 19,681 | 19,681 | 19,681 | 19,681 | 19,681 | 19,681 | 157,448 |
| **Repair / Maintenance Expense** | | | | | | | | | |
| Repair Equipment - Excavating | 9,873 | 13,494 | 8,940 | 9,176 | 10,000 | 10,000 | | 5,000 | 56,483 |
| Repair Equipment - Trucking | 10,000 | 10,000 | 0 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 70,000 |
| Repair Equipment - Livestock | 2,052 | 0 | 2,500 | 25,000 | 2,500 | 2,500 | | | 29,552 |
| Grower Wash Hog Buildings | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 17,500 |
| **Repair / Maintenance Expense Total** | 24,425 | 25,994 | 21,440 | 46,676 | 22,500 | 15,000 | 17,500 | | 173,535 |
| **Supplies Expense** | | | | | | | | | |
| General Supplies | 6,000 | 6,000 | 3,000 | 6,000 | 3,000 | 3,000 | 3,000 | 6,000 | 30,000 |
| **Supplies Expense Total** | 2,000 | 2,000 | 32,507 | 2,000 | 3,000 | 8,878 | 3,000 | 2,775 | 58,339 |
| Materials - Excavating | 0 | 0 | 32,507 | 21,440 | 46,676 | 10,179 | 22,500 | 3,000 / 8,878 | 58,339 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Office Supplies | 0 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 3,500 |
| Supplies Expense Total | 0 | 8,500 | 36,007 | 8,500 | 8,500 | 13,679 | 12,378 | 3,500 | 9,275 | 91,839 |
| Other Tax Expense | | | | | | | | | |
| Tax & Licenses - Trucking | 0 | 11,012 | 1,497 | 5,375 | 5,375 | 42,838 | 4,660 | | 65,382 |
| Other Tax Expense Total | 0 | 11,012 | 1,497 | 5,375 | 5,375 | 42,838 | 4,660 | | 65,382 |
| Utilities Expense | | | | | | | | | |
| Electric & Phone | 1,665 | 1,665 | 1,665 | 1,665 | 1,665 | 1,665 | 1,665 | 1,665 | 11,655 |
| Hog Facilities | 1,972 | 0 | 0 | 1,972 | 1,972 | 0 | 0 | 1,972 | 5,916 |
| Utilities Expense Total | 3,637 | 1,665 | 1,665 | 3,637 | 3,637 | 1,665 | 1,665 | 3,637 | 17,571 |
| Animal Health Expense | | | | | | | | | |
| Animal Health Pharmaceuticals | 3,494 | 17,650 | 16,450 | 6,985 | 32,850 | 6,350 | 14,300 | 19,650 | 117,729 |
| Animal Health Expense Total | 3,494 | 17,650 | 16,450 | 6,985 | 32,850 | 6,350 | 14,300 | 19,650 | 117,729 |
| Veterinary Services | | | | | | | | | |
| Veterinary Services Expense | 400 | 400 | 1,150 | 350 | 800 | 0 | 450 | 250 | 3,400 |
| Veterinary Services Expense Total | 400 | 400 | 1,150 | 350 | 800 | 0 | 450 | 250 | 3,400 |
| Interest Expense-Other | | | | | | | | | |
| Interest Expense- Equipment Notes | 2,289 | 2,500 | 3,031 | 2,864 | 4,340 | 2,575 | 2,178 | 19,777 |
| Interest Expense -Vehicle Notes | 101 | 99 | 97 | 95 | 93 | 91 | 89 | 665 |
| Interest Expense-Other Total | 2,390 | 2,599 | 3,128 | 2,959 | 4,433 | 2,666 | 2,267 | 20,442 |
| Other Tax Expense | | | | | | | | | |
| Other Tax Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Other Tax Expense Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Miscellaneous | 0 | 0 | 100 | 500 | 0 | 50 | 0 | 250 | 900 |
| Other Expense | 0 | 730 | 0 | 125 | 2,250 | 0 | 750 | 900 | 4,755 |
| Other Expense Total | 0 | 730 | 100 | 625 | 2,250 | 50 | 750 | 1,150 | 5,655 |
| Contract Production Expense | | | | | | | | | |
| Contract Yardage | 8,439 | 6,950 | 8,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 76,389 |
| Contract Production Expense Total | 8,439 | 6,950 | 8,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 76,389 |
| Expenses Total | 192,014 | 281,609 | 285,003 | 307,605 | 380,943 | 340,358 | 261,833 | 264,724 | 2,314,089 |
| Net Income From Operations | 186,649 | 102,806 | 86,997 | 121,196 | (246,359) | 373,739 | (2,883) | 289,128 | 911,273 |
| Other Expenses | | | | | | | | | |
| Other Expense | | | | | | | | | |
| Insurance - Partner Life | 2,507 | 2,507 | 4,452 | 2,507 | 2,507 | 2,507 | 3,092 | 2,702 | 20,274 |
| Other Expense Total | 2,507 | 2,507 | 4,452 | 2,507 | 2,507 | 2,507 | 3,092 | 2,702 | 20,274 |
| Liabilities | | | | | | | | | |
| B&T - Trucking | 1,004 | 1,004 | 1,004 | 1,004 | 1,004 | 1,004 | 1,004 | 1,004 | 7,028 |
| BMO Harris | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 105,000 |
| Loans Adequate Protection | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 |
| Loans Est. Adequate Protection Total | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 | 16,004 |
| Monthly Profit/Loss | 186,649 | 84,295 | 66,541 | 102,685 | (264,870) | 355,228 | (21,979) | 270,422 | 778,971 |